SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

FRUIT STREET HEALTH PBC and
LAURENCE N. GIRARD,

Index No.: 656696/2021

**SECOND AMENDED SUMMONS**

Plaintiffs,

DATE FILED: December 13, 2021

v.

Plaintiffs designate New York County as
the place of trial

GREEN CAPITAL FUNDING, LLC;
YELLOWSTONE CAPITAL, LLC,
ADVANCE MERCHANT SERVICES, LLC;
MAX RECOVERY GROUP, LLC;
YITZHAK STERN; DAVID GLASS;
LMF TRADING GROUP, LLC;
SVP FUNDING, LLC; SALVATORE LASPISA
ANES D. HADZIFEJZOVIC a/k/a ALEX HADZ

The basis of venue is the location of
Defendants.

Defendants.

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve

a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of

appearance, on the plaintiffs' attorneys within 20 days after the service of this summons,

exclusive of the day of service (or within thirty (30) days if this summons is not personally

delivered to you within the State of New York); and in case of your failure to appear or answer,

judgment will be taken against you by default for the relief demanded in the complaint.

Dated:  New York, New York
        December 13, 2021

**WHITE AND WILLIAMS LLP**

By:_____

Shane R. Heskin
7 Times Square
New York, NY  10036
(215) 864-7165
*Attorneys for Plaintiffs*

TO:   LMF Trading Group, LLC
925 Lake Sanford Court
St. Augustine, Florida 32092

Green Capital Funding, LLC
One Evertrust Plaza
Jersey City, New Jersey 07302

Yitzhak D. Stern
220 Surrey Rd.
Hillside, NJ 07205

Yellowstone Capital, LLC
One Evertrust Plaza
Jersey City, New Jersey 07302

Max Recovery
55 Broadway
New York, New York 10006

David Glass
200 E. Las Olas Boulevard
Suite 1600
Fort Lauderdale, FL 33301

SVP Funding, LLC
One Evertrust Plaza
Jersey City, New Jersey 07302

Salvatore Laspisa
119 Monroe Street
Massapequa Park, NY 11762-2421

ANES D. HADZIFEJZOVIC
a/k/a ALEX HADZ
11 Haines Avenue
Clifton, New Jersey 07011-1111

Advance Merchant Services, LLC
116 Nassau Street, Suite 804
New York, New York 10038

Case 1:22-cv-00359-LAK   Document 1-3   Filed 01/14/22   Page 3 of 154

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

FRUIT STREET HEALTH PBC, and
LAURENCE N. GIRARD,

                                 Plaintiffs,          Index No.  656696/2021

v.

GREEN CAPITAL FUNDING , LLC;
YELLOWSTONE CAPITAL, LLC; ADVANCE
MERCHANT SERVICES, LLC; MAX
RECOVERY GROUP, LLC; YITZHAK
STERN; DAVID GLASS; LMF TRADING
GROUP, LLC; SVP FUNDING, LLC;
SALVATORE LASPISA AND ANES D.
HADZIFEJZOVIC a/k/a ALEX HADZ.

                                 Defendants.

---

### SECOND AMENDED COMPLAINT AND DEMAND FOR A TRIAL BY JURY

Plaintiffs Fruit Street Health PBC ("Fruit Street"), and Laurence N. Girard allege as

against Defendants Green Capital Funding, LLC, Yellowstone Capital, LLC, Advance Merchant

Services, LLC, Max Recovery Group, LLC , LMF Trading, LLC, SVP Funding, LLC, Yitzhak

Stern, David Glass, Salvatore Laspisa and Anes D. Hadzifejzovic a/k/a Alex Hadz as follows:

### NATURE OF THE ACTION

1.      This is an action to save a burgeoning, life changing technology business from

Defendants' unlawful predatory lending practices.

2.      Plaintiff Fruit Street Health is a healthcare services provider that delivers the

CDC's National Diabetes Prevention Program via telehealth and live group video conferencing

with registered dietitians. The program is designed to help 88 million Americans living with

prediabetes to avoid developing Type 2 diabetes, an expensive healthcare condition. The National Diabetes Prevention Program has been proven to help individuals with prediabetes reduce their risk for Type 2 diabetes by more than 58% based on Medicare funded research published in the New England Journal of Medicine. Fruit Street is a company owned by more than 500 physicians and is a public benefit corporation focused on having a social impact by improving the health of the public.

3. Fruit Street Health is a public benefit corporation, which unlike traditional C Corporations whose primary interest is maximizing shareholder value, public benefit corporations balance stakeholders' pecuniary interests, the interests of those who are involved and affected by the corporation (such as employees and customers), as well as the advancement of their intended public benefit goal for improving society.

4. Defendant Yellowstone Capital, LLC is one of the largest merchant cash advance ("MCA") companies whose entire scheme preys upon struggling businesses big and small. It uses a network of affiliated companies to carry out its illegal loansharking enterprise, such as Defendants Green Capital, LLC, Advance Merchant Services, LLC, Max Recovery Group, LLC SVP Funding LLC and LMF Trading Group LLC.

5. Yellowstone provides funds to Plaintiffs, and other small businesses, through what it calls MCA agreements or factoring agreements. In actuality, these agreements are unquestionably loans. However, Yellowstone cannot call these transactions what they are (loans) because the whole point of its scheme is to avoid the usury laws of various states, including New York. Thus, in order to charge the unlawful and unconscionable interest rates it seeks to impose, Yellowstone must call them by a different name.

2

6.      As a direct result of this conduct, the Federal Trade Commission and the New Jersey Attorney General filed actions against Yellowstone seeking to stop Yellowstone's unlawful conduct.  *See* Exs. 1 and 2.

7.      In fact, the New Jersey Attorney General's action specifically seeks to enjoin Yellowstone from enforcing the unlawful judgments Yellowstone has obtained in New York. *See* Ex. 1.

8.      The New York Legislature also took swift action banning the very weapon used here by Yellowstone—the confession of judgment—against out-of-state victims.  Unfortunately, the Legislature left its own residents exposed to this predatory tactic.

9.      In or around October 2021, Fruit Street requested a brief pause in payments when Fruit Street could no longer sustain the onerous fixed weekly payments required under the MCA agreement by Green Capital.

10.      Despite this financial strain, Green Capital refused to pause payments and instead filed a confession of judgment due to Fruit Street's inability to pay.

11.      Indeed, as Yellowstone admitted in its recent pleading before the Southern District of New York, "hardship" is not a defense to a merchant's payment obligation under any applicable law.

12.      This judicial admission and the actions of Green Capital in the present case reveal that Yellowstone uses MCA agreements as a mere cover for its unlawful predatory lending enterprise.

13.      In truth and in practice, Yellowstone treats its MCA agreements as loans that are absolutely repayable regardless of whether its victims generate sufficient receipts or not.

3

14.    Yellowstone ensures that these loans are absolutely repayable by designing their MCA agreements to result in a default in the event that its victims cannot pay the suffocating daily payments, which triggers its full recourse protections.

15.    To demonstrate the sham from inception here, Green Capital purported to purchase 49% of Fruit Street's receivables.  On its face, Green Capital knew that Fruit Street could not both operate and pay over 49% of its receivables.  Rather, the 49% stated on the face of the agreement was a mere sham to ensure that Fruit Street would never actually be able to exercise its purported right to reconciliation.

16.    It gets even more fantastic.  By May 2021, Yellowstone had actually purported to purchase 98% of Fruit Street's receivables.  It allegedly purchased 49% on March 19, 2021 through Advance Merchant Services, and it allegedly purchased another 49% through Green Capital on April 7, 2021.

17.    The sham is further demonstrated by the below email among the parties:[1]



**Alex Hadz** <alex@svpfunding.com>
to Laurence ▾

I do appreciate the feedback Laurence, with that said, I would like to point out a few things:

- The factor below is 6 points lower than what you took last time around
- We have quadrupled your approval in comparison to last time
- We have stretched the term by an additional 2 months almost
  - If I have to go to 100 days, I will, but that is the max
- The same goes for net amount
  - If I have to increase to adjust to 100K net, I will
- Last months rev, while yes there was 794K in deposits, there were also 722K in withdrawals
- The rolling active balance is what allows us to get this approval
- Please do not forget the other positions in your account as well
  - Forward
  - Flash Funding
  - Kapitus
  - Fox Business
  - VCG

---

[1] Exs. 4-5.

4

18.     Where to start?  First, the email above admits that the parties are negotiating a payback term of 100 days or less, which would result in a criminally usurious interest rate. Second, the total monthly deposits is admitted to be $794k.  Thus, if the transaction truly was a sale of 49% of Fruit Street's receivables, the monthly amount purchased above would have been nearly $400,000 per month.  The email above relates to the purported purchase of $152,070 in receivables on February 21, 2020.  That would equate to a repayment term of just under two weeks, unless of course it was a paper sham.  Third, the email acknowledges that Fruit Street has already entered into at least five other MCA positions.  Thus, how could Fruit Street sell what has already been sold five times over?  And this was all disclosed in the email above.

19.     Unsurprisingly, in May 2021, Fruit Street ran into the very Catch-22 that these MCA agreements are designed to create.  Due to the amount of receipts generated and the need to pay other necessary business expenses, Fruit Street had two fatal choices:  (1) use whatever cash it had to pay its employees, taxes, rent and insurance and not pay Green Capital; or (2) pay Green Capital and not pay its employees, taxes, rent and insurance.  No matter what Fruit Street chose, it would have been in breach of the MCA agreement.

20.     The sham was further confirmed when Fruit Street requested reduced payments on May 25, 2021.  Both transactions were brokered through Anes D. Hadzifejzovic a/k/a Alex Hadz.  When Fruit Street requested a reduction in payments, Hadz performed no reconciliation. And how could he?  Yellowstone had purportedly purchased 98% of Fruit Street's receivables, rendering the reconciliation provision illusory.  Instead, Anes D. Hadzifejzovic a/k/a Alex Hadz admitted the fraud.  He responded by agreeing to reduce payments on the March 19, 2021 MCA agreement with the daily payment, but told Fruit Street the April 7, 2021 MCA agreement had to

5

stay at $10,000 per week. Why? Here is why: "The weekly we have to stay at reduced 10k for now only due to the large balance for that file."

21.     Thus, Anes D. Hadzifejzovic a/k/a Alex Hadz admitted that the reconciliation provision was a sham, and that the payment amount was tied to the balance owed, not the amount of receivables generated.

22.     Fruit Street was thus left with not a right to a reconciliation, but rather the unilateral dictate of Yellowstone.

23.     Under the terms of the MCA agreements, Fruit Street must warrant and covenant *during the entire term of the agreement* that "there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of merchant." Fruit Street must also warrant and covenant that it will pay all taxes and insurance.

24.     At the same time, Fruit Street must make a fixed weekly payment to Yellowstone regardless of whether it has receipts or not.

25.      Thus, when Fruit Street was faced with this Catch-22, it was at the complete mercy of Yellowstone. Fruit Street had to choose between shutting down a critical healthcare service that benefits more than 30,000 patients in its diabetes prevention program or paying its MCA loans.

26.     Despite advising Green Capital that Fruit Street did not have sufficient receipts to make its required weekly payment, Green Capital turned the account over to its collection arm, Defendant Max Recovery Group (which is led by Vadim Serebro, Yellowstone's former and perhaps current General Counsel), for collection.

27.     To fund its MCAs, Yellowstone uses a network of investors or independent sales organizations. Here, Yellowstone used Defendant LMF Trading Group LLC and SVP Funding

6

LLC, which are run and operated by Defendants Salvatore Laspisa and Anes D. Hadzifejzovic a/k/a Alex Hadz.

28.     At LMF Trading's direction, Max Recovery sent UCC lien notices to customers and non-customers in a bad-faith attempt to extort a settlement under duress. *See* Ex. 3. Among other parties, Max Recovery sent UCC lien notices to doctors who had invested in Fruit Street. Max Recovery even sent a UCC lien notice to a privately owned soccer team that owes no receipts to Fruit Street. Instead, it is a company owned by the guarantor of the Yellowstone MCA agreements, Girard, and was thus sent in a blatant attempt to intimidate and harass.

29.     In addition to sending out UCC lien notices, on October 27, 2021, Green Capital filed a fraudulent judgment by confession against Fruit Street and Girard seeking judgment for more than $350,000. The filing was rejected by the clerk of this Court.

30.     In total, Fruit Street received $960,135, and paid back $1,333,539.

31.     Despite making $373,404 from Fruit Street over a two-year period, Yellowstone, through Green Capital, filed a confession of judgment against Fruit Street, seeking an additional $365,000. In other words, Yellowstone seeks a profit exceeding $738,000.

## **THE PARTIES**

32.     Plaintiff Fruit Street is a public benefit corporation duly organized under the laws of Delaware with its principal place of business located in New York, New York.

33.     Plaintiff Laurence B. Girard is an individual resident and citizen of New York.

34.     LMF Trading Group is a limited liability corporation organized under the laws of Florida with a principal place of business located at 925 Lake Sanford Court, St. Augustine, Florida 32092.

7

35.    On information and belief, SVP Funding LLC is a limited liability corporation organized under the laws of New York with a principal place of business located at One Evertrust Plaza, Jersey City, New Jersey 07302.

36.    Defendant Green Capital Funding, LLC is a limited liability company organized and existing under the laws of the State of New York with its principal offices located at One Evertrust Plaza, Jersey City, New Jersey 07302.

37.    Defendant Advance Merchant Services, LLC is a limited liability company organized and existing under the laws of the State of New York with its principal offices located at 116 Nassau Street, Suit 804, New York, New York 10038.

38.    Defendant Yellowstone Capital, LLC is a limited liability company organized and existing under the laws of the State of New York with its principal offices located at One Evertrust Plaza, Jersey City, New Jersey 07302.

39.    Defendant Max Recovery is a limited liability company organized and existing under the laws of the State of New York with its principal offices located at 55 Broadway, New York, NY 10006.

40.    Defendant Yitzhak Stern is an individual who resides at 220 Surrey Road, Hillside, New Jersey 07205.

41.    Defendant David Glass is an individual who resides at 200 E. Las Olas Boulevard, Suite 1600, Fort Lauderdale, Florida 33301.

42.    Defendant Salvatore Laspisa is an individual who resides at 119 Monroe Street, Massapequa Park, New York 11762-2421.

43.    Defendant Anes D. Hadzifejzovic a/k/a Alex Hadz is an individual who resides at 11 Haines Avenue, Clifton, New Jersey 07011-1111.

8

## JURISDICTION

44.     Defendants are subject to the personal jurisdiction of this Court because each regularly transacts business within the State of New York, has purposefully availed itself of the laws of New York for the specific transactions at issue.

45.     Venue is proper because the underlying judgment was filed in this county.

## FACTUAL BACKGROUND

**A.     Fruit Street's Business.**

46.     Fruit Street delivers the CDC's commercial health plans, employers, to physician practices, and directly to the public via group telehealth video conferencing with registered dietitians, wearable devices such as Fitbit and wireless scales, and a mobile application which allows participants to take photos of their food and receive feedback.

47.     The DPP resulted from clinical work conducted by the Diabetes Prevention Program Research Group, which conducted a major multicenter clinical research study that was published in 2002. The study contained 3,234 participants who were overweight and had prediabetes, and was aimed at discovering whether modest weight loss through dietary changes and increased physical activity or treatment with the oral diabetes drug metformin (Glucophase) was more effective at preventing or delaying type 2 diabetes.

48.     Among its findings, the study showed that people at risk for developing diabetes can prevent or delay the onset of diabetes by losing a modest amount of weight through diet and exercise. DPP participants in the lifestyle intervention group reduced their risk of developing diabetes by 58 percent during the study. Lifestyle changes worked particularly well for participants aged 60 and older, reducing their risk by 71 percent.

9

Case 1:22-cv-00359-LAK   Document 1-3   Filed 01/14/22   Page 12 of 154

49.     Fruit Street is supported by 500 physician investors who invested more than $25 million into the company.

50.     Fruit Street's clinical outcomes have been endorsed by the Centers for Disease Control & Prevention evidenced by the fact that Fruit Street was awarded Full Recognition for its outcomes by the CDC. This means that Fruit Street is consistently delivering high quality healthcare outcomes to individuals with prediabetes

51.     Girard is the founder, President and CEO of Fruit Street.

**B.     The Yellowstone Loans at Issue.**

52.     Yellowstone, through Green Capital, Advance Merchant Services, Laspisa and Anes D. Hadzifejzovic a/k/a Alex Hadz, induced Fruit Street to enter six MCA agreements.

53.     The first usurious loan was with Green Capital on November 14, 2019.

54.     The loan amount was $25,000 and the principal and interest was $36,475.

55.     While on its face, Fruit Street was to repay the loan based on an outrageous 49% of its daily receivables, the parties had actually negotiated and agreed upon a fixed repayment term of three months.  Again, Yellowstone unilaterally included this term to disguise its true nature.

56.     Thus, in order to avoid the usury laws, Yellowstone disguised this fixed daily payment by falsely representing that $598 per day was a good-faith estimate of 49% of Fruit Street's daily receivables.  That was an absolute sham and Yellowstone knew it.

57.     As negotiated and agreed upon by the parties, Yellowstone intended to charge and receive the full repayment amount over six months, which results in a simple interest rate in excess of at least 184%.

10

58. Yellowstone, through Green Capital and Anes D. Hadzifejzovic a/k/a Alex Hadz, induced Fruit Street to enter into a second usurious loan with Green Capital on February 19, 2020.

59. The loan amount was $111,000 and the principal and interest was $152,070.

60. While on its face, Fruit Street was to repay the loan based on an outrageous 49% of its daily receivables, the parties had actually negotiated and agreed upon a fixed repayment term of five months. Again, Yellowstone unilaterally included this term to disguise its true nature.

61. Thus, in order to avoid the usury laws, Yellowstone disguised this fixed daily payment by falsely representing that $1,200 per day was a good-faith estimate of 49% of Fruit Street's daily receivables. That was an absolute sham and Yellowstone knew it.

62. As negotiated and agreed upon by the parties, Yellowstone intended to charge and receive the full repayment amount over four months, which results in a simple interest rate in excess of at least 111%.

63. Yellowstone, through Green Capital and Anes D. Hadzifejzovic a/k/a Alex Hadz, induced Fruit Street to enter into a third usurious loan with Green Capital on June 23, 2020.

64. The loan amount was $154,000 and the principal and interest was $210,980.

65. While on its face, Fruit Street was to repay the loan based on an outrageous 49% of its weekly receivables, the parties had actually negotiated and agreed upon a fixed repayment term of six months. Again, Yellowstone unilaterally included this term to disguise its true nature.

11

Case 1:22-cv-00359-LAK   Document 1-3   Filed 01/14/22   Page 14 of 154

66.     Thus, in order to avoid the usury laws, Yellowstone disguised this fixed daily payment by falsely representing that $7,999 per week was a good-faith estimate of 49% of Fruit Street's daily receivables.  That was an absolute sham and Yellowstone knew it.

67.     As negotiated and agreed upon by the parties, Yellowstone intended to charge and receive the full repayment amount over six months, which results in a simple interest rate in excess of at least 80%.

68.     Yellowstone, through Green Capital and Anes D. Hadzifejzovic a/k/a Alex Hadz, induced Fruit Street to enter into a fourth usurious loan with Green Capital on November 19, 2020.

69.     The loan amount was $250,000 and the principal and interest was $342,500.

70.     While on its face, Fruit Street was to repay the loan based on an outrageous 49% of its daily receivables, the parties had actually negotiated and agreed upon a fixed repayment term of six months.  Again, Yellowstone unilaterally included this term to disguise its true nature.

71.     Thus, in order to avoid the usury laws, Yellowstone disguised this fixed daily payment by falsely representing that $12,685 per week was a good-faith estimate of 49% of Fruit Street's weekly receivables.  That was an absolute sham and Yellowstone knew it.

72.     As negotiated and agreed upon by the parties, Yellowstone intended to charge and receive the full repayment amount over six months, which results in a simple interest rate in excess of at least 74%.

73.     Yellowstone, through Green Capital and Anes D. Hadzifejzovic a/k/a Alex Hadz, induced Fruit Street to enter into a fifth usurious loan with Advance Merchant Services on March 19, 2021.

12

Case 1:22-cv-00359-LAK   Document 1-3   Filed 01/14/22   Page 15 of 154

74. The loan amount was $150,000 and the principal and interest was $218,550.

75. While on its face, Fruit Street was to repay the loan based on an outrageous 49% of its daily receivables, the parties had actually negotiated and agreed upon a fixed repayment term of four months. Again, Yellowstone unilaterally included this term to disguise its true nature.

76. Thus, in order to avoid the usury laws, Yellowstone disguised this fixed daily payment by falsely representing that $3,366 per day was a good-faith estimate of 49% of Fruit Street's daily receivables. That was an absolute sham and Yellowstone knew it.

77. As negotiated and agreed upon by the parties, Yellowstone intended to charge and receive the full repayment amount over six months, which results in a simple interest rate in excess of at least 136%.

78. Yellowstone, through Green Capital and Anes D. Hadzifejzovic a/k/a Alex Hadz, induced Fruit Street to enter into a sixth usurious loan with Green Capital on April 7, 2021.

79. The loan amount was $400,000 and the principal and interest was $547,600.

80. While on its face, Fruit Street was to repay the loan based on an outrageous 49% of its weekly receivables, the parties had actually negotiated and agreed upon a fixed repayment term of 6 months. Again, Yellowstone unilaterally included this term to disguise its true nature.

81. Thus, in order to avoid the usury laws, Yellowstone disguised this fixed weekly payment by falsely representing that $16,996 per week is a good-faith estimate of 49% of Fruit Street's weekly receivables. That was an absolute sham and Yellowstone knew it.

82. As negotiated and agreed upon by the parties, Yellowstone intended to charge and receive the full repayment amount over six months, which results in a simple interest rate in excess of at least 74%.

13

**D.     Yellowstone Intentionally Disguised the True Nature of the Transaction.**

83.     Despite their documented form, the transactions are, in economic reality, loans

that are absolutely repayable.  Among other hallmarks of a loan:

(a)     The Weekly or Daily Payment was fixed and the so-called reconciliation provision was mere subterfuge to avoid this state's usury laws.  Rather, just like any other loan, the Purchased Amount was to be repaid within a specified time;

(b)     The default and remedy provisions purported to hold Fruit Street absolutely liable for repayment of the Purchased Amount.  The loans sought to obligate Fruit Street to ensure sufficient funds were maintained in the Account to make the Weekly Payments and, after only two instances of insufficient funds being maintained in the Account, Fruit Street was in default and, upon default, the outstanding balance of the Purchased Amount purportedly became immediately due and owing;

(c)     While the agreement purported to "assign" all of Fruit Street's future account receivables to Yellowstone until the Purchased Amount was paid, Fruit Street retained all the indicia and benefits of ownership of the account receivables including the right to collect, possess and use the proceeds thereof.  Indeed, rather than purchasing receivables, Yellowstone merely acquired a security interest in Fruit Street's accounts to secure payment of the Purchased Amount;

(d)     The transaction was underwritten based upon an assessment of the Fruit Street's credit worthiness; not the creditworthiness of any account debtor;

(e)     The Purchased Amount was not calculated based upon the fair market value of Fruit Street's future receivables, but rather was unilaterally dictated by Yellowstone based upon the interest rate it wanted to be paid.  Indeed, as part of the underwriting process, Yellowstone did not request any information concerning Fruit Street's account debtors upon which to make a fair market determination of their value;

(f)     The amount of the Daily Payments was determined based upon when Yellowstone wanted to be paid, and not based upon any good-faith estimate of Fruit Street's future account receivables;

(g)     Yellowstone assumed no risk of loss due to Fruit Street's failure to generate sufficient receivables because the failure to maintain sufficient funds in the Account constituted a default under the agreements;

(h)     Yellowstone required that Fruit Street undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the company would continue to operate and generate receivables and a breach of such obligations, representations and warranties constituted a default, which fully

14

protected Yellowstone from any risk of loss resulting from Fruit Street's failure to generate and collect receivables.

(i)      Yellowstone required that Fruit Street grant it a security interest in its receivables and other intangibles and, further that Girard personally guaranteed the performance of the representations, warranties and covenants, which Yellowstone knew were breached from day one.

## D.      Yellowstone and its Employees Admit That its MCA Agreements are Loans

84.      In or around early 2016, Yellowstone and other MCA companies responded to increasing lawsuits and regulatory scrutiny by ensuring that their advertising materials were consistent with the language in their sham agreements.

85.      Yellowstone, however, cannot take back the statements it made about its MCA agreements before it learned that telling the truth was bad for business.

86.      Yellowstone has previously admitted in advertising and promotional materials that it was a direct lender and that its MCA agreements are loans.

87.      Indeed, Yellowstone specifically targets small businesses in need of "a loan":



88.      Yellowstone employees, including its owner, Stern, also have admitted at various times on social media and/or industry forums that Yellowstone is really a lender.

89.      While Yellowstone's employees, at times, have also tried to distinguish MCAs from loans, their description of Yellowstone's MCA program actually reinforces the notion that the transactions are loans.

15

90.     In or around August 2013, Yellowstone retained a professional marketing company to create promotional videos that were marketed to the public on YouTube.

91.     Yellowstone created a channel for the videos, which it called EZBusinessLoans. EZBusinessLoans, *EZBusinessLoans*, YouTube, https://www.youtube.com/channel/UCqIxvb 0kQMfrHcaEFM9nNuw/videos?shelf_id=0&sort=dd&view=0 (last visited Nov. 29, 2017).

92.     The channel contains 15 videos.

93.     The actors in the videos were all employees of Yellowstone.

94.     The premise of each video is that small businesses cannot get approved for a loan from a traditional bank, but anyone with a pulse can get a loan from Yellowstone.

95.     One of the Yellowstone employees portrayed a character by the name of Dr. Daniel Dershowitz, a.k.a., Dynamite Disco Danny.[2]

96.     This video is titled "Bad Credit Business Loans ™ | 855-445-9649." *Id.*

97.     The premise of the video is that Dr. Dershowitz went to Las Vegas after his divorce, whereupon he overindulged, maxed out his credit cards and started dipping into his business account. *Id.* This video clearly targeted these loans for personal consumer use.

98.     Dr. Dershowitz then makes the following statements about his experience with a traditional lender and his experience with Yellowstone:

> When the funds got low, I was in over my head.  The only way out was to get a business loan.  So I went to the bank and when they ran my credit, the lady laughed at me**.  So I went online and found Yellowstone Capital.  I applied for a <u>loan</u> on Monday based on my monthly sales and on Wednesday they gave me my money.**  It's crazy because my heartrate is higher than my credit score.  So if you need money you need to apply right now while their computers are still giving out money to basically any business owner with a pulse. *Id.* (emphasis added).

---

[2] EZBusinessLoans, *Bad Credit Business Loans™ | 855-445-9649*, YouTube (Aug. 2, 2013), https://www.youtube.com/watch?v=WsPZSgnms lE&pbjreload= 10.

16

99.     Below the video is the following link: "CLICK HERE TO APPLY! http://www.yellowstonecap.com/FundsToday." *Id.*

100.    As the video played, subtitles described Yellowstone's MCA program:

Bad credit business loans are, and forever will be, extremely hard to obtain. Luckily, **Yellowstone Capital makes it easy to obtain an <u>unsecured bad credit business loan</u> if you have been turned away by your bank in search of an unsecured bad credit business loan, or unsecured business funding.**

We keep our application process super short, and super easy. Once you submit your application, your business funding offer can be approved in the same day. Many of your clients receive their **<u>bad credit business loans</u>** in as little as three days.

Been turned away for a small business credit card? **Apply at Yellowstone Capital for a <u>bad credit business loan, also known as a business cash advance</u>, or a merchant cash advance.**

Need money for remodeling, upgrades, or to buy a new location? Our small business loans are easy to obtain for these things.

**<u>Our business loans</u>** are unsecured. There are no set minimum monthly payments, which means there are never any late fees. So what are you waiting for? Click the link at the top of the description to get started with your **<u>bad credit business loan</u>** application today! *Id.* (emphasis added).

101.    These videos all link to a loan application Yellowstone's website. *Id.*

102.    On or about April 1, 2013, Stern posted a video titled: "It's Morning in America – Yellowstone Capital Helps Small Business."[3]

103.    The man in the video makes the following statement:

For the past 4 years, Yellowstone Capital has successfully helped small businesses navigate cash flow issues.  With verifiable monthly revenue of just $25,000 through credit card processing or bank statements, **<u>a simple loan</u>** is at your disposal despite FICO score.  We are in this together. Call 877-972-2748 now or visit us at [www.yellowstonecap.com](www.yellowstonecap.com) *Id.* (emphasis added).

104.    Below the video, Yellowstone described its services as follows:

---

[3] Isaac Stern, *It's Morning in America – Yellowstone Capital Helps Small Business*, YouTube (Apr. 1, 2013), https://m.youtube.com/ watch?v=98D9aCaHKbo.

17

**We have the money and we want to help. Let Yellowstone Capital lend you a helping hand today and just see how far we can go together.**

105.    Yellowstone's MCA program is also described as a loan by its employees on various other social media websites.

106.    Nathaniel Kingsley, marketing director for Yellowstone Capital, wrote an article titled: *How to Get Business Money Fast in the Face of Disaster.*

107.    In the article, Kinglsey described cash advances as follows:

Cash advances work as a sort of line of credit. You have access to a set amount, but if you only wind up needing several thousand, you only pay interest on the amount you used. The 'line of credit' model can prove especially helpful to a business rebuilding from disaster, as unforeseen costs associated with rebuilding can appear as you go.[4]

108.    On October 10, 2012, Yellowstone issued a press release describing a new starter advance program.[5] In the press release, Mike Samuels, a seasoned representative for Yellowstone since 2009, states that Yellowstone's MCA is a line of credit: "[a]s long as you currently own a business and are generating revenue, … it's likely that we can find you funding. Structured properly, a starter advance can help to establish the same valuable line of credit that a standard merchant cash advance offers." *Id.*

109.    On May 12, 2015, Yellowstone posted an article on its blog titled: "Yellowstone Has the Options You Need to Stay Ahead of the Competition."[6]

110.    In the article, Yellowstone references one of its ISO reps, Juan Monegro, stating that Juan "knows firsthand just how valuable it can be to have access to the variety of options

---

[4] Nathaniel Kingsley, *How to Get Business Money Fast in the Face of Disaster,* First Class Business (Apr. 18, 2013), http://firstclassbusiness.org/how-to-get-business-money-fast-in-the-face-of-disaster (emphasis added).
[5] *Yellowstone Capital Extends Approvals for Starter Advances,* YELLOWSTONE CAPITAL(Oct. 10, 2012), http://m.yellowstonecap.com/press/release/yellowstone capital-first-to-fund-bank-only-ach-deals/24.

[6] *Yellowstone Has the Options You Need to Stay Ahead of the Competition*, YELLOWSTONE CAPITAL (Nov. 2, 2015), http://yellowstonecap.com/blog/yellowstone-has-options-you-need-stay-ahead-competition/.

18

that Yellowstone offers.  He works with all sorts of deals, ranging from A and B paper deals to ones that are very high risk, even by C and D paper standards."  *Id.*  A, B, C, and D paper are references to the credit risk a lender takes based on a number of factors.

111.    The website Alignable.com launched in January 2014.  Alignable is a free network where small business owners build relationships and generate referrals.  Yellowstone advertises itself as "direct lender" on Alignable:[7]



112.    In 2013, Yellowstone employee, Steve Corlin, also admitted on his Facebook page that Yellowstone's MCAs are loans.  Corlin has been employed by Yellowstone from February 2011 to present.

113.    Specifically, on August 22, 2013, Corlin posted the following: "GET APPROVED FOR A UNSECURED BUSINESS LOAN 24 HOURS A DAY!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!"

114.    Above and below this post are posts relating to advertisements about Yellowstone's business loans with links to Yellowstone's website.

---

[7] *Yellowstone Capital*, ALIGNABLE, https://www.alignable.com/jersey-city-nj/yellowstone-capital# (last visited Nov. 29, 2017).

115.    Corlin also has a linkedin page where he describes his position at Yellowstone as a "Senior Loan Officer."  *Id.*  Corlin describes Yellowstone's services as follows:

> **The merchant cash advances that we offer are an unsecured business loan alternative.** The money that you get as part of your cash advance can be used for everything from renovation work to bringing in more stock. Our business cash advances are there for businesses of all sizes, and businesses from all different niches. If your business is starved of cash and the day to day running of it is nothing short of an impossible mission, you should think about applying for a cash advance in order to remove those financial constraints, **so your business can go on to become profitable and continue to grow once again**.[8]

116.    Fabio Giordano is a Funding Specialist for Yellowstone and has been employed from March 2016 to present.  Giordano also admits Yellowstone is a direct lender:

> **I am a Direct Lender!**
> We Fund the UnBankable!
> I want your B-Z Paper![9]

117.    Simon Gould is a senior underwriter in Yellowstone's Funding Department, and has been employed by Yellowstone from January 2010 to present.  On his LinkedIn page, Gould admits Yellowstone is a direct lender:

> **As a direct lender** we work hard to secure funding and working capital for high risk small business and merchant cash advance deals short term up to 2 million.

Simon Gould, *Simon Gould*, LINKEDIN, https://www.linkedin.com/in/simon-gould-67171065/ (last visited Nov. 29, 2017) (emphasis added).

118.    Dawanna Terry is employed by Yellowstone as a Senior Financial Analyst.  Terry has worked for Yellowstone from April 2015 to present.

119.    Terry describes her position and responsibilities at Yellowstone as follows:

"**Process Financial Loans** For Business To Promote More Working Capital ..."[10]

---

[8] Steve Corlin, *Steve Corlin*, LinkedIn, https://www.linkedin.com/in/steve-corlin-a2b47966/ (last visited Nov. 29, 2017) (emphasis added).
[9] Fabio Giordano, *Fabio Giordano*, LinkedIn, https://www.linkedin.com/in/fabio-giordano-5bb06713b/ (last visited Nov. 29, 2017).

20

Case 1:22-cv-00359-LAK   Document 1-3   Filed 01/14/22   Page 23 of 154

120.    DeBanked.com is a website dedicated to the MCA industry.  DeBanked.com has a forum where users can advertise and/or solicit services.

121.    Yeyfri Garcia is employed by Yellowstone as a Senior Funding Specialist and Senior Member of ISO Development.

122.    On May 12, 2017, a Yellowstone employee posted in a forum on DeBanked.com:

We believe that EVERY DEAL IS FUNDABLE!! – even high risk deals. **With all of our new benefits we almost GUARANTEE your <u>loan approval</u>. We can get you approved in less than 24 hours.**[11]

123.    Jay Marte is employed by Yellowstone.  Marte also referred to Yellowstone as a "direct lender" that offered 1st-10th position funding and prepay discounts for merchants.[12]

124.    Stern likewise admitted that Yellowstone is a lender in one of his posts on DeBanked.com. In an advertisement for an underwriting position, Stern stated that Yellowstone is "[s]eeking an experienced Underwriter in the Small Business Lending space."[13]

## **FIRST CAUSE OF ACTION**

### **Declaratory Judgment, Vacatur of Judgment, and Restitution**

125.    Plaintiffs repeat and re-allege the allegations set forth above herein.

---

[10] Dawanna Terry, *Dawanna Terry*, LinkedIn, https://www.linkedin.com/in/dawanna-terry-341186b9/ (last visited Nov. 29, 2017) (emphasis added).

[11] Ygarcia29, *Become an ISO With Our Company!!*, DeBanked (May 12, 2017, 2:19 PM), https://debanked.com/forums/ showthread.php/1182-Become-an-ISO-with-our-company!!.

[12] Jormanm, *Direct Lend Paying Great Offers For All ISOs*, DeBANKED (April 5, 2017, 12:32 PM), https://debanked.com/forums/show thread.php/1131-Direct-lender-paying-great-offers-for-all-ISOs?p=4847.

[13] Isaacdstern, *Yellowstone Capital / Fundry Seeks MCA Experienced Underwriter*, DeBANKED (Nov. 2, 2015 1:01 PM), http://debanked.com/forums/showthread.php/623-Yellowstone-Capital-Fundry-seeks-MCA-experienced-underwriter.

21

126.   On October 27, 2021, at the direction of LMF Trading, Green Capital filed a confession of judgment representing that Fruit Street had breached the terms of the MCA agreement with Green Capital by ceasing making payments under the agreement.

127.   In addition, Defendants filed a confession of judgment against Girard personally despite alleging that he had breached any of the representations, warranties or covenants triggering the personal guarantee.

128.   Despite knowing that these representations were false, LMF Trading directed Green Capital to file and obtain a judgment by confession against Plaintiffs.

129.   The Transaction between Green Capital and Fruit Street is not truly a purchase of receivables.  Instead, it was simply titled as such in a failed effort to conceal its criminally usurious nature.

130.   That is, the loan made to Fruit Street charged an interest rate exceeding twenty-five percent.  The loan therefore violated N.Y. Penal Law § 190.40 and is void and unenforceable.

131.   As noted above, Yellowstone entered the Transaction with the specific intent of charging interest in excess of twenty-five percent, rendering the Transaction criminally usurious *per se* under N.Y. Penal Law § 190.40.

### SECOND CAUSE OF ACTION
### (RICO:  18 U.S.C. § 1962)

132.   Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

**A.     The Unlawful Activity.**

133.   More than a dozen states, including New York, place limits on the amount of interest that can be charged in connection with providing a loan.

22

Case 1:22-cv-00359-LAK Document 1-3 Filed 01/14/22 Page 25 of 154

134.    In 1965, the Legislature of New York commissioned an investigation into the illegal practice of loansharking, which, prior to 1965, was not illegal with respect to businesses.

135.    As recognized by the New York Court of Appeals in *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on Investigation entitled An Investigation of the Loan-Shark Racket brought to the attention of the Governor and the public the need for change in both, as well as for change in the immunity statute, and for provisions making criminal the possession of loan-shark records and increasing the grade of assault with respect to the "roughing up tactics" used by usurious lenders to enforce payment."

136.    As a result of this Report, a bill was proposed to allow corporations to interpose the defense of usury in actions to collect principal or interest on loans given at interest greater than twenty-five percent per annum.

137.    This measure was deemed vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of criminal usury.

138.    As noted above, loan-sharks with full knowledge of the prior law, made it a policy to loan to corporations.

139.    The investigation also disclosed that individual borrowers were required to incorporate before being granted a usurious loan.

140.    Like here, this was a purely artificial device used by the loanshark to evade the law—an evasion that the Legislature sought to prevent.

141.    Among other things, the Report recognized that "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted."

23

### B.    Culpable Persons.

142.    Glass, Stern, Laspisa, Anes D. Hadzifejzovic a/k/a Alex Hadz, and Max Recovery are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation or limited liability company capable of holding a legal interest in property.

143.    At all relevant times, each of Glass, Stern, Laspisa, Anes D. Hadzifejzovic a/k/a Alex Hadz, and Max Recovery was, and is, a person that exists separate and distinct from the Enterprise, described below.

144.    Glass has an ownership interest in Yellowstone and is the mastermind of the Enterprise.

145.    Stern has an ownership interest in Yellowstone, and was the Chief Executive Officer of Yellowstone at all relevant times.

146.    On information and belief, Anes D. Hadzifejzovic a/k/a Alex Hadz has an ownership interest in LMF Trading, and was Funding Specialist with LMF Trading at all relevant times.

147.    On information and belief, Laspisa has an ownership interest in SVP Funding, and was Funding Specialist with LMF Trading at all relevant times.

148.    SVP funds and administers loans on behalf of the Enterprise.

149.    LMF Trading funds and administers loans on behalf of the Enterprise.

150.    Max Recovery is the collection arm of the Enterprise.

151.    Through their operation of Yellowstone, LMF Trading and Max Recovery, the RICO Persons solicit, underwrite, fund, service and collect upon lawful debt incurred by small businesses in states that do not have usury laws.

24

## C.       The Enterprise.

152.    Yellowstone, Green Capital Funding, Advance Merchant Services, LMF, SVP and Max Recovery, constitute an Enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

153.    Yellowstone, Green Capital Funding, Advance Merchant Services, LMF, SVP and Max Recovery are associated in fact and through relations of ownerships for the common purpose of carrying on an ongoing unlawful enterprise.  Specifically, the Enterprise has a common goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states.

154.    Since at least 2012 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States.

155.    The debt, including such debt evidenced by the Agreements, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes and (ii) the rates are more than twice the legal rate permitted under New York Penal Law §190.40.

156.    Since at least 2012 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of collecting upon fraudulent fees through electronic wires.

25

Case 1:22-cv-00359-LAK   Document 1-3   Filed 01/14/22   Page 28 of 154

157.    The Enterprise's conduct constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343, which is "racketeering activity" as defined by 18 U.S.C. 1961(1).  Its repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutes a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

### D.    The Roles of the RICO Persons in Operating the Enterprise, and the roles of the individual companies within the Enterprise.

158.    The RICO Persons have organized themselves and the Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

### i.    David Glass

159.    Glass is an owner and the mastermind of the Enterprise.  Together with Stern, Glass is responsible for the day-to-day operations of the Enterprise and has final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

160.    In his capacity as the mastermind of the Enterprise, Glass, together with Stern, is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used by the Enterprise to collect upon the

26

unlawful debt if the borrower defaults upon its obligations.  All such forms were used to make and collect upon the unlawful loans.

161.    Glass has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

162.    While Glass purports to have divested from Yellowstone prior to the transactions at issue, Glass in fact maintained an interest, operating the company through Stern.

163.    Additionally, Glass's continued involvement in the management of Yellowstone is evidenced by a January 17, 2019 text message exchange with Tsvi Davis, regarding Davis's desire to divest himself of Yellowstone equity:

DAVIS: Hey I'm looking to get rid of my equity of Yellowstone. I'm looking into my options of selling it and have some intrest [sic] from some people. Any intrest [sic] in taking it over and saving all the trouble?
Glass: Are you familiar with a local governmental employee call [sic] the NEW YORK STATE ATTORNEY GENERAL?
DAVIS: lol
DAVIS: Yes
GLASS: I'm on a flight
GLASS: Call u after
DAVIS: Ok what's the prob with all of that?
DAVIS: I don't think it's in anyone's best intrest [sic] for me to have eq
DAVIS: So I got to see what my options are to sell it
GLASS: we are living on different planets. you are trying to cash out and we are hoping to not be charged
GLASS: I doubt you have any options right now
GLASS: Let's see if we can get thru this
DAVIS: Not looking to cash out and win the lottery. Looking to cut ties and get discounted price for it. Or try to get someone else to buy in which obviously you have first right and tag along options but looking at all options and not looking to wait months to do it
GLASS: Probably best u wait for the IPO no?
DAVIS: Lol

27

Case 1:22-cv-00359-LAK   Document 1-3   Filed 01/14/22   Page 30 of 154

DAVIS: I'm not a fan of penny stocks

GLASS: The company is up to its *** in lawsuits and government investigations. The industry is under a microscope. There is no market for these shares at all. All there is now is unlimited personal liability all around.

164.    Glass has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to the Enterprise.

**ii.    Yitzhak Stern**

165.    Stern is an owner of Yellowstone and was its Chief Executive Officer at all relevant times. Together with Glass, Stern is responsible for the day-to-day operations of the Enterprise and has final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

166.    In his capacity as the day-to-day leader of the Enterprise, Stern, together with Glass, is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations. All such forms were used to make and collect upon the unlawful loans.

167.    Stern has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, soliciting and recruiting members

28

Case 1:22-cv-00359-LAK   Document 1-3   Filed 01/14/22   Page 31 of 154

of the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

168.     Stern has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to the Enterprise.

### iii.     Anes D. Hadzifejzovic a/k/a Alex Hadz

169.     Anes D. Hadzifejzovic a/k/a Alex Hadz is a Funding Specialist with Yellowstone. Although he purports to operate as a funding specialist with LMF Trading Group, the corporate name is a sham.   In reality, LMF Trading is a hidden affiliate of Yellowstone. Anes D. Hadzifejzovic a/k/a Alex Hadz is responsible for the day-to-day funding operations of the Enterprise and had final say on the funding decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

170.     In his capacity as the day-to-day funder of the Enterprise, Anes D. Hadzifejzovic a/k/a Alex Hadz is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations.   All such forms were used to make and collect upon the unlawful loans.

29

Case 1:22-cv-00359-LAK   Document 1-3   Filed 01/14/22   Page 32 of 154

171.    Anes D. Hadzifejzovic a/k/a Alex Hadz  has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, soliciting and recruiting members of the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

172.    Anes D. Hadzifejzovic a/k/a Alex Hadz has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to the Enterprise.

### iv.    Salvatore Laspisa

173.    Laspisa is a Funding Specialist with Yellowstone.  Although he purports to operate as a funding specialist with SVP, the corporate name is a sham.  In reality, SVP is a hidden affiliate of Yellowstone.  Laspisa is responsible for the day-to-day funding operations of the Enterprise and had final say on the funding decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

174.    In his capacity as the day-to-day funder of the Enterprise, Laspisa is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used by the Enterprise to collect upon the unlawful debt if the

30

Case 1:22-cv-00359-LAK   Document 1-3   Filed 01/14/22   Page 33 of 154

borrower defaults upon its obligations.  All such forms were used to make and collect upon the unlawful loans.

175.    Laspisa has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, soliciting and recruiting members of the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

176.    Laspisa has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to the Enterprise.

###### v.    Yellowstone, Green Capital, and Advance Merchant Services

177.    Yellowstone is organized under the laws of New York and maintains officers, books, records, and bank accounts independent of Max Recovery and LMF Trading.  Green Capital, and Advance Merchant Services are wholly owned and controlled by Yellowstone.

178.    Glass, Stern, Laspisa and Anes D. Hadzifejzovic a/k/a Alex Hadz have operated Yellowstone as part of an unlawful enterprise to collect upon unlawful debt and commit wire fraud. Pursuant to its membership in the Enterprise, Yellowstone has: (i) entered into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation agreements with Investors to fund the usurious loans; (ii) pooled the funds of Investors in order to fund each usurious loan; (iii) underwritten the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entered into the so-called merchant agreements on behalf of the Enterprise; (v) serviced the usurious loans; (vi) set-up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) obtained judgments in its name to further collect upon the unlawful debt.

31

Case 1:22-cv-00359-LAK  Document 1-3  Filed 01/14/22  Page 34 of 154

179.    In this case, Yellowstone, through Defendants: (i) solicited borrowers; (ii) pooled funds from Investors to fund the Agreements; (iii) underwrote the Agreements; (iv) entered into the Agreements; and (v) collected upon the unlawful debt evidenced by the Agreements by effecting daily ACH withdrawals from the bank accounts of Fruit Street.

### vi.    LMF Trading

180.    LMF Trading is a funding arm of Yellowstone.    It maintains separate officers, books, records, and bank accounts independent of the other Defendants.

181.    Directly and through their members, agent officers, and/or employees, LMF Trading has been and continues to be responsible for providing Yellowstone with all or a portion of the pooled funds necessary to fund the usurious loans, including the Agreements, and to approve and ratify the Enterprise's efforts to collect upon the unlawful debts by, among other things, approving early payoff terms, settlement agreements and other financial arrangements with borrowers to collect upon the unlawful debt.

182.    LMF Trading ultimately benefits from the Enterprise's unlawful activity when the proceeds of collecting upon the unlawful debts are funneled to the Investors according to their level of participation in the usurious loans.

### vii.    SVP Funding

183.    SVP Funding is a funding arm of Yellowstone.    It maintains separate officers, books, records, and bank accounts independent of the other Defendants.

184.    Directly and through their members, agent officers, and/or employees, SVP has been and continues to be responsible for providing Yellowstone with all or a portion of the pooled funds necessary to fund the usurious loans, including the Agreements, and to approve and ratify the Enterprise's efforts to collect upon the unlawful debts by, among other things,

32

Case 1:22-cv-00359-LAK  Document 1-3  Filed 01/14/22  Page 35 of 154

approving early payoff terms, settlement agreements and other financial arrangements with borrowers to collect upon the unlawful debt.

185.    SVP ultimately benefits from the Enterprise's unlawful activity when the proceeds of collecting upon the unlawful debts are funneled to the Investors according to their level of participation in the usurious loans.

> **viii.    Max Recovery**

186.    Max Recovery is a debt collection arm of Yellowstone.  It maintains officers, books, records, and bank accounts independent of the other Defendants.

187.    Upon default of a borrower's obligations under the usurious loan agreements and in furtherance of the Enterprise's goal of collecting upon the unlawful debt, at the direction of Defendants, Max Recovery collects upon the unlawful debt by falsely representing to third parties that the transactions constitute the sale and purchase of future receivables, by, among other things, sending out UCC lien notices to third parties.

188.    Together with these UCC lien notices and in furtherance of the Enterprise's goal of collecting upon the unlawful debt, Max Recovery has sent thousands of UCC lien notices to third parties all across the country.  In reliance upon the false representations that the transactions are true purchases of receipts under the UCCC, Yellowstone and Defendants, have caused third parties to withhold payment from Fruit Street and other merchants, and/or pay Max Recovery directly.  The sending of these UCC lien notices constitutes the collection of an unlawful debt.

> **E.    Interstate Commerce**

189.    The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

INDEX NO. 656696/2021

RECEIVED NYSCEF: 12/13/2021

Case 1:22-cv-00359-LAK   Document 1-3   Filed 01/14/22   Page 36 of 154

190.    Specifically, members of the Enterprise maintain offices in New York and New Jersey and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities in New York, including Fruit Street, and throughout the United States via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

191.    In the present case, all communications between the members of the Enterprise, Fruit Street were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications. Specifically, the Enterprise used interstate emails to originate, underwrite, service and collect upon the Agreements, fund the advances under each of the Agreements and collect the Daily Payments via interstate electronic ACH debits.

192.    In addition, at the direction of Defendants, each of the Agreements was executed in states outside of New Jersey, and original copies of the Agreements and the applicable Confession Affidavits were sent from New York to the Enterprise, through Defendants, at their offices in New Jersey via Federal Express using labels prepared by Defendants.

**F.    Injury and Causation.**

193.    Plaintiffs have and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial.

194.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, hundreds of thousands of dollars in improperly collected criminally usurious loan payments and the unlawful entry and enforcement of judgments.

34

Case 1:22-cv-00359-LAK   Document 1-3   Filed 01/14/22   Page 37 of 154

195.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

196.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

## SECOND CAUSE OF ACTION
### (Conspiracy under 18 U.S.C. § 1962(d))

197.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

198.    Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

199.    By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendants concerning the underwriting, funding, servicing and collection of the unlawful loans, including the Agreements, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role.  Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

200.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts, including the Agreements, in violation of 18 U.S.C. § 1962(c).  In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and

35

Case 1:22-cv-00359-LAK   Document 1-3   Filed 01/14/22   Page 38 of 154

execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the Agreements.

201.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

202.    The participation and agreement of each Defendant were necessary to allow the commission of this scheme.

203.    Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at the hearing.

204.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars in improperly collected loan payments.

205.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

206.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendant, and seek an order from the Court:

a)      Vacating the judgment by confession, if entered by the clerk;

b)      Declaring each of Plaintiffs' agreements with Defendants to be a usurious loan in violation of New York Penal Law §190.40 and thus void and unenforceable;

36

Case 1:22-cv-00359-LAK   Document 1-3   Filed 01/14/22   Page 39 of 154

a)      Awarding compensatory, direct, and consequential damages, including prejudgment interest, in an amount to be determined at trial;

b)      Awarding treble damages;

c)      Requiring Defendants to pay Plaintiffs' attorneys' fees and costs; and

d)      Granting such other and further relief as this Court deem just and proper.

### **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues properly so tried.

Dated:  December 13, 2021

**WHITE AND WILLIAMS LLP**

By: _____

Shane R. Heskin
7 Times Square, Suite 2900
New York, NY 10036-6524
(215) 864-6329
heskins@whiteandwilliams.com
*Attorneys for Plaintiffs*

37

28146508v.1

# EXHIBIT 1

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
Division of Law
124 Halsey Street - 5th Floor
P.O. Box 45029-5029
Newark, New Jersey 07101
Attorney for Plaintiffs

By:     Chanel Van Dyke (165022015)
        Deputy Attorney General
        (973) 648-7819

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION, HUDSON COUNTY
DOCKET NO. _____

| | |
|---|---|
| GURBIR S. GREWAL, Attorney General of the State of New Jersey, and PAUL R. RODRÍGUEZ, Acting Director of the New Jersey Division of Consumer Affairs,<br><br>                                    Plaintiffs,<br><br>                    v.<br><br>YELLOWSTONE CAPITAL LLC; FUNDRY.US LLC; HIGH SPEED CAPITAL LLC; WORLD GLOBAL CAPITAL LLC d/b/a YES FUNDING; HFH MERCHANT SERVICES LLC; MCA RECOVERY LLC; GREEN CAPITAL FUNDING LLC; MAX RECOVERY GROUP LLC; and JANE and JOHN DOES 1-10, individually and as owners, officers, directors, shareholders, founders, managers, members, agents, servants, employees, representatives and/or independent contractors of YELLOWSTONE CAPITAL LLC, FUNDRY.US LLC, HIGH SPEED CAPITAL LLC, WORLD GLOBAL CAPITAL LLC d/b/a YES FUNDING, HFH MERCHANT SERVICES LLC, MCA RECOVERY LLC, GREEN CAPITAL FUNDING LLC, and MAX RECOVERY GROUP LLC; and XYZ CORPORATIONS 1-10,<br><br>                                    Defendants. | Civil Action<br><br><br><br><br>**COMPLAINT** |

Plaintiffs Gurbir S. Grewal, Attorney General of the State of New Jersey ("Attorney General"), with offices located at 124 Halsey Street, Fifth Floor, Newark, New Jersey, and Paul R. Rodríguez, Acting Director of the New Jersey Division of Consumer Affairs ("Director") (collectively, "Plaintiffs"), with offices located at 124 Halsey Street, Seventh Floor, Newark, New Jersey, by way of Complaint, state:

## PRELIMINARY STATEMENT

1.      The Attorney General and the Director commence this action against New Jersey-based Yellowstone Capital LLC ("Yellowstone"); Yellowstone's parent Fundry.US LLC ("Fundry"); Yellowstone's subsidiaries High Speed Capital LLC ("High Speed"), World Global Capital LLC d/b/a YES Funding ("World Global"), HFH Merchant Services LLC ("HFH"), Green Capital Funding LLC ("Green Capital"), and MCA Recovery LLC ("MCA Recovery"); and Yellowstone's affiliate Max Recovery Group LLC ("Max Recovery").[1] Defendants, acting in concert with each other as well as other third-party entities and individuals, have engaged in unconscionable business practices, deceived consumers, and/or made false or misleading statements in the (i) sale of unlawful, predatory and usurious loans to small businesses and their owners, which Defendants masked as merchant cash advances ("MCAs"); (ii) marketing and advertising of the purported MCAs; and (iii) servicing and collection of the purported MCAs.

2.      The Yellowstone MCA Defendants have advertised, marketed, offered, and sold short-term, high-cost financing to small businesses and their owners who need quick access to funds but who may not qualify for traditional financing such as bank loans. Under their "Merchant

---

[1] Yellowstone, Fundry, High Speed, World Global, HFH, and Green Capital are, collectively, the "Yellowstone MCA Defendants." MCA Recovery and Max Recovery are, collectively, the "MCA Collection Defendants." The "Defendants" include all named and unnamed entity and individual defendants.

Agreement" contracts with small businesses and their owners ("Consumers"), the Yellowstone MCA Defendants have purported to provide an MCA—a lump sum payment to purchase a portion of a business's future receivables at a discount—to be repaid by the Consumer as set forth in the contract. Yellowstone has induced these Consumers—often struggling, unsophisticated small businesses whose owners have "bad credit" or need "fast cash"—to enter the Merchant Agreements with false and misleading advertising promising MCAs with flexible repayment terms that are tied to the business's receivables and that do not require the owner's personal guarantee.

3.     In reality, the Yellowstone MCA Defendants' Merchant Agreements have subjected Consumers to far less favorable repayment terms than the Consumers would have enjoyed under a legitimate MCA contract, and Defendants have doubled down on their abuse of Consumers through numerous unconscionable, deceptive, and fraudulent servicing and collection practices. Among other things, the Yellowstone MCA Defendants drafted their Merchant Agreements to bury myriad unconscionable terms that, among other things, eliminate the distinctions between loans (with fixed regular payments over a defined term) and legitimate MCAs (with variable payments tied to actual receivables and an undefined term) that Yellowstone touts in its advertising. Under these Merchant Agreements, unlike legitimate MCA contracts, the fixed daily payments extracted from Consumers' accounts have little to no relation to the businesses' receivables, and Consumers whose businesses are struggling have been either stymied in their efforts to adjust their daily payment amounts or driven by Defendants into an even worse financial situation. Meanwhile, the Yellowstone MCA Defendants have, through various other devices, shifted risk onto Consumers—both businesses and their owners—in ways that are inconsistent with legitimate MCA contracts and that have facilitated Defendants' unconscionable collection practices. In short, by masking their MCAs as purchases of accounts receivable, as opposed to

what they really are—unlawful and usurious loans—Defendants have sought to avoid responsibility for their predatory lending.

4.      Defendants' misconduct has led to the financial ruin of small businesses and owners across the United States.  As of 2017, Yellowstone had reported advancing $553 million to small businesses.  From 2012 to 2018, MCA companies collected more than $1.5 billion in judgments through the filing of over 25,000 Confessions of Judgment ("COJs").  Yellowstone was responsible for 25% of those filings, making it the biggest filer by far in the MCA industry—an industry that stands to grow substantially as a result of the COVID-19 pandemic, which has caused large numbers of small businesses to struggle and close.

5.      For the reasons stated herein, Plaintiffs bring this action to seek redress for Defendants' violations of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 to -226 ("CFA"), and the Regulations Governing General Advertising, N.J.A.C. 13:45A-9.1 to -9.8 ("Advertising Regulations").  Plaintiffs therefore seek to permanently enjoin Defendants' unconscionable and deceptive business practices, and to recover statutory civil penalties, consumer restitution, and other equitable and monetary relief.

## PARTIES AND JURISDICTION

6.      The Attorney General is charged with the responsibility of enforcing the CFA and the Advertising Regulations.  The Director is charged with the responsibility of administering the CFA and the Advertising Regulations on behalf of the Attorney General.  Plaintiffs bring this action pursuant to their authority under the CFA, specifically N.J.S.A. 56:8-8, 56:8-11, 56:8-13, and 56:8-19.

7.      Venue is proper in Hudson County, pursuant to R. 4:3-2, because it is a county in which Defendants have done business.

Case 1:22-cv-00359-LAK   Document 1-3   Filed 01/14/22   Page 45 of 154

8.      Defendant Yellowstone is the primary business platform from which Defendants operate.  Yellowstone is a limited liability company established in New York and registered to do business in New Jersey on July 16, 2015.  Yellowstone presently maintains a principal place of business located at 1 Evertrust Plaza, 14th Floor, Jersey City, New Jersey 07302.

9.      Yellowstone's registered agent in New Jersey is Yitzhak Stern, who maintains a mailing address at 1 Evertrust Plaza, Suite 1401, Jersey City, New Jersey 07302.

10.     Defendant Fundry is Yellowstone's parent corporation. Fundry is a limited liability company established in New Jersey on May 26, 2016, with a principal place of business at 1 Evertrust Plaza, Suite 1401, Jersey City, New Jersey 07302.

11.      Fundry's registered agent in New Jersey is Fundry.US, which maintains a mailing address at 1 Evertrust Plaza, 14th Floor, Attention B. Klein, Jersey City, New Jersey 07302.

12.     Defendant High Speed is Yellowstone's wholly owned subsidiary.  High Speed is a limited liability company established in New York on May 5, 2014.  Upon information and belief, High Speed presently maintains a principal place of business and mailing address at 1 Evertrust Plaza, 14th Floor, Jersey City, New Jersey 07302.  High Speed failed to register in New Jersey pursuant to N.J.S.A. 14A:13-3(1), despite doing business in New Jersey and, upon information and belief, maintaining a principal place of business in New Jersey.

13.     High Speed's registered agent in New York is Business Filings Incorporated, which maintains a mailing address at 187 Wolf Road, Suite 101, Albany, New York 12205.

14.     Defendant World Global is Yellowstone's wholly owned subsidiary.  World Global is a limited liability company established in New York on June 27, 2016.  Upon information and belief, World Global presently maintains a principal place of business located at 1 Evertrust Plaza, 14th Floor, Jersey City, New Jersey 07302.  World Global failed to register in New Jersey pursuant

to N.J.S.A. 14A:13-3(1), despite doing business in New Jersey and, upon information and belief, maintaining a principal place of business in New Jersey.

15.    World Global's registered agent in New York is Business Filings Incorporated, which maintains a mailing address at 187 Wolf Road, Suite 101, Albany, New York 12205.

16.    Defendant HFH is Yellowstone's wholly owned subsidiary.  HFH is a limited liability company established in New York on January 9, 2017.  Upon information and belief, HFH presently maintains a principal place of business and mailing address at 1 Evertrust Plaza, 14th Floor, Jersey City, New Jersey 07302.  HFH failed to register in New Jersey pursuant to N.J.S.A. 14A:13-3(1), despite doing business in New Jersey and, upon information and belief, maintaining a principal place of business in New Jersey.

17.    HFH's registered agent in New York is Business Filings Incorporated, which maintains a mailing address at 187 Wolf Road, Suite 101, Albany, New York 12205.

18.    Defendant Green Capital is Yellowstone's wholly owned subsidiary.  Green Capital is a limited liability company established in New York on April 28, 2015.  Green Capital presently maintains a principal place of business and mailing address at 1 Evertrust Plaza, 14th Floor, Jersey City, New Jersey 07302.  Green Capital has never registered as a business in New Jersey as required pursuant to N.J.S.A. 14A:13-3(1), despite doing business in New Jersey and maintaining a principal place of business in New Jersey.

19.    Green Capital's registered agent in New York is Business Filings Incorporated, which maintains a mailing address at 187 Wolf Road, Suite 101, Albany, New York 12205.

20.    Defendant MCA Recovery is Yellowstone's wholly owned subsidiary.  MCA Recovery is a limited liability company established in New York on November 30, 2012.  Upon

information and belief, MCA Recovery presently maintains a principal place of business and mailing address at 17 State Street, Suite 4000, New York, New York 10004.

21.    MCA Recovery's registered agent in New York is Business Filings Incorporated, which maintains a mailing address at 187 Wolf Road, Suite 101, Albany, New York 12205.

22.    Defendant Max Recovery is a debt collection company affiliated with Yellowstone. Max Recovery is a limited liability company established in New York on January 18, 2017. Upon information and belief, Max Recovery presently maintains a principal place of business and mailing address at 55 Broadway, 3rd Floor, New York, New York 10006.

23.    Max Recovery's registered agent in New York is Business Filings Incorporated, which maintains a mailing address at 187 Wolf Road, Suite 101, Albany, New York 12205.

24.    At various times, Defendant Yellowstone employed, contracted with, and/or acted through and in concert with a web of third parties, including entities and/or individuals described by Yellowstone as Independent Funding Organizations ("Funders"), Independent Sales Organizations ("ISOs"), and Sales Representatives (collectively, "Third Parties"), in its MCA transactions with Consumers.

25.    Upon information and belief, Jane and John Does 1 through 10 are fictitious individuals meant to represent the owners, officers, directors, shareholders, founders, managers, members, agents, servants, employees, representatives, and/or independent contractors of Yellowstone, Fundry, High Speed, World Global, HFH, MCA Recovery, Green Capital, and/or Max Recovery, who have been involved in the conduct that gives rise to this Complaint, but are heretofore unknown to the Plaintiffs. As these defendants are identified, Plaintiffs shall amend this Complaint to include them.

26.    Upon information and belief, XYZ Corporations 1 through 10 are fictitious entities

meant to represent any additional entities that have been involved in the conduct that gives rise to this complaint, but are heretofore unknown to the Plaintiffs. As these defendants are identified, Plaintiffs shall amend this Complaint to include them.

<u>**GENERAL ALLEGATIONS COMMON TO ALL COUNTS**</u>

27. Since at least July 2015, the Yellowstone MCA Defendants—Yellowstone, Yellowstone's parent Fundry, and Yellowstone's subsidiaries High Speed, World Global, HFH, and Green Capital—in concert with each other and related or affiliated entities and the Third Parties, have advertised, marketed, offered for sale, and sold MCAs to Consumers in this State and elsewhere, and have serviced the repayment of the MCAs by such Consumers. The MCA Collection Defendants—MCA Recovery and Max Recovery—in concert with the Yellowstone MCA Defendants and/or other related or affiliated Third Parties, have engaged in debt collection from Consumers on behalf of the Yellowstone MCA Defendants.

28. The Yellowstone MCA Defendants purport to provide Consumers an MCA—a lump sum payment to purchase a portion of a business's future receivables at a discount—to be repaid by the Consumers as set forth in the Yellowstone MCA Defendants' Merchant Agreements.

29. As set forth herein, however, the Yellowstone MCA Defendants' Merchant Agreements contain numerous unconscionable terms that, among other things, cause them to operate as unlawful, usurious loans rather than legitimate MCAs. The Yellowstone MCA Defendants, and Yellowstone in particular, relied on false and misleading advertising and misrepresentations to induce Consumers to enter their unlawful, one-sided Merchant Agreements. And, once they induced Consumers to enter the Merchant Agreements, Defendants engaged in myriad unconscionable, deceptive, and fraudulent practices in connection with servicing the repayment of the MCAs and collection of debts they alleged to be owed on those MCAs.

## A.    Background on MCAs

30.    In a typical merchant agreement involving the purchase and sale of receivables, a small business agrees to sell a percentage of its future receivables in exchange for a lump sum payment—an MCA.  The business agrees to a repayment amount exceeding the amount of the MCA, and that amount is repaid through daily payments reflecting a percentage of the business's estimated average daily receivables (with that percentage being equal to the percentage of the business's receivables purchased by the MCA company).

31.    Estimated daily payments typically are calculated based on a review of several months of receivables. That information is used to determine the business's average monthly receivables, which are then divided by the average number of business days in a month to determine the average daily receivables. The average daily receivables are then multiplied by the percentage of receivables purchased by the MCA company to calculate the estimated daily payments.

32.    Unlike a loan, a legitimate MCA contract does not guarantee the issuer regular payments or payment over a fixed, finite term. Instead, if a business's receivables change over time, its daily payment amount can be adjusted through a process called "reconciliation." A decrease in receivables decreases the merchant's daily payments, and the MCA will be repaid over a longer period. In addition, the MCA company's recourse in the event of default typically lies with the small business's receivables.

33.    The variability and lack of security associated with legitimate MCA contracts create certain risks for the MCA company – and corresponding protections for the merchant – in the event of a downturn in the merchant's business. In part because legitimate MCAs, unlike traditional closed-end installment loans, do not involve fixed regular payments and a finite repayment period,

MCAs generally are excluded from certain consumer protections that apply to loans, such as usury caps.

**B.** **The Yellowstone MCA Defendants' Merchant Agreements Include Numerous Unconscionable Terms and Conditions and Are Implemented in an Unconscionable Manner**

34.     Although the Yellowstone MCA Defendants' Merchant Agreements were presented to Consumers as MCA contracts, the Merchant Agreements include numerous terms and conditions that made them substantially less favorable to Consumers than typical MCA contracts, that were individually and collectively unconscionable, and that were implemented by Defendants in an unconscionable manner.

**1.** **Yellowstone Advertised the Merchant Agreements As Having the Benefits of Typical MCA Contracts**

35.     Notwithstanding the disadvantageous terms and conditions that distinguished the Yellowstone MCA Defendants' Merchant Agreements from typical MCA contracts, Yellowstone specifically touted the substantial distinctions between traditional loans and MCAs in its marketing to small business owners in need of "fast cash" or with bad credit.

36.     Yellowstone's advertising described its MCA repayment terms as flexible, "not fixed," and "calculated as a set percentage of your sales":

> One of the biggest advantages to taking out a cash advance is the fact that repayments are not fixed. You won't pay X amount until the debt is settled, instead you'll pay a different amount each month, which is calculated as a set percentage of your sales. This means that your business will never be crippled with high repayment fees – because they'll always be in proportion with your actual sales.

37.     Similarly, in another advertisement, Yellowstone described its flexible repayment terms as "based directly on sales":

> When it comes to repaying your cash advance we know that fixed monthly payments can be very challenging for businesses to accommodate – especially if your business is in a seasonal market.

> For that reason the repayments that you make will be based directly on the sales that you make that month. So if sales are up[,] you'll pay a larger repayment, but if sales are down, you'll pay less. Repayments are calculated by a percentage of your sales – which offers great flexibility.

38. In addition, Yellowstone promoted its MCAs as not requiring a personal guarantee:

a. "Here at Yellowstone Capital we provide no personal guarantee capital for most businesses"; and

b. "We Provide Capital With No Personal Guarantee."

39. Yellowstone also advertised its MCAs as "unsecured" in YouTube promotional videos.

## 2. Consumers' Daily Payments Were Fixed, Instead of Calculated As a Percentage of Receivables As Advertised

40. Despite specifically citing these distinctions between traditional loans and MCAs as a selling point, the Yellowstone MCA Defendants structured their Merchant Agreements to eliminate these distinctions altogether, and to include unconscionable terms that shift risk to the Consumers. The Merchant Agreements in fact obligate Consumers to pay a fixed amount subject to interest, over a defined period, untethered from the Consumers' receivables – just as the Consumers would be obligated to repay a traditional loan, but without the legal protections afforded to loan borrowers.

41. In addition, as part of the Merchant Agreement, the Yellowstone MCA Defendants compelled Consumers to execute additional documents including unconscionable terms and conditions that not only obligated the small business owners to personally guarantee repayment of these usurious loans, but also made it exceedingly simple for Defendants to obtain a one-sided judgment against and/or to freeze and seize the assets of not only the small business, but the small business owner.

11

42.     The Merchant Agreement consists of the front page and Terms and Conditions Sheet; Addendum to Secured Merchant Agreement; Appendix A – Fee Structure; ACH Authorization Form; a Security Agreement and Guaranty; and/or an Affidavit of Confession of Judgment. At various times, the Yellowstone MCA Defendants printed the Merchant Agreements in small, illegible type, with material provisions appearing in 5.5-point to 6-point font size.

43.     The first page of the Merchant Agreement[2] states:

### **PURCHASE AND SALE OF FUTURE RECEIVABLES**

Merchant hereby sells, assigns and transfers to [Yellowstone] (making [Yellowstone] the absolute owner) in consideration of the funds provided ("Purchase Price") specified below, all of Merchant's future accounts, contract rights and other obligations arising from or relating to the payment of monies from Merchant's customers' . . . (the "Receipts" . . . ), for the payment of Merchant's sale of goods or services until the amount specified below (the "Purchased Amount") has been delivered by Merchant to [Yellowstone].

The Purchased Amount shall be paid to [Yellowstone] by Merchant's irrevocably authorizing <u>only one</u> depositing account acceptable to [Yellowstone] (the "Account") to remit the percentage specified below (the "Specified Percentage") of the Merchant's settlement amounts due from each transaction, until such time as [Yellowstone] receives payment in full of the Purchased Amount. . . . [Yellowstone] may, upon Merchant's request, adjust the amount of any payment due under this Agreement at [Yellowstone]'s sole discretion and as it deems appropriate . . . .

44.     Immediately below this text in large letters are listed the Purchase Price, the Specified Percentage (usually between 10% and 25%), and the Purchased Amount. For example, one Consumer's Merchant Agreement stated:

**Purchase Price: $ <u>20,000.00</u> Specified Percentage: <u>20  %</u> Receipts Purchased Amount: <u>$28,600.00</u>**

---

[2] There are minor, immaterial differences among the Merchant Agreements, Addendum, and other documents used by the multiple Yellowstone MCA Defendants with different Consumers.

Case 1:22-cv-00359-LAK   Document 1-3   Filed 01/14/22   Page 53 of 154

Thus, in exchange for a $20,000 lump sum (less certain inadequately disclosed fees) that Yellowstone would pay to the Consumer, Yellowstone would be owed $28,600 from the Consumer's future receivables to be paid in daily payments of 20% of receivables. Specifically, the Merchant Agreement provides that the Consumer is required to pay the Specified Percentage (in this case 20%) "of the Merchant's settlement amounts due from each transaction" and that Yellowstone would debit that "specified remittance from the merchant's bank account on a daily basis."

45.     Although this language in the Merchant Agreement provides that the Daily Payment should be calculated as the Specified Percentage of expected receivables – as in a legitimate MCA contract – the language is modified by the "Addendum to the Secured Merchant Agreement" ("Addendum"). The Addendum, which is executed simultaneously with the Merchant Agreement and controls in the event of a conflict with the Merchant Agreement, automatically converts the Specified Percentage to a fixed Daily Payment:

> By signing below, the Merchant hereby requests and acknowledges that the Specified Percentage **shall be revised** to [AMOUNT] per business [d]ay (the "Daily Payment") **which the parties agree is a good-faith approximation of the Specified Percentage, based on the Merchant's prior receipts due to [Yellowstone] pursuant [to] the Agreement**.

> [Emphasis added.]

46.     The Daily Payment is set so that the full Purchased Amount is absolutely payable in a fixed period, often as short as 100 days. For the exemplar Consumer noted above, the revised Daily Payment was $358, and the repayment term was just 80 business days or 102 calendar days, resulting in an annual interest rate that exceeds the interest rates codified in New Jersey's usury laws.

**3.**     **Consumers' Daily Payment Obligations Were Not Tethered to Estimated or Actual Receivables**

47.     Despite the Addendum stating that "the parties agree" that the Daily Payment "is a good-faith approximation of the Specified Percentage, based on the [Consumer]'s prior receipts due to [the Yellowstone MCA Defendants] pursuant [to] the Agreement," on information and belief, the Yellowstone MCA Defendants did not review Consumers' receipts to determine the Daily Payment amount.

48.     At various times, contrary to representations in the Merchant Agreement, Yellowstone's advertising, and the Addendum itself, the fixed Daily Payment bore no meaningful relationship to the Specified Percentage of Consumers' actual estimated receivables.

49.     Unlike the typical review of accounts receivable performed by the purchaser prior to entering an agreement to purchase future receivables, the Yellowstone MCA Defendants only review, at most, the merchant's prior bank statements.

50.     To obtain financing from the Yellowstone MCA Defendants, Consumers are only required to submit their "last three months of business banking statements and a completed application."  The Merchant Agreements do not require Consumers to identify their customers or to provide the Yellowstone MCA Defendants with copies of the merchant's invoices.

**4.**     **Consumers Were Unable to Modify Daily Payments Through Reconciliation**

51.     The Yellowstone MCA Defendants do not modify the Daily Payments or provide a right to modify the Daily Payments to account for changes in Consumers' receivables as stated in Yellowstone's advertising and as is typical in legitimate MCA contracts.

52.     The Merchant Agreement provides that Consumers may request a reconciliation to adjust the fixed Daily Payment to account for changes in the Consumers' receivables, but the terms of the Merchant Agreement and Addendum make this option illusory. First, the Merchant

Agreement provides that modification of the Consumer's fixed Daily Payment rests in the MCA Defendant's "sole discretion and as it deems appropriate." Similarly, the Addendum provides that reconciliation is "only a courtesy" that the Yellowstone MCA Defendants are "under no obligation to provide[.]"

53. Even worse, provisions buried in small print in the Addendum impose severe restrictions on the availability of reconciliation and on Consumers' ability to even request it. The Addendum provides that the Consumer may request reconciliation only within five (5) days following the end of the month (and in some contracts, only within three (3) days) and within that same limited window the Consumer also must provide all "evidence and documentation" demanded by the Yellowstone MCA Defendant in its "sole and absolute discretion."

54. Prior to November 2018, Defendant Yellowstone provided inadequate notice to Consumers of their ability to request reconciliation under the Merchant Agreements by burying the relevant provisions in the Addendum at the end.  It was only after facing public criticism in November 2018 that Yellowstone began to provide a separate notice to Consumers at the time of funding to ensure that they were aware of their ability to request reconciliation under the Merchant Agreements.

55. When Consumers did attempt to notify Defendant Yellowstone of financial difficulties and request reconciliation, after executing the Merchant Agreements, they often could no longer reach Yellowstone.

56. At various times, Defendants have refused to adjust the Daily Payment amount, despite Consumers' lack of incoming receivables.

57. The following Consumer experiences illustrate the challenges Consumers faced when seeking reconciliation:

a. Before defaulting and being forced into an unfavorable settlement agreement with Defendant Yellowstone, a Pennsylvania Consumer had emailed Yellowstone twice "asking for relief and to slow down my payback." Yellowstone replied that the Consumer "was a new customer and that [the Consumer] was not far enough in to [her] loan, when in fact [she] was more than 60% through [her] second loan with Yellowstone."

b. One Consumer sent an email to Defendant MCA Recovery providing in pertinent part: "this week will be a severe cash flow crunch for me – leading up to Memorial Day weekend sales have been slower than usual. Can you please postpone pulls for a week until after the holiday?" MCA Recovery responded by asking if the Consumer had another account that it could debit from. In response to subsequent emails from the Consumer explaining that "I'm 62 with a young disabled son, I'm about to lose our home, and file for bankruptcy" and again requesting a revised repayment plan, MCA Recovery forwarded that email to Defendant Yellowstone with the message: "CONTROL YOUR GIRL. Craziest fucking merchant ever."

c. When a New York Consumer contacted Defendant Yellowstone to advise that his account was overdrawn and to request a "temporary daily payment decrease from $750 to $100 for 3 weeks," Yellowstone "stated they needed several documents of which all were sent. Then they needed one more document[,] [but] when it was sent[,] they stated since I had taken out a loan after theirs[,] they could not work with me even though I informed them that my account was overdrawn and if I didn't get the issue resolved I would not have the ability to keep my bank account opened. They were not concerned and still refused to negotiate." In responding to the Consumer, Yellowstone noted that he "accepted funds based on set terms that he ultimately could not meet" and that the Consumer "had taken the full funding amount based on a contractually predetermined agreement in terms of payback schedule."

58.    By converting the Specified Percentage to a fixed Daily Payment of specified duration untethered from Consumers' receivables and/or making reconciliation to account for changes in Consumers' receivables largely unavailable, the Yellowstone MCA Defendants eliminated much of the variability with legitimate sales of receivables and effectively converted them to fixed-rate, finite-term loans.

**5.** **Other Hidden and Unconscionable Contract Terms Empowered the Yellowstone MCA Defendants at Consumers' Expense and Put Consumers' Assets at Risk**

59.     Additional documents that must be signed as a condition of entering the Merchant Agreement contained other onerous provisions that shifted risk from the Yellowstone MCA Defendants to the Consumers.

60.     As discussed further below, Consumers were required to execute a Security Agreement, Guaranty, and an Affidavit of COJ as part of the Merchant Agreement.

61.     The Merchant Agreement required the Consumer to enter into an irrevocable Power of Attorney appointing a Yellowstone MCA Defendant,

> as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to [the Yellowstone MCA Defendants] . . . in the case of . . . the occurrence of an Event of Default . . . from Consumer, under this Agreement, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign [Consumer]'s name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to [the MCA Defendant]; and (v) to file any claims or take any action or institute any proceeding which [the MCA Defendant] may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount[.]

62.     The Merchant Agreement prohibited Consumers from interrupting, transferring, moving, selling, disposing, or otherwise conveying their businesses or assets without "the express prior written consent of [the Yellowstone MCA Defendants]."

63.     The Merchant Agreement's ACH Authorization Form required Consumers to provide the Yellowstone MCA Defendants with all information necessary to access the Consumers' bank accounts, including their bank name, bank portal website, username, password,

security question/answer 1, security question/answer 2, and security question/answer 3.

64.     Acceleration clauses within the Merchant Agreement provided that upon any of the specified events of default, "[t]he full uncollected Purchase Amount plus all fees due under this Agreement and the attached Security Agreement become due and payable in full immediately"; Defendants may immediately and without notice to the Consumer enter and execute on the COJ "in the amount of the Purchase Amount stated in the Agreement, plus attorneys' fees calculated at twenty-five percent (25%) of the balance due hereunder at the time of breach"; and Defendants may immediately and without notice to the Consumer initiate a lawsuit, and in the event a judgment is recovered, the Consumer "shall be liable for all of [Defendants'] costs of lawsuit, including but not limited to all reasonable attorneys' fees and court costs" in addition to attorneys' fees calculated at twenty-five percent (25%) of the balance due at the time of the breach.

65.     At various times, the Merchant Agreement provided that the inability of the Consumer to pay its debts, general assignment for the benefit of creditors, interruption, suspension, dissolution or termination of its business, and a voluntary or involuntary bankruptcy filing are events of default triggering the acceleration clause and the one-sided protections afforded the Yellowstone MCA Defendants by the Security Agreement, Guaranty, and COJ.

66.     Appendix A to the Merchant Agreement (which provides a list of fees) provided that a fee will be assessed upon an event of default.  Buried within that provision, Appendix A provided at various times that just two (or four depending on the Merchant Agreement) missed Daily Payments constituted a default, thereby triggering the acceleration clause and enforcement mechanisms available to the Yellowstone MCA Defendants through the Security Agreement, Guaranty, and COJ.

67.     The Merchant Agreement also provided at various times that Consumers "consent[]

to the waiver of notice prior to [the Yellowstone MCA Defendants] exercising any and all rights provided for in this Agreement[.]"

68.     Further, the Merchant Agreement required Consumers to acknowledge that the Yellowstone MCA Defendants "may be using 'doing business as' or 'd/b/a' names in connection with various matters relating to the transaction between [the Yellowstone MCA Defendants] and [Consumer]," including notices or filings, and the Security Agreement equally permitted the Yellowstone MCA Defendants to "use another legal name and/or D/B/A" in notices or filings.

69.     In the event of default, the Security Agreement enabled Defendants to collect all amounts due under the Merchant Agreement by reaching beyond the small business's receivables to the Consumer's assets "now owned, or hereafter acquired, including without limitation: (a) all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the 'UCC'), now or hereafter owned or acquired by [Consumer]; and (b) all proceeds, as that term is defined by Article 9 of the UCC."

70.     Through the Security Agreement, the MCA Defendants obtain a security interest in the Consumer's assets.  To perfect that security interest, Defendants must issue a UCC-1 Financing Statement.  A UCC-1 Financing Statement provides notice to all interested parties of Defendants' right to seize the Consumer's assets and serves as a lien on secured collateral.  Upon the occurrence of an alleged event of default under the Merchant Agreement, the MCA Defendants may seek to perfect the UCC-1 Financing Statement by filing it with the Secretary of State in the small business's state of incorporation.

Case 1:22-cv-00359-LAK   Document 1-3   Filed 01/14/22   Page 60 of 154

71.     The broad Guaranty provided recourse beyond the assets of the small business to its owner's personal assets.

72.     At various times, the Yellowstone MCA Defendants could invoke this personal guarantee "at the time [Consumer] admits its inability to pay its debts, or makes a general assignment for the benefit of creditors, or any proceeding shall be instituted by or against [Consumer] seeking to adjudicate it bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or composition of it or its debts."

### 6.     Consumers Were Required to Sign an Unconscionable Affidavit of COJ and Waive Their Rights

73.     Defendants told Consumers that the only way to obtain an MCA was to execute an Affidavit of COJ.

74.     The Affidavit of COJ permitted the MCA Collection Defendants to obtain a judgment against the small business and its individual owner in the event of a future default.  By signing the Affidavit of COJ in advance of any purported default, the Consumer waived his or her rights and consented to the entry of judgment for the entire balance owed under the Merchant Agreement.

75.     The Yellowstone MCA Defendants failed to inform Consumers prior to signing the COJ that they required the small business owners to sign both in their individual capacity and on behalf of their business, thereby allowing a judgment against both the Consumer's business assets and personal assets in the event of a purported default.

76.     Defendants' one-sided Affidavit of COJ also provided for judgment against the Consumer for liquidated attorneys' fees in the amount of 25% of the outstanding balance, costs, expenses, disbursements, and "interest at the rate of 16% per annum from [the date of the Merchant Agreement], or the highest amount allowed by law, whichever is greater."   The attorneys' fees

provisions provide for excessive fees compared to the minimal work required to file the COJs and related documents.

77.     Upon an alleged default, the MCA Collection Defendants—on behalf of the Yellowstone MCA Defendants—would file the Affidavit of COJ, along with their own Affidavit of Non-Payment, and a proposed form of judgment with the County Clerk without notice to the Consumer.  The County Clerk then filed the judgment without notice to the Consumer, and without a hearing, or any review by a judge.

78.     At various times, Defendants engaged in robo-signing, or filing the same generic Affidavit of Non-Payment form in support of COJs, wherein they accuse Consumers of stopping Daily Payments, when in fact those Consumers were still current in their Daily Payments.

79.     Defendants also facilitated their filing of COJs by designating 10 New York counties in the COJ as permissible filing locations, despite New York law requiring that COJs only designate one county where the affidavits may be filed.

80.     In addition, as a condition of the Merchant Agreement, Defendants required Consumers to waive any claims against the Yellowstone MCA Defendants "under any legal theory" and also to waive the right to a jury trial or to bring a class action.

81.     Defendants also required Consumers, in advance, to "waive any and all objections to jurisdiction or venue" and to "waive any right to oppose any motion or application made by either party to transfer such proceeding to an Acceptable Forum[.]"

82.     After entry of the judgment by the County Clerk, the MCA Collection Defendants then sought to collect on the judgment by freezing Consumers' bank accounts, often before the Consumers even became aware a COJ was filed against them.

83.     Indeed, at various times, as a result of Defendants' actions, Consumers only became

Case 1:22-cv-00359-LAK   Document 1-3   Filed 01/14/22   Page 62 of 154

aware of a judgment when they could not make payroll or pay critical operating expenses after their bank accounts were frozen. Adding to the confusion and unfairness, the Consumers often do not recognize the names of the entities attempting to collect on the judgments.

84.     Many states have banned COJs as against public policy, and in August 2019, New York amended its COJ statute to prevent Defendants, among other MCA companies, from enforcing COJs against Consumers located outside of New York.

## C.     **The Yellowstone MCA Defendants' Merchant Agreements Operate as Usurious Loans**

85.     Although the Yellowstone MCA Defendants characterize the MCAs as "purchase[s] and sale[s] of future receivables," which are not subject to certain borrower protections such as usury laws, and state that the Purchase Price "is not intended to be, nor shall it be construed as a loan," the terms of the Merchant Agreements make the MCAs operate as loans.

86.     Unlike legitimate purchases and sales of receivables, loans provide a greater degree of certainty to creditors through their fixed, regular payments and finite repayment terms.  In exchange for the rigid payment terms loans impose on borrowers, interest is capped to protect borrowers from usurious rates, and lenders are regulated by certain additional state and federal laws.

87.     The stream of payments back to the Yellowstone MCA Defendants is not variable in either amount or number of payments to be made.

88.     Specifically, the fixed Daily Payment amounts are not meaningfully tied to receivables, do not vary from day to day, have a finite repayment term for the full Purchased Amount, and the ability to adjust those payments based on receivables is virtually non-existent.

89. And, as noted, the Merchant Agreements provide the Yellowstone MCA Defendants with recourse far beyond the Consumer's receivables in the event of default, through security interests, guarantees, and COJs.

90. The Yellowstone MCA Defendants structured the MCAs to be just as secure as and to operate as traditional fixed-payment, finite-term loans, but without the statutory interest protections afforded to borrowers of those loans.

91. Yellowstone even advertises its MCAs as loans (e.g., "No Personal Guarantee Loans"; "Need a loan for your business?"; "Bad Credit Business Loans"; "Yellowstone Capital makes it easy to obtain an unsecured bad credit business loan") and characterizes itself as a "direct lender" in certain email solicitations sent to Consumers, although such advertising is inconsistent with other representations made by the Yellowstone MCA Defendants.

92. For example, Yellowstone used the following advertisement describing the MCAs it offers as a "loan" and "line of credit" to obtain "fast cash":



93. In or around August 2013, Yellowstone also advertised its MCA program as "bad credit business loans."

94. New Jersey's civil usury statute, specifically N.J.S.A. 31:1-1, caps interest rates on loans at 6% per annum, or 16% per annum when there is a written contract specifying the rate of

interest. New Jersey's criminal usury statute, specifically N.J.S.A. 2C:21-19, caps annual interest rates at 30% for non-corporate borrowers, and 50% for corporate borrowers.

95. The Yellowstone MCA Defendants regularly charge Consumers annual interest rates on their loans that far exceed the maximum rates permitted by New Jersey law. For example:

a. Defendant Green Capital loaned a Colorado Consumer $125,000 (the "Purchase Price") and required the Consumer to pay back $186,875 (the "Purchased Amount") in daily payments of $1,995 (the "Daily Payment") over the course of approximately 93 business days, or approximately 119 calendar days.[3] Thus, the annual interest rate charged by Green Capital exceeds the rates permitted by New Jersey usury laws.

b. A Florida Consumer's Merchant Agreement with Defendant Yellowstone provided for a Purchase Price of $3,000, a Purchased Amount of $4,377, a Daily Payment of $65 per business day, and repayment term of 85 days. Thus, the annual interest rate charged by Yellowstone exceeds the rates permitted by New Jersey usury laws.

c. A Maryland Consumer's Merchant Agreement with Defendant World Global provided for a Purchase Price of $285,000, a Purchased Amount of $427,215, a Daily Payment of $4,299 per business day, and repayment term of 127 days. Thus, the annual interest rate charged by World Global exceeds the rates permitted by New Jersey usury laws.

**D.** **Defendants Engaged in False and Misleading Advertising**

**1.** **Yellowstone Misrepresented That it Provides MCAs Regardless of Credit or Collateral**

96. Until at least April 18, 2019, the "home" page of the Yellowstone Website offered small businesses funding, claiming to "say yes to more small businesses, regardless of collateral or credit":

---

[3] To calculate the repayment term, the Purchased Amount is divided by the Daily Payment (e.g., $186,875 ÷ $1,995 = approximately 93 days, which equates to approximately 13 weeks). To account for weekends, as the Daily Payment is only withdrawn on business days, add two days for each week (e.g., 13 x 2 = 26 weekend days). Therefore, the approximate total repayment term is 119 days (e.g., 93+26).

Yellowstone Capital | Home



97.    As noted, the Merchant Agreements in fact require Consumers to simultaneously execute Security Agreements providing "Collateral," and in some instances, "Additional Collateral" and "Cross-Collateral," to secure the payment and performance obligations due to Yellowstone.

98.    In addition, the Merchant Agreements expressly permit "[Yellowstone], [its] agents and representatives and any credit-reporting agency engaged by [Yellowstone], to . . . pull a credit report at any time now or for so long as Merchant and/or Owner(s) continue to have any obligation owed to [Yellowstone] as a consequence of this Agreement or for [Yellowstone's] ability to determine Merchant's eligibility to enter into any future agreement with [Yellowstone]."

99.    Indeed, contrary to the representations on the Yellowstone Website, Yellowstone does investigate Consumer credit, as Yellowstone or its affiliates have made unauthorized and/or

excessive credit inquiries that negatively affected the Consumers' credit scores.

**2.** **Yellowstone Misrepresented That Its MCAs Are "Unsecured" and/or Do Not Require a Personal Guarantee**

100. Defendant Yellowstone marketed its MCAs as "unsecured" in YouTube promotional videos. However, Yellowstone's Merchant Agreements are often specifically labeled as "secured" in bold, underlined type at the top of the agreement:

# YELLOWSTONE CAPITAL LLC

30 Broad Street, 14th Floor, Suite 1462, New York, New York 10004
One Evertrust Plaza, Suite 1401, Jersey City, New Jersey 07302

## SECURED MERCHANT AGREEMENT

101. Moreover, the Merchant Agreements are secured by: personal guarantees from the small business owners; UCC security interests over the merchants' accounts and other assets; and signed, notarized COJs from the merchants and their guarantors.

102. In another advertisement, Defendant Yellowstone stated that it provides "no personal guarantee loans." But Yellowstone required Consumers to execute a Guaranty and Affidavit of COJ as part of the Merchant Agreement. These documents required the individual business owner to personally guarantee repayment of the MCA and expressly enabled Yellowstone to obtain a judgment against the small business's assets and the owner's personal assets in the event of a purported default.

**3.** **Yellowstone Misrepresented That it Provides Flexible Repayment Terms**

103. In at least two advertisements, Defendant Yellowstone advertised its flexible repayment terms by representing:

- "if sales are up[,] you'll pay a larger repayment, but if sales are down, you'll pay less";

26

- "repayments are not fixed"; and

- "your business will never be crippled with high repayment fees – because they'll always be in proportion with your actual sales[.]"

104.     These advertisements were false and deceitful. As noted, Yellowstone's Merchant Agreements, particularly the Addendum, provided for fixed Daily Payments that are not meaningfully tied to Consumers' receivables. The Addendum also imposed severe restrictions on Consumers' ability to request reconciliation due to a reduction in their receivables. In addition, Defendants either failed to respond to Consumer requests to reduce the Daily Payment amount where the Consumer's actual sales did not support them, or simply refused to reduce payments and instead required the MCAs to be paid back within a specified time period.

105.     For example, a Michigan Consumer tried to reach Yellowstone, after one of his clients stopped paying him, to notify Yellowstone that the client's non-payment was impacting his ability to make the Daily Payments, but every time the Consumer called Yellowstone, no one answered. Eventually, Yellowstone filed a COJ and UCC lien against this Consumer.

106.     Another North Carolina Consumer repeatedly called Yellowstone to advise that no money was coming in, but Yellowstone kept demanding the same Daily Payment and never mentioned reconciliation.

E.     **Defendants Engaged in Numerous Other Fraudulent Business Practices**

107.     Compounding the effects of their one-sided Merchant Agreements, Defendants engaged in misrepresentations and unconscionable business practices that harm Consumers in their origination-, servicing-, and collection-related activities. Defendants' fraudulent business practices have included misrepresenting the amounts of financing they will provide and fees they will charge; misrepresenting their office locations and staff identities; making unauthorized withdrawals from Consumers' accounts; unconscionably deploying COJs, Security Agreements,

27

and UCC filings in their collection activities; fraudulently inducing Consumers to refinance their MCAs; employing threatening and harassing collection tactics; conducting unauthorized and excessive credit checks; and misleading Consumers as to their relationships with various Third Parties.

1. **The Yellowstone MCA Defendants Made Material Misrepresentations to Consumers**

    a. **Misrepresentations of the Amounts of Financing Provided and Fees Charged**

108.    At various times, the Yellowstone MCA Defendants misrepresented to Consumers the amount of the Purchase Price they would receive, the amount of fees the Yellowstone MCA Defendants would debit from their bank accounts, and the upfront fees they charged.

109.    The Yellowstone MCA Defendants failed to conspicuously disclose that various fees buried toward the end of the Merchant Agreements are withdrawn upfront from the promised Purchase Price.  As a result, Consumers enter these Merchant Agreements expecting to receive the full Purchase Price in their bank accounts, only to then receive a significantly lower amount than they were promised.

110.    For example, Defendant Yellowstone underfunded the $3,000 Purchase Price specified in a Florida Consumer's Merchant Agreement by $150, without informing the Consumer that any of the fees disclosed in the Merchant Agreement would reduce the Purchase Price amount to be transferred to the Consumer's bank account.

111.    Similarly, Defendant Green Capital withheld $6,250 in fees from the Purchase Price of $125,000 pursuant to a Colorado Consumer's Merchant Agreement, without disclosing in that Merchant Agreement that certain fees would be deducted upfront from the Purchase Price and the respective amount of each such fee.

112.    On at least one occasion, Defendant Yellowstone failed to accurately disclose the

Origination Fee amount in the Merchant Agreement.

113.    Specifically, for that Michigan Consumer, the Merchant Agreement provided for the Origination Fee to be "$295.00," but then a Fee Sheet provided to the Consumer for the same Merchant Agreement stated that the Origination Fee would be "5%." The latter equated to an Origination Fee of $1,430.00, which is significantly more than the $295.00 Origination Fee specified in the Merchant Agreement.

114.    Alternatively, at various times, the Yellowstone MCA Defendants' Merchant Agreements provided that several of the fees would be either a defined amount or a percentage of the funded amount (e.g., ACH Program Fee of "$395.00 or up to 10% of the funded amount," Bank Fee of "$195.00 or up to 10% of the funded amount"), but then failed to notify Consumers what the specific amount of each of those fees would be and whether those amounts would be withheld from the Purchase Price.

115.    At various times, the Yellowstone MCA Defendants withheld amounts greater than the specified fee amount from the Purchase Price or failed to disclose additional withheld fee(s).

116.    At various times, Defendants Yellowstone and MCA Recovery charged Consumers additional fees not disclosed in the Merchant Agreements.

117.    For example, a Washington Consumer sent an email to Defendant MCA Recovery regarding her Merchant Agreement with Defendant Yellowstone.  The email provided in pertinent part: "I had also asked about the smaller fees that have been applied throughout – there is no explanation of what these are and you did not answer my questions about this either. I was not aware of any additional fees being added on. This was not explained to me. If this is written somewhere, then I need to see where that is written so I can look it up."  Upon information and belief, Defendant MCA Recovery never responded to the Consumer.

118.    Similarly, a Utah Consumer sent an email to Defendant Yellowstone stating in pertinent part: "I am being lied to about additional fees but not being provided a statement of those fees. My repayment contract already included $8857.61 in fees." Upon information and belief, Defendant Yellowstone never responded to the Consumer.

119.    On at least one occasion, the Yellowstone MCA Defendants promised Consumers a specific amount of financing in the Merchant Agreement, but then underfunded the Purchase Price and instead provided Consumers with a smaller amount of financing than promised.

120.    For example, Defendant HFH entered two Merchant Agreements with a Maryland Consumer providing for Purchase Prices of $50,000 and $150,000, but then underfunded the Purchase Prices by $5,366 and $12,862, respectively.

121.    Subsequently, Defendants World Global and High Speed entered two more Merchant Agreements with that same Consumer providing for Purchase Prices of $285,000 and $425,000, but then underfunded the Purchase Prices by $24,096 and $21,744, respectively.

122.    Collectively, the Consumer received $64,068 less than the amounts promised in the four Merchant Agreements she entered with Defendants HFH, World Global, and High Speed.

### b.  Misrepresentations of Office Location and Staff Identities

123.    At various times, Defendants Yellowstone and MCA Recovery misrepresented to Consumers that they maintained an office in New York.

124.    When at least two Consumers flew from Michigan and Texas, respectively, to Defendants' purported offices in New York after Defendants repeatedly failed to respond to the Consumers' attempts to contact them, the Consumers found no office at the location provided by Yellowstone and MCA Recovery.

125.    At various times, Defendants held individuals or entities out as employees to Consumers by permitting those individuals or entities to work out of desktops on Yellowstone

premises, or to send emails to Consumers from Yellowstone email addresses, but then later claimed those individuals or entities were "Third Parties" for which Defendants were not responsible.

### 2. The Yellowstone MCA Defendants Made Unauthorized Withdrawals From Consumers' Accounts

126. At various times, the Yellowstone MCA Defendants made unauthorized withdrawals from Consumers' accounts. Because Consumers were not expecting the Yellowstone MCA Defendants' unauthorized debits, these withdrawals often caused additional financial harm to Consumers such as overdraft fees and lost operating capital.

127. The Yellowstone MCA Defendants continued withdrawing purported Daily Payments from Consumers' bank accounts after the Consumers had fully repaid the "Purchased Amount." After unlawfully withdrawing additional amounts sometimes totaling thousands of dollars from individual Consumers, the Yellowstone MCA Defendants failed to timely refund the Consumers either in whole or in part and/or to respond at all to Consumers' inquiries regarding the unauthorized withdrawals.

128. Examples of Consumers from whose accounts the Yellowstone MCA Defendants made unauthorized withdrawals include:

    a. An Illinois Consumer who complained that Defendant Yellowstone had withdrawn excess payments amounting to more than $5,000 and that he was unable to contact anyone at Yellowstone to address the issue.

    b. A Rhode Island Consumer who reported that after she had repaid the Purchased Amount in full, Defendant Yellowstone continued to debit the Daily Payment amount from her account until she was forced to request that her bank issue a stop payment order.

    c. Defendant Yellowstone withdrew an additional $7,100 from a New York Consumer's account without his approval after he had repaid the Purchased Amount in full. When the Consumer complained, Yellowstone provided a partial refund of $2,900 and then stopped responding to him.

d. A Utah Consumer complained that after making the required payments to Defendant Yellowstone under the Merchant Agreement, Yellowstone withdrew an additional $3,480, and the Consumer was subsequently unable to reach anyone from Yellowstone.

e. A Florida Consumer had to pay her bank a stop payment fee to stop Defendant Yellowstone from continuing to withdraw purported Daily Payments from her account after she had already repaid the Purchased Amount in full. At the time of the stop payment, Yellowstone had debited the Consumer's account for a total of $4,550, or $173 more than the $4,377 Purchased Amount the Consumer owed, but Yellowstone only provided the Consumer with a partial refund of $108.

129.  At various times, the Yellowstone MCA Defendants withdrew double the amount of the agreed-upon Daily Payment. For example:

a. After a Colorado Consumer entered into a Merchant Agreement with Defendant Green Capital for a specified Daily Payment amount, Green Capital started debiting his account each day in an amount that was twice the agreed upon Daily Payment without the Consumer's knowledge or authorization. When the Consumer brought this to the attention of Green Capital, it acted surprised and represented that it would not happen again, but then the double debits continued. As a result of the unauthorized double debits, the Consumer's account had a negative balance, and other attempted payments bounced.

b. Defendant Yellowstone's internal email correspondence reveals that Yellowstone repeatedly instructed that a Missouri Consumer's bank account be debited twice on the same day (e.g., "[d]ebit [] twice tomorrow . . . ."; and "[f]ire 2 more of these payments debits next Monday").

c. On at least one occasion, after a Maryland Consumer put a hold on her account following Defendant High Speed's withdrawal of twice the Daily Payment amount for multiple days in a row, High Speed immediately filed a COJ against the Consumer allegedly based on her failure to maintain sufficient funds in her account. High Speed made no effort to speak with the Consumer prior to filing the COJ. High Speed falsely asserted in the COJ filing that the Consumer had defaulted under the terms of the Merchant Agreement. Moreover, the Consumer emailed High Speed to explain that she had overpaid as a result of the duplicate withdrawals by High Speed, but High Speed refused to return the duplicate withdrawals to her account.

130.  On at least two occasions, Defendants Yellowstone and Green Capital debited Consumer accounts in excess of the agreed-upon amount specified in settlement agreements. For example:

a. Defendant Green Capital debited a Colorado Consumer's account for $966 more than the total amount authorized by the Consumer pursuant to a settlement agreement to resolve a COJ, thereby causing the Consumer to pay his bank a stop payment fee to prevent additional, unauthorized debits thereafter. Green Capital did not respond to the Consumer's repeated requests for a refund of the overpayment.

b. Defendant Yellowstone withdrew $6,152.39 from a Utah Consumer's account above the settlement amount authorized by the Consumer. When the Consumer brought this overpayment to Yellowstone's attention, she was "called stupid."

131.     In nearly all of these circumstances, when Consumers attempted to contact Defendants regarding the unauthorized withdrawals, they had difficulty receiving assistance.

132.     In the few instances where the Consumer was able to speak with a representative, Defendant Yellowstone typically failed to refund the unauthorized debits in part or in full. For example, when three Consumers from Nevada, Minnesota, and California contacted Yellowstone to complain that Yellowstone was continuing to debit their accounts after they had repaid the Purchased Amount in full, Yellowstone responded by: (1) refusing to return the excess payments to one Consumer; (2) advising another Consumer that its lending partners were refusing to return the excess funds; and (3) claiming to the third Consumer that its system did not reflect any amount owed to the Consumer.

**3.      Defendants Unconscionably Used COJs and UCC-1 Financing Statements**

**a.  Unconscionable Use of COJs**

133.     As noted, the Yellowstone MCA Defendants required Consumers to execute an Affidavit of COJ as part of the Merchant Agreement.  By demanding that Consumers sign the Affidavit of COJ, the Yellowstone MCA Defendants compelled Consumers to waive their procedural rights and consent to the entry of judgment against them without notice or a hearing.

134.     Until recently, upon the occurrence of a Consumer's purported default, the MCA Collection Defendants would immediately file the COJ in New York (even against out-of-state

Consumers), obtain a judgment, and begin to enforce that judgment before the Consumers even learned of the judgment. With the judgment, the MCA Collection Defendants would freeze the Consumers' personal and business assets until the full, accelerated balance owed under the Merchant Agreements plus interest and fees was satisfied.

135.    At various times, Defendants filed COJs and obtained judgments against Consumers who did not default or otherwise breach the Merchant Agreements. Defendants' enforcement of these improperly obtained judgments against these Consumers threatened the viability of their businesses.

136.    Examples of Defendants' fraudulent and unconscionable use of COJs include the following:

a.    Green Capital fraudulently filed a COJ and obtained a judgment against a Colorado Consumer that was not permitted by the terms of the Merchant Agreement. Green Capital falsely claimed in its Affidavit of Non-Payment filed in support of the COJ that the Consumer had ceased remitting payments and otherwise prevented Green Capital from debiting the Consumer's account. Contrary to Green Capital's claims, the Consumer was still making payments to Green Capital as of the date of the filing. The Consumer did not receive any notice prior to entry of the fraudulent COJ and resulting judgment. After obtaining the judgment in New York, Green Capital levied the Consumer's Colorado bank account, which had no New York branches, seized the Consumer's personal and business assets, and sent notifications to the Consumer's vendors. The wrongfully-obtained judgment significantly harmed the Consumer's landscaping business during its peak season, interfered with the Consumer's ability to pay his employees and vendors, and resulted in a debt that had not gone into default appearing on the Consumer's credit report. The Consumer also lost many of his long-term clients, and vendors, whom he had worked with for 20 to 25 years.

b.    High Speed improperly filed a COJ and obtained a judgment against a Maryland Consumer. The Consumer was forced to put a hold on her account because High Speed continued debiting twice the amount of the Daily Payment provided in the Merchant Agreement after the Consumer contacted High Speed to explain that she had overpaid as a result of the unauthorized withdrawals and to request a refund. High Speed refused to provide a refund. Instead, High Speed filed a COJ without informing the Consumer, falsely claiming that the Consumer had defaulted under the Merchant Agreement and obtained a judgment against the Consumer. Following the fraudulent COJ filing and resulting judgment, High

Speed levied the Consumer's business and personal bank accounts and unlawfully obtained thousands of dollars. High Speed later falsely claimed it was unaware of the levies and promised to return the funds and lift the levies. High Speed delayed for approximately six weeks before removing the levy on the Consumer's personal account, which caused her to incur thousands of dollars in overdraft fees, returned payment fees, and other significant damages. High Speed's wrongfully obtained judgment and levy hindered the Consumer's ability to access her own funds, to obtain legitimate financing, and effectively to continue operating until High Speed removed the fraudulent judgment and levy.

137.  At various times, Defendants Yellowstone and MCA Recovery agreed to revise repayment terms or provided the required "prior written consent" for a bank change, but when the Consumers acted on that agreement or authorization, Yellowstone and MCA Recovery immediately filed COJs and obtained judgments against them.  For example:

a.  Yellowstone and MCA Recovery filed a COJ and obtained a judgment against a Michigan Consumer who had changed banks based on a purported "default" caused when the Consumer switched banks.  No actual "default" occurred under the terms of the Merchant Agreement because the Consumer had obtained the required "prior written consent" from Yellowstone before timely continuing to make payments from a new bank account.  The Consumer contacted Yellowstone and requested a new ACH Authorization Form so he could designate a new bank and continue making timely payments.  Yellowstone agreed and provided the Consumer with the new ACH Authorization Form, which he timely completed and returned to Yellowstone. Yet, Yellowstone and MCA Recovery still filed the COJ and obtained a judgment against the Consumer, despite providing the "prior written consent."  After obtaining the judgment, Yellowstone and MCA Recovery immediately sent credit card processing freezes to the Consumer's bank and unlawfully attempted to enforce the judgment in Michigan, a state where Yellowstone and MCA Recovery were not licensed.  Yellowstone and MCA Recovery also froze the monies owed to the Consumer from his financing company, thereby causing: vehicles not to be paid for; titles, registrations, and license plates not to be issued; vehicles to be impounded; and the Consumer to vacate his business premises because he could not make payments to the land contract vendor.

b.  After agreeing to revised repayment terms, Yellowstone filed a COJ and obtained a judgment against a North Carolina Consumer even though it was debiting the Consumer's account for the revised Daily Payment.  After obtaining a judgment against the Consumer, Yellowstone garnished the wages of the Consumer's employees and seized both the merchant's business assets and the personal assets of the guarantor – the small business owner.  The Consumer's business suffered greatly and several of his employees lost their

jobs even though the Consumer was making his Daily Payments on time. In addition, a debt that was never in default now appears on the Consumer's credit report.

138. At various times, Defendants Green Capital, High Speed, Yellowstone, and MCA Recovery filed false Affidavits of Non-Payment in support of COJs that misrepresented to the court the facts of alleged defaults. For example:

    a. Green Capital filed an Affidavit of Non-Payment in court on June 24, 2019 claiming that the Colorado Consumer had ceased making payments on June 18, 2019, when the Consumer had continued making Daily Payments. In fact, the Consumer made Daily Payments on June 21 (Friday), June 24 (Monday), and June 25 (Tuesday) and only stopped making payments after learning that Green Capital had wrongfully filed the COJ seeking a judgment in breach of the Merchant Agreement. Green Capital's sworn Affidavit also misrepresented that the Consumer had obstructed Green Capital's access to the designated bank account.

    b. High Speed filed a sworn Affidavit of Non-Payment on August 7, 2018, falsely claiming that a Maryland Consumer was in default when the Consumer had complied with all of her obligations under multiple Merchant Agreements. The Consumer stopped payment as a result of High Speed's continued duplicate withdrawals and refusal to refund the excess amounts. At that time the Consumer had actually paid more to High Speed than what was due under the Merchant Agreements at the time the Affidavit was filed.

    c. Yellowstone and MCA Recovery filed a sworn Affidavit of Non-Payment claiming a Michigan Consumer was in default under the Merchant Agreement. In fact, the Consumer had simply changed banks with Yellowstone's "prior written consent" and timely submitted a revised ACH Authorization Form to Yellowstone.

139. Defendants' fraudulent and unconscionable practices in connection with the filing of COJs have caused substantial harm to small businesses and their owners.

**b. Unconscionable Use of Security Agreements and UCC Filings**

140. As noted above, the Yellowstone MCA Defendants also required Consumers to execute Security Agreements before they would advance any funds, which enable Defendants to file UCC-1 financing statements in the event of an alleged default.

141. Defendant Yellowstone and the MCA Collection Defendants have also filed

fraudulent and wrongful UCC-1 financing statements to the financial detriment of Consumers. For example:

a. Yellowstone and Max Recovery filed a UCC-1 financing statement against a Missouri Consumer claiming she had an outstanding balance when the Consumer had already fulfilled all of her obligations under the Merchant Agreement. As a result, the Consumer needed to file an application with the Missouri Secretary of State to have the UCC-1 filing removed. Relying on the wrongfully obtained UCC-lien, Yellowstone and Max Recovery contacted and directed at least one of the Consumer's customers to pay Yellowstone and Max Recovery instead of the Consumer, thereby threatening the Consumer's relationship with the customer.

b. Yellowstone and MCA Recovery wrongfully filed a UCC-1 financing statement against a Michigan Consumer who was not in default under the terms of the Merchant Agreement. As a result, the Consumer was compelled to file an application with the Michigan Department of State to terminate the UCC filing. Based on the information provided by the Consumer, the UCC Filing Office terminated the financing statement after finding that it was "fraudulent or wrongfully filed." However, Yellowstone's and MCA Recovery's fraudulent UCC filing had already caused substantial damage to the Consumer's business because they had already sent UCC lien notices to third parties based on the false default, fraudulently seized the Consumer's assets with the financing company for the Consumer's business, and even failed to release the Consumer's assets after the UCC termination.

142.    Defendants' fraudulent and unconscionable practices in connection with the filing of UCC-1 financing statements have caused substantial harm to small businesses and their owners.

### c. Unconscionable Use of Improperly Obtained Judgments and UCC Filings to Extract Inequitable Settlements

143.    At various times, Defendants have abused the immense leverage they gained over financially distraught Consumers as a result of wrongfully obtained judgments and UCC liens to extract unfair settlement agreements from Consumers. For example:

a. High Speed induced the Maryland Consumer referenced in paragraph 136, acting without counsel, to enter into two settlement agreements by representing to the Consumer that executing the settlement agreements was the only way for the Consumer to regain access to her bank accounts and avoid going out of business. After doing so, High Speed then failed to honor its obligation under those settlement agreements to remove the improperly obtained judgment and lien, which prevented the Consumer from finalizing a lending agreement with

the Small Business Administration. High Speed further violated the agreement terms by illegally withdrawing several thousand dollars from the Consumer's personal account, resulting in significant damages in excess of the amounts unlawfully converted.

b. Yellowstone and MCA Recovery attempted to obtain a substantial settlement from the Michigan Consumer referenced in paragraph 141, representing that a settlement was a prerequisite to Yellowstone and MCA Recovery terminating the UCC filing, releasing any held accounts, and filing a satisfaction of judgment for the Consumer. Yellowstone and MCA Recovery made this representation on July 21, 2016, when the Michigan Department of State had already terminated the UCC filing on July 13, 2016 after finding that it was "fraudulent or wrongfully filed." Nonetheless, Yellowstone and MCA Recovery refused to release the Consumer's assets seized pursuant to the fraudulent UCC filing in the hopes of extorting a settlement from the Consumer (e.g., emailing the Consumer "[m]ake me an offer to settle this and everything will be released," even as the Consumer protested that Yellowstone and MCA Recovery had "locked up everything where there is no money whatsoever and customers that purchased vehicles can[']t get titles or plates for [their] vehicles" and that "the credit card processors are eating up the money that is sitting in [their] account [and] trying to debit my account for service charges").

### 4. The Yellowstone MCA Defendants Fraudulently Induced Consumers to "Refinance" Their MCAs Rather than Engage in Reconciliation

144. On at least one occasion, Defendants High Speed, HFH, and World Global, together with Third Parties acting on their behalf, induced a Maryland Consumer seeking to lower her payment to "refinance" the outstanding balance of an existing MCA into a second MCA despite the fact that reconciliation was an option.

145. Defendants High Speed, HFH, and World Global failed to disclose that this strategy would result in double the interest on the same principal amount, and thus an outstanding balance that is significantly greater than the balance the Consumer would have owed had it simply paid off the first MCA without "refinancing."

146. Defendants High Speed, HFH, and World Global misrepresented that refinancing her Merchant Agreements would enable her to keep up with Daily Payments under the prior agreements and to maintain sufficient cash flow to operate her business, rather than advising the

Consumer of her ability to reconcile the current Daily Payment amounts with her company's actual receivables under her existing Merchant Agreements.

147.    The "refinancing" resulted in a substantially higher total repayment amount for the Consumer, as High Speed, HFH, and World Global inflated her carryover balances from prior agreements and charged her double the interest on the same outstanding debt in each new agreement.

### 5.    Defendants Engaged in Threatening and Harassing Collection Efforts

148.    Defendants Yellowstone, MCA Recovery, Green Capital, and High Speed have engaged in harassing and threatening collection calls to Consumers to induce them to continue making their Daily Payments. For example:

a.  A Tennessee Consumer explained that when the small business "ran into hard times," Yellowstone "[did]n't listen and ke[pt] pushing for more and more money." Instead of pursuing reconciliation with the Consumer due to the business's hard times, Yellowstone continued its near-constant calls and harassment. The Consumer reported that the Yellowstone representative would get angry, yell, threaten to shut down the business, and hang up.

b.  A New Jersey Consumer reported: "[w]e are in the construction business and have experienced a lull this winter. We missed 1 payment and in just a very short time have been harassed and threatened by [Defendant Green Capital] that they're coming after our assets, our family, freezing our bank account, threatened bodily harm, etc. [Defendant Green Capital] ha[s] conducted multiple federal offenses including running our credit without our consent [and] spoofing our phones[.]"

c.  High Speed bullied a Maryland Consumer by not letting her speak when she attempted to ask for reconciliation, as well as for an explanation of the inflated carryover balances and resulting usurious interest. The Consumer described a collection call she received from High Speed as follows:

> High Speed said, "You know you have a balance right?" – I started by saying, "I don't know" - and was abruptly cut off by High Speed who was telling me my head was up my ass and whatever else. If he had let me finish my sentence, it would have sounded like this, "I don't know what the balance should be because I noticed that the carry over balances were getting interest added each time which calculated to 132% interest. Could

you take a look at my info and please adjust in the event I am missing something?"

d. After Yellowstone and MCA Recovery learned that a Michigan Consumer had contacted the State of Michigan's Secretary of State in an effort to terminate Yellowstone's fraudulent UCC filing, Yellowstone's and MCA Recovery's representatives called the Consumer and threatened him: "[They were] really mad and threatened me that I will get 5 years in prison for terminating the UCC filing."

e. A Colorado Consumer was "constantly threatened [by Defendant Green Capital] that the COJ would be filed if [he] missed a payment."

f. The same day Yellowstone and MCA Recovery filed a COJ against a North Carolina Consumer, their attorney started calling to threaten the Consumer and his employees.  Prior to the COJ filing, the Consumer had reached out to Yellowstone repeatedly to advise that no money was coming in, but Yellowstone kept demanding the same Daily Payment and never mentioned reconciliation.  On the day of the COJ filing, Yellowstone and/or MCA Recovery started to make threatening calls to the Consumer 40 to 50 times a day.  During collection calls, Defendant Yellowstone "threatened to have [the Consumer] arrested, threatened to have all accounts seized which they did, [and] threatened to come . . . take care of things."  Yellowstone called "every day saying no payment or not enough" and threatened "legal action[,] . . . jail, property seized, and assets taken."  At one point, the threats escalated to a point where the attorney for Yellowstone and MCA Recovery claimed he was in front of the Consumer's store (in North Carolina) and was coming in.  After the COJ was filed, Yellowstone and MCA Recovery obtained a judgment and froze all of the Consumer's assets and shut the Consumer's business down.  The Consumer lost all his bank accounts, lost his point-of-sale system, and ultimately lost his business.  Despite losing everything, the Consumer continued to be harassed and threatened through multiple daily calls, including calls made by Defendant Yellowstone from spoofed phone numbers.

**6.    Defendants Conducted Unauthorized and Excessive Credit Checks**

149.    At various times, Defendants Yellowstone and MCA Recovery have conducted unauthorized and/or excessive credit checks.

150.    For example, a Michigan Consumer discovered that Yellowstone and MCA Recovery had provided Arch Capital Funding LLC ("Arch Capital") with permission to do an unauthorized hard inquiry into his credit without first obtaining the Consumer's prior authorization, and that they had then used that credit check from Arch Capital also without the

Consumer's prior authorization. Defendant Yellowstone released the Consumer's personal information to Defendant MCA Recovery, who forwarded the personal information to Arch Capital, an entity formerly affiliated with Yellowstone, who then conducted the hard credit inquiry.

151. On another occasion, Yellowstone harmed a Consumer's credit score and subsequent loan terms by conducting excessive credit checks in connection with the Consumer's MCA applications. Specifically, in connection with two MCA applications a Mississippi Consumer submitted to Yellowstone for a business loan, Yellowstone conducted eight hard inquiries on the Consumer's credit. Yellowstone never provided a loan or any funding to the Consumer, but Yellowstone's eight credit checks caused the Consumer's credit score to decline by 36 points.

152. Likewise, in connection with a Maryland Consumer's application for an MCA, Defendant Yellowstone conducted an unauthorized hard credit inquiry negatively impacting the Consumer's credit, despite the Consumer's express authorization of a soft inquiry only.

### 7.   Defendant Yellowstone Is Responsible for and Conducted Little to No Oversight of Third Parties' Underwriting, Servicing, and Collections In Its Name

153. At various times, Defendant Yellowstone employed, contracted with, and/or acted through and in concert with a web of Third Parties, including entities and/or individuals described by Yellowstone as Independent Funding Organizations ("Funders"), Independent Sales Organizations ("ISOs"), and Sales Representatives, in its MCA transactions with Consumers.

154. Yellowstone claims these Third Parties have assumed a number of functions, including acting as a broker, underwriting, evaluating, and negotiating potential Merchant Agreements, and servicing and collecting amounts owed on Merchant Agreements in the event of default.

155. Between at least July 2015 and July 2019, Defendant Yellowstone held out Third

Parties to Consumers as indistinguishable from Yellowstone itself. During this period, Yellowstone did not disclose to Consumers the Third Parties' functions and/or involvement with the performance of the Merchant Agreement. Meanwhile, Yellowstone permitted Third Parties to use Yellowstone email addresses in correspondence with Consumers.

156. At various times, Third Parties operated out of Yellowstone's Jersey City, New Jersey office.

157. At various times, Third Parties and/or their employees were either former employees or management of Yellowstone and/or current employees or management of Yellowstone.

158. At various times, Yellowstone allowed Third Parties to use the Yellowstone platform to perform Consumer credit checks without notice to or the consent of Consumers.

159. At all relevant times, the Consumers transacting with Yellowstone believed that they negotiated their Merchant Agreements with Yellowstone, and that Yellowstone remained their point of contact for subsequent correspondence relating to their Merchant Agreements.

160. At various times, Yellowstone shared the Consumer's Merchant Agreement, including the Consumer's sensitive banking information, with Third Parties, without first obtaining the Consumer's express informed consent.

161. To the extent Defendant Yellowstone and/or any of the other Yellowstone MCA Defendants acting in concert with Yellowstone seek to disclaim liability for any of the acts and/or conduct alleged herein on the grounds that the Third Parties purportedly engaged in the underlying misconduct, Yellowstone and/or the other Yellowstone MCA Defendants are responsible for the Third Parties' performance of their roles and responsibilities relating to the Merchant Agreements.

162. Not only has Defendant Yellowstone failed to disclose and held the Third Parties

out to Consumers as Yellowstone's employees, representatives, and/or agents, but it has also failed to conduct any meaningful supervision of the Third Parties' brokering, underwriting, negotiating, servicing, and collection activities relating to Yellowstone's Merchant Agreements with Consumers.

## COUNT I

### VIOLATION OF THE CFA BY DEFENDANTS
### (UNCONSCIONABLE COMMERCIAL PRACTICES)

163.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 162 above as if more fully set forth herein.

164.    The CFA, N.J.S.A. 56:8-2, prohibits:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing[] concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . . .

165.    The CFA defines "merchandise" as including "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." N.J.S.A. 56:8-1(c).

166.    At all relevant times, the Yellowstone MCA Defendants have engaged in the advertisement and sale of merchandise within the meaning of N.J.S.A. 56:8-1(c), including MCAs, and the MCA Collection Defendants have engaged in the advertisement and sale of merchandise within the meaning of N.J.S.A. 56:8-1(c), including debt collection services.

167.    In the operation of their business, Defendants have engaged in the use of unconscionable commercial practices, false promises, misrepresentations and/or the knowing

concealment, suppression or omission of material facts.

168.    At various times, Defendants have engaged in unconscionable commercial practices including, but not limited to, the following:

a.   Charging unlawful interest rates on small business loans disguised as purchases of receivables, in excess of the maximum rates permitted by New Jersey usury laws;

b.   Refusing Consumers' requests for reconciliation and directing that the advance be paid back within a specified time period even where the Consumers' businesses have no incoming receivables, or simply failing to respond to Consumers' inquiries regarding reconciliation;

c.   Making unauthorized withdrawals from Consumers' accounts, including by withdrawing double the amount of the agreed-upon Daily Payment, often causing additional financial harm to Consumers such as overdraft fees and lost operating capital;

d.   Continuing to withdraw purported Daily Payments from Consumer bank accounts after the Consumers had fully repaid the "Purchased Amount," and then failing to timely refund the Consumers either in whole or in part and/or to respond at all to Consumer inquiries regarding the unauthorized withdrawals;

e.   Debiting Consumer accounts in excess of the agreed-upon amount specified in settlement agreements;

f.   Failing to respond to Consumer complaints, inquiries, and/or refund requests in a timely manner or at all;

g.   Compelling Consumers to execute an Affidavit of COJ as part of the Merchant Agreement, thereby waiving their procedural rights and consenting to the entry of judgment against them without notice or a hearing;

h.   Filing COJs and obtaining judgments against Consumers who did not default or otherwise breach the Merchant Agreements;

i.   Enforcing improperly obtained judgments against Consumers, thereby threatening the viability of their businesses;

j.   Filing false Affidavits of Non-Payment in support of COJs that misrepresented to the court the facts of alleged defaults;

k.   Filing fraudulent and wrongful UCC-1 financing statements to the financial detriment of Consumers;

l.   Abusing the immense leverage Defendants gained over financially distraught Consumers as a result of wrongfully obtained judgments and UCC liens to extract unfair settlement agreements from Consumers;

m.   On at least one occasion, levying an out-of-state bank account in Colorado with no New York branches, thereby resulting in the Consumer's loss of long-term clients;

n.   On at least one occasion, knowingly preventing a Consumer's business from finalizing its lending agreement with the Small Business Administration by failing to timely honor the provision in the settlement agreement requiring withdrawal of the COJ and removal of the lien on the Consumer's bank accounts;

o.   On at least one occasion, illegally withdrawing several thousand dollars from a Consumer's personal account, thereby causing significant damages in excess of the amounts unlawfully converted;

p.   Falsely inflating carryover balances to be "refinanced" in each successive deal and charging the Consumer double the interest on the same outstanding debt from prior agreements in each new agreement;

q.   Engaging in harassing and threatening collection calls to Consumers to induce them to continue making their Daily Payments;

r.   Fixing attorneys' fees in the Merchant Agreement at an arbitrary percentage (25%) of the accelerated balance that is grossly disproportionate to the fees actually incurred in filing COJs and related documents;

s.   Including substantively unconscionable contract provisions in the Merchant Agreements (e.g., clauses requiring Consumers to execute a COJ, thereby forcing Consumers to waive their rights to notice and a hearing; clauses providing that Consumers "consent[] to the waiver of notice" prior to the Yellowstone MCA Defendants exercising any rights under the Merchant Agreements; "No Liability" clauses requiring Consumers to waive any claims against the Yellowstone MCA Defendants "under any legal theory"; power of attorney clauses requiring the merchant to "irrevocably appoint[] [the Yellowstone MCA Defendants] as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations" due to the Yellowstone MCA Defendants from Consumers upon the occurrence of an Event of Default under the Merchant Agreement, including to collect monies that have become due with respect to any of the collateral, to endorse checks related to that collection, to sign the Consumer's name on any invoice directing the Consumer's customers to make their payments directly to the

Yellowstone MCA Defendants, and "to enforce its rights with respect to payment of the Purchased Amount"; and clauses providing for both jury trial waivers and class action waivers);

t.   Conducting unauthorized and/or excessive credit checks;

u.   Allowing Third Parties to use the Yellowstone platform to perform Consumer credit checks without notice to or the consent of Consumers;

v.   Sharing the Consumer's Merchant Agreement, including the Consumer's sensitive banking information, with Third Parties, without first obtaining the Consumer's express informed consent;

w.   Failing to conduct any meaningful supervision of the Third Parties' brokering, underwriting, negotiating, servicing, and collection activities relating to Defendant Yellowstone's Merchant Agreements with Consumers;

x.   Filing Affidavits of COJ designating 10 counties for filing, in violation of the requirement in N.Y. C.P.L.R. § 3218 that the Affidavit designate only one county where the Affidavit may be filed;

y.   Failing to advise Consumers that the following documents are all part of their contract with the Yellowstone MCA Defendants and/or explain the impact of these documents on the contract: the Addendum converting the Specified Percentage of receivables to a fixed Daily Payment, the Security Agreement requiring Consumers to provide the Yellowstone MCA Defendants with a security interest in all of their assets, the Guaranty requiring the individual owner to personally guarantee the performance of the small business, and the Affidavit of COJ allowing Defendants to immediately obtain a judgment in the event of an alleged default without notice or a hearing;

z.   Burying the Consumer's right to request a reconciliation in small print in the Addendum to the Merchant Agreement;

aa.   Failing to specify in the "Events of Default" section of the Merchant Agreement that in some instances, just two or four missed payments constitutes a default, thereby triggering the enforcement mechanisms available to Defendants through the Security Agreement, the Guaranty, and the COJ, and instead burying this event of default under "NSF Fee" in Appendix A to the Merchant Agreement that provides a list of fees;

bb.   Providing the Merchant Agreements in small, illegible type, with material provisions in some instances appearing in 5.5-point to 6-point font size; and

cc.   Providing in the Merchant Agreements and Security Agreements that

Case 1:22-cv-00359-LAK Document 1-3 Filed 01/14/22 Page 87 of 154

the Yellowstone MCA Defendants may use another legal name and/or doing business as name when filing UCC-1 financing statements and other notices or filings, without identifying other legal names or doing business as names that the Yellowstone MCA Defendants might use.

169. Each unconscionable commercial practice by Defendants constitutes a separate violation under the CFA, specifically N.J.S.A. 56:8-2.

## COUNT II

### VIOLATION OF THE CFA BY DEFENDANTS
### (FALSE PROMISES, MISREPRESENTATIONS, DECEPTION
### AND KNOWING OMISSIONS OF MATERIAL FACT)

170. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 169 above as if more fully set forth herein.

171. Defendants' conduct in violation of the CFA includes, but is not limited to, the following acts of false promises, misrepresentations and/or deception:

  a. Misrepresenting or concealing from Consumers the true nature of the MCA transactions as usurious loans;

  b. Misrepresenting to Consumers the amount of the Purchase Price they would receive, the amount of fees the Yellowstone MCA Defendants would debit from their bank accounts, and the upfront fees they charged;

  c. Failing to conspicuously disclose that various fees buried towards the end of the Merchant Agreements are withdrawn upfront from the promised Purchase Price;

  d. Providing that several of the fees would be either a defined amount or a percentage of the funded amount (e.g., ACH Program Fee of "$395.00 or up to 10% of the funded amount," Bank Fee of "$195.00 or up to 10% of the funded amount"), but then failing to notify Consumers what the specific amount of each of those fees would be and whether those amounts would be withheld from the Purchase Price;

  e. Withholding amounts greater than the specified fee amount from the Purchase Price or failing to disclose additional withheld fee(s);

  f. Fraudulently inducing Consumers to "Refinance" their MCAs rather than engage in reconciliation;

  g. Concealing from a Consumer the compounded interest charges for

"refinancing" previous balances under prior Merchant Agreements;

h. Representing on the Yellowstone Website that "we say yes to more small businesses, regardless of collateral or credit," but then requiring Consumers to execute Security Agreements providing collateral to Defendants in the event of a default and repeatedly conducting excessive and/or unauthorized credit checks in considering Consumer applications for MCAs;

i. Representing in advertising that Yellowstone's business loans are "unsecured," but then specifically labeling the Merchant Agreements as "secured" and requiring Consumers to provide various forms of security to Yellowstone as a prerequisite to receiving MCAs;

j. Representing in advertising that Yellowstone offers flexible repayment terms (e.g., "if sales are up[,] you'll pay a larger repayment, but if sales are down, you'll pay less"), but then ignoring or refusing Consumer requests to pay less when their sales were down;

k. Representing in advertising that "We Provide Capital With No Personal Guarantee," but then requiring Consumers to execute a Guaranty and Affidavit of COJ as part of the Merchant Agreements that require the Consumer to personally guarantee the MCA in the event of a default;

l. Representing to Consumers that Defendants Yellowstone and MCA Recovery maintained an office in New York, when at least two Consumers flew from different states to Defendants' office in New York only to find that there was no office at the location provided by Defendants;

m. Holding individuals or entities out as employees to Consumers by permitting those individuals or entities to work out of desktops on Yellowstone premises, or to send emails to Consumers from Yellowstone email addresses, but then later claiming those individuals or entities were "Third Parties" for which Defendant Yellowstone was not responsible;

n. Prior to July 2019, failing to disclose to Consumers the Third Parties' functions and/or involvement with the performance of the Merchant Agreements at the time of funding, despite permitting Third Parties to use Yellowstone email addresses in correspondence with Consumers;

o. Requiring Consumers to execute Affidavits of COJ as part of the Merchant Agreements without providing any explanation of what the COJ was or its impact on the Consumers (e.g., sending the COJ with the Merchant Agreement as an attachment to an email and directing the Consumer to return same within a short period of time);

p.  Agreeing to revise repayment terms or providing the required "prior written consent" for a bank change, but then, when the Consumers acted on that agreement or authorization, immediately filing COJs and obtaining judgments against them;

q.  Misrepresenting the availability of reconciliation, but then refusing Consumers' requests for reconciliation and directing that the advance be paid back within a specified time period, or simply failing to respond to Consumers' inquiries regarding reconciliation;

r.  Prior to November 2018, failing to adequately inform Consumers of their right to request reconciliation (under the Merchant Agreements) at the time of funding; and

s.  Entering settlement agreements with Consumers, but then failing to abide by the terms of those agreements, thereby causing additional financial harm to Consumers.

172.  Each false promise, misrepresentation, deception, and/or knowing omission of material fact by Defendants constitutes a separate violation under the CFA, specifically N.J.S.A. 56:8-2.

## COUNT III

### VIOLATION OF THE CFA BY YELLOWSTONE MCA DEFENDANTS (USE OF UNREGISTERED, ASSUMED OR FICTITIOUS NAMES)

173.  Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 172 above as if set forth more fully herein.

174.  N.J.S.A. 56:1-2, which prohibits a person from conducting business under an assumed name that is not registered, provides in pertinent part:

> No person shall conduct or transact business under any assumed name, or under any designation, name or style, corporate or otherwise, other than the real name or names of the individual or individuals conducting or transacting such business, unless such person shall file a certificate in the office of the clerk of the county or counties in which such person conducts or transacts, or intends to conduct or transact, such business, together with a duplicate thereof

for filing in the office of the Secretary of State, as provided in section 56:1-3 of this Title.

[N.J.S.A. 56:1-2.]

175.    Pursuant to N.J.S.A. 56:1-5, corporations are exempted from the requirements of N.J.S.A. 56:1-2; however, individuals and limited liability companies must register their assumed names.

176.    At all relevant times, the Yellowstone MCA Defendants were limited liability companies required to register their assumed names.

177.    At all relevant times, the Yellowstone MCA Defendants included a provision in the Merchant Agreements and Security Agreements purporting to permit them to conduct business under unregistered assumed names.

178.    The Yellowstone MCA Defendants have engaged in conduct in violation of N.J.S.A. 56:1-2 by providing in the Merchant Agreements and Security Agreements that the Yellowstone MCA Defendants may use another legal name and/or doing business as name when filing UCC-1 financing statements and other notices or filings, without identifying other legal names or doing business as names that the Yellowstone MCA Defendants might use.

179.    The Yellowstone MCA Defendants' conduct constitutes an unconscionable commercial practice in violation of the CFA, specifically N.J.S.A. 56:8-2.

## COUNT IV

### VIOLATION OF THE ADVERTISING
### REGULATIONS BY DEFENDANT YELLOWSTONE

180.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 179 above as if more fully set forth herein.

181.    The Advertising Regulations, N.J.A.C. 13:45A-9.1 to -9.8, address, among other

issues, general advertising practices.

182.    Specifically, the Advertising Regulations governing general advertising practices

provide, in relevant part:

(a)    Without limiting the application of N.J.S.A. 56:8-1 [to -226], the following
practices shall be unlawful with respect to all advertisements:

. . . .

9.    The making of false or misleading representations of facts
concerning the reasons for, existence or amounts of price reductions,
the nature of an offering or the quantity of advertised merchandise
available for sale.

[N.J.A.C. 13:45A-9.2(a)(9).]

183.    Defendant Yellowstone violated the Advertising Regulations by engaging in

certain conduct including, but not limited to:

a.    Representing on the Yellowstone Website that "we say yes to more
small businesses, regardless of collateral or credit," but then requiring
Consumers to execute Security Agreements providing collateral to
Yellowstone in the event of a default and repeatedly conducting
excessive and/or unauthorized credit checks in considering Consumer
applications for MCAs;

b.    Representing in advertising that Yellowstone's business loans are
"unsecured," but then specifically labeling the Merchant Agreements as
"secured" and requiring Consumers to provide various forms of security
to Yellowstone as a prerequisite to receiving MCAs;

c.    Representing in advertising that Yellowstone offers flexible repayment
terms (e.g., "if sales are up[,] you'll pay a larger repayment, but if sales
are down, you'll pay less"), but then ignoring or refusing Consumer
requests to pay less when their sales were down; and

d.    Representing in advertising that "We Provide Capital With No Personal
Guarantee," but then requiring Consumers to execute a Guaranty and
Affidavit of COJ as part of the Merchant Agreements that require the
Consumer to personally guarantee the MCA in the event of a default.

184.    Defendant Yellowstone's conduct constitutes multiple violations of the Advertising

Regulations, specifically N.J.A.C. 13:45A-9.2(a)(9), each of which constitutes a per se violation

of the CFA, specifically N.J.S.A. 56:8-2.

## **PRAYER FOR RELIEF**

WHEREFORE, based upon the foregoing allegations, Plaintiffs respectfully request that

the Court enter judgment against Defendants:

(a) Finding that the acts and practices of Defendants constitute multiple instances of unlawful practices in violation of the CFA, N.J.S.A. 56:8-1 to -226 and that the acts and practices of Defendant Yellowstone constitute multiple instances of unlawful practices in violation of the Advertising Regulations, N.J.A.C. 13:45A-9.1 to -9.8;

(b) Permanently enjoining Defendants and their owners, officers, directors, shareholders, founders, managers, members, agents, servants, employees, representatives, independent contractors and all other persons or entities under their control, from engaging in, continuing to engage in or doing any acts or practices in violation of the CFA, N.J.S.A. 56:8-1 to -226, and the Advertising Regulations, N.J.A.C. 13:45A-9.1 to -9.8, including, but not limited to, the acts and practices alleged in this Complaint, as authorized by the CFA, specifically N.J.S.A. 56:8-8;

(c) Directing Defendants, jointly and severally, to restore to any affected person, whether or not named in this Complaint, any money or real or personal property acquired by means of any practice alleged herein to be unlawful and found to be unlawful, as authorized by N.J.S.A. 56:8-8;

(d) Directing Defendants, jointly and severally, to pay the maximum statutory civil penalties for each and every violation of the CFA, in accordance with N.J.S.A. 56:8-13;

(e) Directing Defendants, jointly and severally, to pay costs and fees, including attorneys' fees, for the use of the State of New Jersey, as authorized by N.J.S.A. 56:8-11 and N.J.S.A. 56:8-19;

(f) Directing Defendants, jointly and severally, to disgorge all profits unlawfully acquired or retained, as authorized by N.J.S.A. 56:8-8;

(g) Ordering the rescission of each ongoing agreement entered into between the Yellowstone MCA Defendants and any Consumer in connection with an MCA, including each Merchant Agreement; Addendum to Secured Merchant Agreement; Appendix A – Fee Structure; ACH Authorization Form; a Security Agreement and Guaranty; and/or an Affidavit of COJ;

(h)     Ordering Defendants to apply to vacate all unlawfully obtained judgments issued in their favor against Consumers by all courts that have issued such judgments, in papers acceptable to the Plaintiffs;

(i)     Ordering Defendants to file papers sufficient to terminate all unlawfully obtained liens or security interests related to their MCAs;

(j)     Ordering Defendants to file papers or take other actions sufficient to stay the execution of or collection of unlawfully obtained judgments;

(k)     Ordering Defendants to provide an accounting to Plaintiffs of the names and addresses of each Consumer from whom Defendants collected or received monies since July 16, 2015, in connection with MCAs and a complete history, by dates, amounts, and sources, of all monies collected or received by Defendants from all such Consumers (whether through daily payments, execution of judgments, or any other avenue), and all moneys provided by Defendants to such Consumers; and

(l)     Granting such other relief as the interests of justice may require.

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiffs

By:  _Chanel Van Dyke_

Chanel Van Dyke
Deputy Attorney General
Consumer Fraud Prosecution Section

Dated:  December 8, 2020
        Newark, New Jersey

## RULE 4:5-1 CERTIFICATION

I certify, to the best of my information and belief, that the matter in this action involving the aforementioned violations of the CFA, N.J.S.A. 56:8-1 to -226, and the Advertising Regulations, N.J.A.C. 13:45A-9.1 to -9.8, is not the subject of any other action pending in any other court of this State. I further certify, to the best of my information and belief, that the matter in controversy in this action is not the subject of a pending arbitration proceeding in this State, nor is any other action or arbitration proceeding contemplated. I certify that there is no other party who should be joined in this action at this time.

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiffs

By: _____
Chanel Van Dyke
Deputy Attorney General
Consumer Fraud Prosecution Section

Dated: December 8, 2020
Newark, New Jersey

## RULE 1:38-7(c) CERTIFICATION OF COMPLIANCE

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with R. 1:38-7(b).

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiffs

By: _____
Chanel Van Dyke
Deputy Attorney General
Consumer Fraud Prosecution Section

Dated:  December 8, 2020
Newark, New Jersey

## DESIGNATION OF TRIAL COUNSEL

Pursuant to R. 4:25-4, Deputy Attorney General Chanel Van Dyke is hereby designated as trial counsel for the Plaintiffs in this action.

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiffs

By: _____
Chanel Van Dyke
Deputy Attorney General
Consumer Fraud Prosecution Section

Dated:  December 8, 2020
Newark, New Jersey

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | **Case No. 20-cv-6023** |
| Plaintiff, | **COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |
| v. | |
| YELLOWSTONE CAPITAL LLC, a New York limited liability company, | |
| FUNDRY LLC, a New York limited liability company, | |
| YITZHAK D. STERN, a/k/a Isaac Stern, individually and as an officer of Yellowstone Capital LLC and Fundry LLC, and | |
| JEFFREY REECE, individually and as an officer of Yellowstone Capital LLC and Fundry LLC, | |
| Defendants. | |

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.     The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), to obtain permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), in connection with their business financing activities.

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

Case 1:20-cv-03565-VSB   Document 1-3   Filed 05/03/2022   Page 98 of 154

3.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2), (c)(1), (c)(2), and

(d), and 15 U.S.C. § 53(b).

## PLAINTIFF

4.      The FTC is an independent agency of the United States Government created by

statute. 15 U.S.C. §§ 41–58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a),

which prohibits unfair or deceptive acts or practices in or affecting commerce.

5.      The FTC is authorized to initiate federal district court proceedings, by its own

attorneys, to enjoin violations of the FTC Act and to secure such equitable relief as may be

appropriate in each case, including rescission or reformation of contracts, restitution, the refund

of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. § 53(b).

## DEFENDANTS

6.      Defendant **Yellowstone Capital LLC** ("Yellowstone") is a New York limited

liability company with its principal place of business at 1 Evertrust Plaza, Jersey City, New

Jersey 07302.  Until at least March 2016, its principal place of business was 160 Pearl Street,

New York, New York 10005, and it continues to use business addresses located in this District in

connection with acts and practices alleged below.  Yellowstone transacts or has transacted

business in this District and throughout the United States.  At times material to this Complaint,

acting alone or in concert with others, Yellowstone has advertised, marketed, offered, or

distributed financing to businesses throughout the United States.

7.      Defendant **Fundry LLC** ("Fundry") is a New York limited liability company

with its principal place of business at 1 Evertrust Plaza, Jersey City, New Jersey 07302.  Until at

least March 2016, its principal place of business was 160 Pearl Street, New York, New York

10005.  Fundry transacts or has transacted business in this District and throughout the United

2

INDEX NO. 656696/2021
RECEIVED NYSCEF: 12/13/2021

Case 1-21-cv-00596-DAE   Document 1-3  Filed 06/03/2022  Page 99 of 154

States.  At times material to this Complaint, acting alone or in concert with others, Fundry has

advertised, marketed, offered, or distributed financing to businesses throughout the United

States.

8.      Defendant **Yitzhak D. Stern**, also known as Isaac Stern ("Stern"), is a founder

and the Chief Executive Officer of both Yellowstone and Fundry.  At all times material to this

Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the

authority to control, or participated in the acts and practices set forth in this Complaint.

Defendant Stern, in connection with the matters alleged herein, transacts or has transacted

business in this District and throughout the United States.

9.      Defendant **Jeffrey Reece** ("Reece") is the President of both Yellowstone and

Fundry.  At all times material to this Complaint, acting alone or in concert with others, he has

formulated, directed, controlled, had the authority to control, or participated in the acts and

practices set forth in this Complaint.  Defendant Reece, in connection with the matters alleged

herein, transacts or has transacted business in this District and throughout the United States.

## COMMON ENTERPRISE

10.      Defendants Yellowstone and Fundry (collectively, "Corporate Defendants") have

operated as a common enterprise while engaging in the deceptive and unfair acts and practices

alleged below.  Corporate Defendants have conducted the business practices described below

through interrelated companies that have common officers, managers, business functions,

employees, and office locations.  Because these Corporate Defendants have operated as a

common enterprise, they are partners in concerted wrongdoing and liable for the acts and

practices alleged below.  Defendants Stern and Reece have formulated, directed, controlled, had

the authority to control, or participated in the acts and practices of the Corporate Defendants that

3

constitute the common enterprise and are partners in the concerted wrongdoing of the common

enterprise.

## COMMERCE

11.　　At all times material to this Complaint, Defendants have maintained a substantial

course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act,

15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

### Overview

12.　　Since at least 2015, Defendants have advertised, marketed, and offered short-

term, high-cost financing products to small business consumers in immediate need of funds.

Defendants tout these products – often referred to as "merchant cash advances" ("MCAs") – as a

quick source of funds for consumers that do not qualify for bank loans or other traditional forms

of financing.  Defendants characterize their products as discounted purchases of consumers'

future receivables to be repaid in a larger amount via daily installment payments purportedly

based on a percentage of consumers' incoming business receipts.

13.　　Defendants often advertise, market, and offer their MCAs through a vast, ever-

changing network of agents.  Some of these agents include, but are not limited to, Green Capital

Funding LLC, West Coast Business Capital, LLC, World Global Capital LLC, High Speed

Capital LLC, Thryve Capital Funding LLC, and Mason Capital LLC.

14.　　Defendants engage in a pattern of deceptive and unfair conduct in connection with

the marketing, advertising, and offering of their MCAs.  They have misrepresented key aspects

of their products, including their requirements that consumers provide collateral and personal

guarantees, as well as the specific financing amount they will disburse to consumers.

Case 1:20-cv-03583-AS   Document 1-3   Filed 08/03/22   Page 101 of 154

Additionally, the Defendants have made excess, unauthorized withdrawals from consumers'

accounts after consumers already repaid the full amount that they owed.

**Misrepresentations Regarding Collateral
and Personal Guarantees**

15.     Since at least 2015, Defendants have disseminated advertisements that claim that

their MCAs do not require collateral or a personal guarantee.

16.     For example, Defendants have disseminated numerous online advertisements, on

websites including www.yellowstonecap.com, www.m.yellowstonecap.com,

www.smallbusinessfunders.com, www.sbfcash.com, and www.3hourfunding.com, that make the

following statements:

     a.     "We say yes to more small businesses, regardless of collateral" (**Exhibit A**);

     b.     "No collateral loans" & "We won't ask for any kind of collateral" (**Exhibit B**);

     c.     "No collateral, no personal guarantee" (**Exhibit C**);

     d.     "No collateral required" (**Exhibit D**);

     e.     "No Collateral Requirements" (**Exhibit E**);

     f.     "No Personal Guarantee Loans" & "We Provide Capital With No Personal

        Guarantee" (**Exhibit F**); and

     g.     "No Collateral Loans" (**Exhibit G**).

17.     Defendants' video advertisements also represent that Defendants do not require

collateral or personal guarantees.  For example, one of Defendants' video advertisements,

attached as **Exhibit H**, makes the following prominent claims:

5



As this image is displayed, an audio voiceover makes the following representations: "No collateral required. No collateral, no personal guarantee."

18.    Defendants have also disseminated direct mail pieces that represent that they do not require personal guarantees. For example, one such direct mail piece, attached as **Exhibit I**, states: "You do not need excellent credit, or give us a personal guarantee."

19.    In reality, in many instances, Defendants do require business owners to sign a guarantee holding them personally responsible for the entire funded amount should the business default. Additionally, in many instances, Defendants do require that consumers provide collateral, by granting Defendants a purported security interest or lien in all business property consumers own, including all financial accounts, equipment, inventory and other assets.

20.    When consumers default on their financing agreements, Defendants frequently file lawsuits against them, including against the individual business owners who provided the personal guarantees, in order to collect the unpaid funded amount. Additionally, in many instances, as part of these lawsuits, the Defendants seek court orders to seize the collateral that

consumers have pledged. Defendants Stern and Reece have closely overseen and directed

Defendants' day-to-day advertising and marketing efforts. Among other things, they have

directly managed the work of Defendants' marketing agents. They have also frequently

reviewed and provided feedback and approval for advertising content and claims. In fact,

Defendants Stern and Reece have specifically reviewed copies of advertisements that claim the

Defendants do not require collateral.

<u>**Misrepresentations Regarding Financing Amount**</u>

21.     Defendants promote that they provide immediate financing in a specific amount

in exchange for consumers' agreement to repay a higher amount out of consumers' future

business revenues. Consumers remit the repayment amount over a period of months through

daily debits from their bank accounts in installment amounts purportedly corresponding to an

estimated percentage of each day's receipts.

22.     Since at least early 2015 until at least October 2018, the first page of Defendants'

contracts has prominently set forth the "Purchase Price" (the total dollar amount to be provided

to the consumer), the "Specified Percentage" (the percentage of daily revenues used to calculate

daily installment payments to Defendants), and the "Purchased Amount" (the total amount to be

repaid from future receivables).

23.     For example, in an agreement to provide $10,000 in financing, the first page of

the contract provides as follows:

| PURCHASE PRICE: | SPECIFIED PERCENTAGE: | PURCHASED AMOUNT: |
|---|---|---|
| $10,000 | 25% | $14,000 |

24.     In this example, Defendants purportedly agree to provide $10,000 in funding, and

the consumer agrees to repay a total of $14,000 via daily withdrawals from the consumer's bank

account.  The amount of those daily withdrawals is purportedly set at 25% of the consumer's

daily receipts.  A redacted example of Defendants' entire financing agreement is attached to this

complaint as **Exhibit J**.

25.     In reality, however, Defendants routinely provide consumers with substantially

less than the total amount promised on the first page of the contract, by withholding fees that

range from hundreds to thousands of dollars prior to disbursement.  These fees are mentioned

several pages into the contract without any indication that they are deducted from the "Purchase

Price" – the funds promised to consumers.  As a result, consumers, in numerous instances, have

received significantly less funding than they were promised.

26.     In numerous instances, Defendants Stern and Reece have received messages

detailing the difference between the funding amount promised to specific consumers in

Defendants' contracts and the significantly lower amount disbursed to those same consumers

after additional fees were withheld.

27.     To the extent Defendants reveal the actual funding amount consumers will

receive, they sometimes do so in a brief telephone call only *after* consumers have signed their

contracts.  In some instances, consumers express confusion and surprise when they learn that

they will receive significantly less funding than they were promised in their contracts.  For

example, when one consumer learned that she would receive roughly $4,000 less than her

contract stated, she responded, "I think something is wrong," and "you guys are like highway

robbery."

### Unauthorized Withdrawals

28.     Defendants require consumers to provide authorization for Defendants to

withdraw daily payments – typically hundreds of dollars each day – from customers' accounts

using ACH debits until customers have fully repaid the "Purchased Amount" they owe under their agreements.

29.     Since at least 2015, Defendants have withdrawn money from customers' accounts in excess of the amounts customers authorized, by continuing to withdraw daily payments from customers after they have already fully repaid the "Purchased Amount." These unauthorized overpayments have been a typical occurrence for Defendants' customers, and have impacted at least thousands of them, in amounts ranging from hundreds to thousands of dollars.

30.     Defendants have acknowledged that they take these overpayments from customers knowingly. Specifically, Defendants' payment and recordkeeping processes create a "lag" or "debit delay" that results in them collecting an additional 4-5 or more unauthorized payments after customers have already fully repaid the "Purchased Amount." For example, Defendants received one customer complaint stating: "My loan payoff was met and exceeded . . . [by] 4 daily payments totaling in the amount of $3480." Defendants explained to another customer who complained about excess, unauthorized debits that "there is a 4 day lag on ACH debits . . . it's simply the way our processor works."

31.     In both internal communications and communications with customers in response to complaints, Defendants' employees and agents have repeatedly acknowledged that the "lag" or "debit delay" was common practice for Defendants. For example, in response to a customer complaint about such overpayments, Defendants' Operations Manager wrote to one of Defendants' in-house servicers: "Maybe send an account summary so [the customer] understands the 5 day debit delay?" When another customer questioned these overpayments during a telephone call, one of Defendants' in-house servicers responded that "there is *always* a delay" (emphasis added) in the prompt cessation of daily withdrawals. In response to another

customer who noticed and complained after the first day of overpayment, one of Defendants'

servicers responded that he "made an exception" for the customer by stopping ACH debits

before the full 4-5 days of overpayments elapsed.

32.     Additionally, in numerous instances, Defendants' unauthorized payments have

exceeded the 4-5 days associated with their typical "lag" or "debit delay."  For example, one

customer submitted a complaint stating that Defendants continued making ACH debits from his

account "for another two weeks and only stopped after numerous calls," resulting in an

overpayment of $4,345.00.  Another customer reported that "[a]ccording to our contract which

we have, we would pay back $10,213.00. . . . Yellowstone has withdrawn $5,409 over the

amount we owed them."

33.     Beyond the unauthorized payments themselves, in some instances, customers

incur additional monetary and other harm, including overdraft fees charged by customers' banks

because their accounts were drained of funds by Defendants' unauthorized withdrawals.  For

example, one customer wrote to Defendants that she "ha[d] $140 in overdraft fees that would not

have happened if [Defendants] would of [*sic*] stopped withdrawing on Monday when I called to

confirm it was the last payment …. I'm still overdrawn and need it desperately."  When another

customer complained to Defendants about overpayments taken from her, and resulting bank

overdraft fees, one of Defendants' in-house servicers told his employee "if she busts your balls

again and doesn't stop – u can use ur judgment and throw her the $100 to go away," and

Defendants' Operations Manager stated "I think it's money well spent if you don't have to talk to

her."

34.     To the extent Defendants refund these unauthorized debits, in numerous instances,

they do so only in response to complaints from customers.  In fact, even after customers

complain to Defendants about these unauthorized withdrawals, Defendants sometimes take weeks or months to refund these payments to customers.

35.     As indicated above, customers each typically pay hundreds (and sometimes thousands) of dollars in these excess, unauthorized payments.  Defendants have charged at least millions of dollars in unauthorized overpayments.

36.     Defendants Stern and Reece have closely overseen and managed Defendants' servicing and collection of payments from consumers.  They have directly supervised their in-house servicers and disseminated relevant policies and practices to them.  Additionally, Defendants Stern and Reece have known about, and communicated with their in-house servicers about, the existence of unauthorized overpayments by consumers.

37.     Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission.

Case 1:20-cv-05766-DAB    Document 1-3   Filed 06/03/2022   Page 210 of 154

## VIOLATIONS OF THE FTC ACT

38.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

39.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

40.    Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

### Count I

### Misrepresentations Regarding
### Collateral and Personal Guarantees

41.    In numerous instances in connection with the advertising, marketing, promotion, or offering of small business financing products, Defendants have represented, directly or indirectly, expressly or by implication, that Defendants:

      a.   require no collateral; and

      b.   require no personal guarantee from business owners.

42.    In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 41, such representations were false or misleading at the time Defendants made them.

43.    Therefore, Defendants' representations as set forth in Paragraph 41 are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count II

### Misrepresentations Regarding Financing Amount

44.     In numerous instances in connection with the advertising, marketing, promotion, or offering of small business financing products, Defendants have represented, directly or indirectly, expressly or by implication, that consumers will receive a specific amount of financing.

45.     In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 44, such representations were false or misleading at the time Defendants made them.

46.     Therefore, Defendants' representations as set forth in Paragraph 44 are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count III

### Unfair Unauthorized Withdrawals

47.     In numerous instances, Defendants have withdrawn money from consumers' bank accounts in amounts in excess of consumers' authorization without the express informed consent of consumers.

48.     Defendants' actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

49.     Therefore, Defendants' practices as described in Paragraph 47 above constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and 45(n).

## CONSUMER INJURY

50.      Consumers are suffering, have suffered, and will continue to suffer substantial
injury as a result of Defendants' violations of the FTC Act.  In addition, Defendants have been
unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this
Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm
the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

51.      Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant
injunctive and such other relief as the Court may deem appropriate to halt and redress violations
of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable
jurisdiction, may award ancillary relief, including rescission or reformation of contracts,
restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and
remedy any violation of any provision of law enforced by the FTC.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b)
and the Court's own equitable powers, requests that the Court:

A.      Enter a permanent injunction to prevent future violations of the FTC Act by
Defendants;

B.      Award such relief as the Court finds necessary to redress injury to consumers
resulting from Defendants' violations of the FTC Act, including rescission or reformation of
contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

C.      Award Plaintiff the costs of bringing this action, as well as such other and
additional relief as the Court may determine to be just and proper.

Dated:  August 3, 2020          Respectfully submitted,

ALDEN F. ABBOTT
General Counsel

 /s/  *Christopher B. Leach*
EVAN R. ZULLOW
(ezullow@ftc.gov)
THOMAS C. KOST
(tkost@ftc.gov)
CHRISTOPHER B. LEACH
(cleach@ftc.gov)
IOANA R. GORECKI
(igorecki@ftc.gov)
Federal Trade Commission
600 Pennsylvania Ave. NW
Mail Stop CC-10232
Washington, DC 20580
Tel: 202-326-2914 (Zullow);
202-326-2286 (Kost);
202-326-2394 (Leach);
202-326-2077 (Gorecki)
Fax: 202-326-2752

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

# EXHIBIT 3

# MAX RECOVERY GROUP LLC

55 BROADWAY | 3RD FLOOR
NEW YORK, NEW YORK 10006

VADIM SEREBRO, ESQ.
*GENERAL COUNSEL*
E-mail: Legal@MaxRecoveryGroup.com

TEL:  646.517.8956
FAX:  646.398.5652
*(not for service of papers)*

November 16, 2021

**New Amsterdam Football Club, P.B.C.**
**Attn: Legal Department**

## UCC LIEN NOTICE

Re:     ***Fruit Street Health PBC d/b/a Fruit Street***
***Health PBC d/b/a Welliko***
***EIN: 46-5619384***
***Balance due to Green Capital Funding LLC:***
***$365,120.00***

Dear Legal Department:

I am one of the attorneys for, and General Counsel to, Max Recovery Group, LLC, the collections firm hired by Green Capital Funding LLC ("GCF"). This notice is being sent pursuant to UCC §9-406 as it has come to our attention that New Amsterdam Football Club, P.B.C. has been conducting business with, and forwarding receivables to, Fruit Street Health PBC d/b/a Fruit Street Health PBC d/b/a Welliko (the "Merchant"), located at 85 BROAD STREET 18TH FLOOR, NEW YORK, NY 10004.

Please be advised that the Merchant has defaulted on a secured merchant agreement entered into by and between the Merchant and GCF on 04/07/2021, a copy of which is enclosed herein for your reference (the "Agreement"). The balance currently due and owing to GCF pursuant to the Agreement is $365,120.00.

According to the Agreement, GCF purchased $547,600.00 of the Merchant's future accounts-receivable for the purchase price of $400,000.00. The Agreement was structured so that GCF was to receive a percentage of all of the Merchant's receipts. In accordance with the Agreement, GCF filed a UCC-1 financing statement with the appropriate Secretary of State, thereby obtaining a perfected security interest in the Merchant's assets, including without limitation the Merchant's receipts, making GCF a secured creditor with respect to the accounts-receivable of the Merchant. A copy of the UCC-1 is also enclosed herein for your reference.

Pursuant to Section 9-406 of the Uniform Commercial Code (UCC), you are directed to forward all receipts due the Merchant to Max Recovery Group LLC, in trust for GCF, as same

November 16, 2021
Page 2 of 2

become due.  Making your payment directly to GCF is the only way to assure that your payment is, in fact, credited to your account obligations to the Merchant.  Please understand that no representative of the Merchant has any authority to collect or receive your payment.  Payment made to the Merchant will not discharge your obligation as described above and will result in you paying the obligation twice as UCC 9-406 directs that once an account debtor has been notified of the assignment of an account, the account debtor may not discharge the account obligation by paying the assignor (in this case, the Merchant). Thus, remitting payment to anyone other than Max Recovery Group LLC, in trust for  {{company|120088}}, will still result in your having to pay GCF.

We trust that you share GCF's desire to avoid the time, expense and inconvenience which would inevitably accompany formal legal proceedings and will, therefore, promptly forward full payment in order to amicably resolve this situation.  If need be, GCF will indemnify New Amsterdam Football Club, P.B.C. for all actions taken with respect to this matter.

Please comply with the above immediately, and contact me at (646) 517-8956, or at legal@maxrecoverygroup.com, if you have any questions or follow up.  Thank you in advance for your anticipated cooperation in this matter.

Sincerely,
**MAX RECOVERY GROUP LLC**

By: _____
Vadim Serebro, Esq.

0872048        2021 Oct 25 PM05:51

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
CSC 800-858-5294

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

CSC
801 Adlai Stevenson Dr
Springfield, IL 62703, USA
NYfilings@cscinfo.com
(Fax)800-345-6059

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME FRUIT STREET HEALTH PBC | | | |
|---|---|---|---|
| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 1c. MAILING ADDRESS 85 BROAD STREET 18TH FLOOR | CITY NEW YORK | STATE NY / POSTAL CODE 10004 | COUNTRY USA |
| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION Corporation | 1f. JURISDICTION OF ORGANIZATION NY | 1g. ORGANIZATIONAL ID #, if any None  [X] NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME FRUIT STREET HEALTH PBC d/b/a WELLIKO | | | |
|---|---|---|---|
| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 2c. MAILING ADDRESS 85 BROAD STREET 18TH FLOOR | CITY NEW YORK | STATE NY / POSTAL CODE 10004 | COUNTRY USA |
| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION Corporation | 2f. JURISDICTION OF ORGANIZATION NY | 2g. ORGANIZATIONAL ID #, if any None  [X] NONE |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME CORPORATION SERVICE COMPANY, AS REPRESENTATIVE | | | |
|---|---|---|---|
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 3c. MAILING ADDRESS PO BOX 2576 UCCSPREP@CSCINFO.COM | CITY Springfield | STATE IL / POSTAL CODE 62708 | COUNTRY USA |

4. This FINANCING STATEMENT covers the following collateral:
**All Assets now owned or hereafter acquired and wherever located, including but not limited to, the following subcategories of assets: a. Accounts, including but not limited to, credit card receivables; b. Chattel Paper; c. Inventory; d. Equipment; e. Instruments, including but not limited to, Promissory Notes; f. Investment Property; g. Documents; h. Deposit Accounts; i. Letter of Credits Rights; j. General Intangibles; k. Supporting Obligations; and l. Proceeds and Products of the foregoing. NOTICE PURSUANT TO AN AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, DEBTOR HAS AGREED NOT TO FURTHER ENCUMBER THE COLLATERAL DESCRIBED HEREIN, THE FURTHER ENCUMBERING OF WHICH MAY CONSTITUTE THE TORTIOUS INTERFERENCE WITH THE SECURED PARTY'S RIGHT BY SUCH ENCUMBRANCER IN THE EVENT THAT ANY ENTITY IS GRANTED A SECURITY INTEREST IN DEBTOR'S ACCOUNTS, CHATTEL PAPER OR GENERAL INTANGIBLES CONTRARY TO THE ABOVE, THE SECURED PARTY ASSERTS A CLAIM TO ANY PROCEEDS THEREOF RECEIVED BY SUCH ENTITY.**

| 5. ALTERNATIVE DESIGNATION [if applicable]: | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.   Attach Addendum [if applicable] | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | | All Debtors | Debtor 1 | Debtor 2 |
| 8. OPTIONAL FILER REFERENCE DATA 220705751 | | | | | | |

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

**Filing Number-202110256715062**

# GREEN CAPITAL FUNDING, LLC

116 Nassau Street, Suite 804, New York, NY 10038

### FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT

This agreement (this "Agreement"), dated 4/7/2021, between GREEN CAPITAL FUNDING, LLC ("GCF") and the seller(s) listed herein (collectively, the "Seller") (all capitalized terms shall have the meanings ascribed to them below):
**Business Legal Name:** FRUIT STREET HEALTH PBC
**D/B/A:** FRUIT STREET HEALTH PBC d/b/a WELLIKO
**Form of Business Entity:** Corporation          EIN #: 46-5619384
**Physical Address:** 85 BROAD STREET 18TH FLOOR, NEW YORK, NY 10004
**Mailing Address:** 85 BROAD STREET 18TH FLOOR, NEW YORK, NY 10004

| PURCHASE PRICE: | PURCHASED AMOUNT: | SPECIFIED PERCENTAGE: | INITIAL WEEKLY INSTALLMENT: |
|---|---|---|---|
| $ 400,000.00 | $ 547,600.00 | 49 % | $ 16,996.00 |

**FOR THE SELLER #1**                    **FOR THE SELLER #2**

*LAURENCE N GIRARD*

By: _____          By: _____
**Name:** LAURENCE N GIRARD            **Name:** N/A
**Title:** Owner/Agent/Manager         **Title:** N/A
**Email:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓              **Email:** N/A
**Business Phone:** ▓▓▓▓▓▓▓            **Business Phone:** N/A

   *Accurate contact information is required to provide the Seller with important information regarding the Agreement.

Concurrently with the execution of this Agreement by Seller, and as condition to the effectiveness hereof, Seller has caused the **Personal Guarantee of Performance** in the form attached hereto as "Exhibit A" (the "Guaranty") to be signed and delivered to GCF by the following Owner(s)/Guarantor(s) of Seller.

**OWNER/GUARANTOR #1**                    **OWNER/GUARANTOR #2**

*LAURENCE N GIRARD*

By: _____          By: _____
**Name:** LAURENCE N GIRARD            **Name:** N/A
**SSN:** ▓▓▓▓▓▓                        **SSN:** N/A
**Phone:** ▓▓▓▓▓▓▓                     **Phone:** N/A
**Address:** 180 WATER STREET #1115, NEW YORK, NY   **Address:** N/A
10038

Furthermore, in the event the Seller and/or Guarantor are comprised of more than one entity and/or individuals, then ALL such entities and/or individuals, respectively, shall sign the Addendum to this Agreement in the form attached hereto as Exhibit B (the "Addendum").

**WHEREAS**, Seller is desirous to sell to GCF, and GCF is desirous to purchase from Seller a Specified Percentage of the Seller's Future Receipts, but only on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the mutual receipts and sufficiency of which is hereby acknowledged by both parties, GCF and Seller hereby agree to the foregoing and as follows:

## 1. Basic Terms and Definitions.

**a.** "Effective Date" shall mean the later of: (i) the date set forth in the preamble to this Agreement, and (ii) the date when GCF paid the Purchase Price to Seller.

**b.** "Specified Percentage" shall mean FORTY NINE PERCENT (49%) of each and every sum from sale made by Seller of Future Receipts.

**c.** "Future Receipts" shall mean, collectively, all of Seller's receipts of any and all monies that shall be received by Seller from any source after the Effective Date of this Agreement; which payments or deliveries of monies can be made in the form of cash, check, credit, charge, or debit card, ACH or other electronic transfer or any other form of monetary payment and/or pecuniary benefit received by Seller.

**d.** "Weekly Receipts" shall mean the amount of Future Receipts received by Seller on a weekly basis.

**e.** "Purchased Amount" shall mean the total amount of the Specified Percentage of the Future Receipts that Seller shall be under obligation to deliver and pay over to GCF pursuant to this Agreement. The parties agree that the Purchased Amount shall be $547,600.00.

**f.** "Purchase Price" shall mean the total amount that GCF agrees to pay for the Purchased Amount. Note that the amount that Seller will actually receive from GCF pursuant to this Agreement will be less than the Purchase Price by the total sum of the Applicable Fees, Prior Balance and the Origination Fee, if any, as set forth in subparagraphs i., j. and k. below. The parties agree that the Purchase Price shall be $400,000.00.

**g.** "Initial Weekly Installment" shall mean the fixed amount that Seller and GCF agree to be a good faith approximation of the Specified Percentage of Seller's Weekly Future Receipts. Seller and GCF further agree that, based upon the information provided by Seller to GCF concerning Seller's most recent accounts receivables, including representations by the Seller to GCF regarding the Seller's estimated Future Receipts, and subject to Seller's right of adjustment/reconciliation set forth in this Agreement, as of the Effective Date the Initial Weekly Installment shall be $16,996.00.

**h.** "Workday" shall mean Monday through Friday except on days when banking institutions are closed for the holidays and do not process ACH payments.

**i.** "Applicable Fees" shall mean, collectively, all initial costs and fees that Seller agrees to pay to GCF as consideration for agreeing to enter into this Agreement and that are described in Section 17 of this Agreement. The total sum of the Applicable Fees will be deducted from the Purchase Price prior to delivering it to Seller pursuant to Seller's authorization set forth in Rider 1 to this Agreement, provided nevertheless that such deduction shall not be deemed to reduce the agreed upon Purchase Price.

**j.** "Prior Balance" shall mean the sum of all amounts that Seller may owe to GCF and/or third party(s) as of the Effective Date of this Agreement. The Prior Balance, if any, is described in Section 18 of this Agreement and will be deducted from the Purchase Price prior to delivering it to Seller pursuant to Seller's authorization set forth in Rider 2 to this Agreement, provided nevertheless that such deduction shall not be deemed to reduce the agreed upon Purchase Price.

**k.** "Origination Fee" shall mean the fee that Seller and a Broker have agreed to in conjunction with brokering this Agreement, which amount Seller authorizes GCF to withhold from the Purchase Price and pay to said Broker. The Origination Fee, if any, is described in Section 19 of this Agreement and will be deducted from the Purchase Price prior to delivering it to Seller pursuant to Seller's authorization set forth in Rider 3 to this Agreement, provided nevertheless that such deduction shall not be deemed to reduce the agreed upon Purchase Price.

**l.** In the event "Seller" is comprised of more than one entity, then:

    **i.** The term "Seller" shall mean, individually and collectively, all such entities; and

    **ii.** Each Seller is an "Affiliate" of all other Seller(s). The term "Affiliate" shall mean an entity or an individual that (1) controls, (2) is under the "Control", or (3) is under common Control with the entity or individual in question. The term "Control" shall mean direct or indirect ownership of more than 50% of the outstanding voting stock of a corporation or other majority equity interest if not a corporation and the possession of power to direct or cause the direction of the management and policy of such corporation or other entity, whether through ownership of voting securities, by stature, or by contract; and

    **iii.** The representations, warranties, covenants, obligations and liabilities of each Seller shall be joint and several under this Agreement; and

    **iv.** The liability of each Seller under this Agreement shall be direct and immediate and shall not be conditional or contingent upon the pursuance of any remedies against any other person or entity; and

    **v.** The terms "Specified Percentage", "Future Receipts", "Weekly Receipts", "Initial Weekly Installment" shall mean the Specified Percentage, the Future Receipts and the Weekly Receipts of each Seller individually; and

    **vi.** GCF may pursue its rights and remedies under this Agreement against any one or any number of entities that constitute Seller without obligation to assert, prosecute or exhaust any remedy or claim against any other Seller or any Guarantor.

1813101 479     Guarantor #1 Initials: _____     Guarantor #2 Initials:_____

**m.** In the event "Guarantor" is comprised of more than one individual, then:

**i.** The term "Guarantor" shall mean, individually and collectively, all such individuals; and

**ii.** Each Guarantor is an Affiliate of all other Guarantor(s); and

**iii.** The representations, warranties, covenants, obligations and liabilities of each Guarantor shall be joint and several under this Agreement and the Guaranty; and

**iv.** The liability of each Guarantor under this Agreement and the Guaranty shall be direct and immediate and shall not be conditional or contingent upon the pursuance of any remedies against any other person or entity; and

**v.** GCF may pursue its rights and remedies under this Agreement and/or Guaranty against any one or any number of individuals that constitute Guarantor without obligation to assert, prosecute or exhaust any remedy or claim against any other Guarantor or any Seller.

**2. The Term.** This Agreement for the purchase and sale of Future Receipts does not have a fixed duration or term, which is potentially infinite. Subject to the provisions of Sections 10-13 hereof, the term of this Agreement shall commence on the Effective Date and expire on the date (the "Expiration Date") when the Purchased Amount and all other sums due to GCF pursuant to this Agreement are received by GCF in full.

**3. Sale of Purchased Future Receipts.** Seller hereby sells, assigns, transfers and conveys (hereinafter, the "Sale") unto GCF all of Seller's right, title and interest in to the Specified Percentage of the Future Receipts until the Purchased Amount shall have been delivered by Seller to GCF (hereinafter, the portion of the Future Receipts sold by Seller to GCF pursuant to this Agreement, the "Purchased Future Receipts"); to have and hold the same unto GCF, its successors and assigns, forever. This Sale of the Purchased Future Receipts is made without express or implied warranty to GCF of collectability of the Purchased Future Receipts by GCF and without recourse against Seller and/or Guarantor(s), except as specifically set forth in this Agreement. By virtue of this Agreement, Seller transfers to GCF full and complete ownership of the Purchased Future Receipts and Seller retains no legal or equitable interest therein.

**4. Payment of Purchase Price.** In consideration of the sale by Seller to GCF of the Purchased Future Receipts pursuant to this Agreement, GCF agrees to pay to Seller the Purchase Price; the amount of the Purchase Price (reduced by the Applicable Fees, Prior Balance, and Origination Fee, if any) shall be delivered to Seller after execution of this Agreement.

**5. Use of Purchase Price.** Seller hereby acknowledges that it fully understands that: (i) GCF's ability to collect the Purchased Amount (or any portion thereof) is contingent upon Seller's continued operation of its business and successful generation of the Future Receipts until the Purchased Amount is delivered to GCF in full; and (ii) that in the event of decreased efficiency or total failure of Seller's business GCF's receipt of the full or any portion of the Purchased Amount may be delayed indefinitely. Based upon the forgoing, Seller agrees to use the Purchase Price exclusively for the benefit and advancement of Seller's business operations and for no other purpose.

**6. Initial Weekly Installments of Purchased Amount.** The Purchased Amount shall be delivered by Seller to GCF weekly in the amount of the Initial Weekly Installment on each and every week commencing on the Effective Date and ending on the Expiration Date.

**7. Approved Bank Account and Credit Card Processor.** During the term of this Agreement, Seller shall: (i) deposit all Future Receipts into one (and only one) bank account which bank account shall be acceptable and preapproved by GCF (the "Approved Bank Account"), (ii) use one (and only one) credit card processor which processor shall be acceptable and preapproved by GCF (the "Approved Processor") and (iii) deposit all credit card receipts into the Approved Bank Account. In the event the Approved Bank Account or Approved Processor shall become unavailable or shall cease providing services to Seller during the term of this Agreement, prior to the first date of such unavailability or cessation of services, Seller shall arrange for another Approved Bank Account or Approved Processor, as the case may be.

**8. Authorization to Debit Approved Bank Account.** Seller hereby authorizes GCF to initiate electronic checks or ACH debits from the Approved Bank Account (which as of the Effective Date of this Agreement shall be the account listed on Appendix A hereto) in the amount of the Initial Weekly Installment on each week commencing on the Effective Date until GCF receives the full Purchased Amount.  Seller shall provide GCF with all access code(s) for the Approved Bank Account.

**9. Fees Associated with Debiting Approved Bank Account.** It shall be Seller's exclusive responsibility to pay to its banking institution and/or GCF's banking institution directly (or to compensate GCF, in case it is charged) all fees, charges and expenses incurred by either Seller or GCF due to rejected electronic checks or ACH debit attempts, overdrafts or rejections by Seller's banking institution of the transactions contemplated by this Agreement, including without limitation a $35.00 charge per bounced or rejected ACH debit.

**10. Seller's Right for Reconciliation.** Seller and GCF each acknowledges and agrees that:

**a.** If at any time during the term of this Agreement Seller will experience unforeseen decrease or increase in its Weekly Receipts, for as long as Seller is not in default under the terms of this Agreement, Seller shall have the right, at its sole and absolute discretion, but subject to the provisions of Section 11 below, to request retroactive reconciliation of the Initial Weekly Installments for one (1) or more full calendar month(s) immediately preceding the day when such request for reconciliation is received by GCF (each such calendar month for which a reconciliation is requested, a "Reconciliation Month").

**b.** Such reconciliation (the "Reconciliation") of the Seller's Initial Weekly Installment for one or more Reconciliation

➡ Guarantor #1 Initials: _____        Guarantor #2 Initials:_____

Month(s) shall be performed by GCF within five (5) Workdays following its receipt of the Seller's request for Reconciliation by either crediting or debiting the difference back to, or from, the Approved Bank Account so that the total amount debited by GCF from the Approved Bank Account during the Reconciliation Month(s) at issue is equal to the Specific Percentage of the Future Receipts that Seller collected during the Reconciliation Month(s) at issue.

c. One or more Reconciliation procedures performed by GCF may reduce or increase the effective Initial Weekly Installment amount during the Reconciliation Month in comparison to the one set forth in Section 1 of this Agreement, and, as the result of such reduction, the term of this Agreement during which GCF will be debiting the Approved Bank Account may get shortened or extended indefinitely.

**11. Request for Reconciliation Procedure.**

a. It shall be Seller's sole responsibility and the right hereunder to initiate Reconciliation of Seller's actual Initial Weekly Installments during any Reconciliation Month by sending a request for Reconciliation to GCF.

b. Any such request for Reconciliation of the Seller's Initial Weekly Installments for specific Reconciliation Month(s) shall be in writing, shall state the Reconciliation Month(s) for which Reconciliation is requested, and shall include copies of Seller's bank statement(s) and credit card processing statements for each Reconciliation Month at issue, and shall be received by GCF via email to reconciliation@customerinfoportal.com, with the subject line "REQUEST FOR RECONCILIATION" or by other means (to be provided to Seller by _____ upon request) during a calendar month immediately following the latest Reconciliation Month listed in the request for reconciliation (time being of the essence as to the last day of the period during which such demand for Reconciliation shall be received by GCF).

c. GCF has the right to deny any request for Reconciliation if such request is received less than thirty (30) days following the date of _____'s previous request for Reconciliation from the Seller. Furthermore, Reconciliation cannot be made two or more times for the same Reconciliation Month (if requested in more than one requests for Reconciliation).

d. Commencing in the calendar month immediately following the Effective Date of this Agreement, Seller shall have the right to request Reconciliation as many times during the term of this Agreement as it deems proper, and GCF shall comply with each such request, provided that:

i. Each such request is made in accordance with the terms of this Section 11; and

ii. If a request for Reconciliation is made after the expiration of the term of this Agreement and, as the result of such Reconciliation, the total amount actually debited by GCF from the Approved Bank Account will become less than the Purchased Amount, then and in such event the term of this Agreement shall automatically be extended until the time when the total amount actually debited from Approved Bank Account pursuant to this Agreement shall become equal to the Purchased Amount.

e. Nothing set forth in Sections 10 or 11 of this Agreement shall be deemed to: (i) provide Seller with the right to interfere with GCF's right and ability to debit the Approved Bank Account while the request for Reconciliation of Seller's receipts is pending or until the Purchased Amount is collected by GCF in full, or (ii) modify the amount of the Initial Weekly Installment for any calendar month during the term of this Agreement other than during the Reconciliation Month(s) as the result of the Reconciliation.

**12. Adjustment of the Initial Weekly Installment**. Seller and GCF each acknowledge and agree that:

a. If at any time during the term of this Agreement Seller experiences a steady decrease in its Weekly Receipts, as long as Seller is not in default under the terms of this Agreement, Seller shall have the right, at its sole and absolute discretion, but subject to the provisions of Section 13 below, to request modification ("Adjustment") of the amount of the Initial Weekly Installment that Seller is obligated to deliver weekly to GCF in accordance with the provisions of Section 6 above. Such Adjustment shall become effective as of the date it is granted and the new adjusted amount of the Initial Weekly Installment (the "Adjusted Weekly Installment") shall replace and supersede the amount of the Initial Weekly Installment set forth in Section 1 above for thirty (30) days from and including the date it is granted. Upon the expiration of such 30-day period the amount of the Adjusted Installment shall automatically revert back to the amount of the Initial Installment, absent an additional request for Adjustment at the expiry of the 30-day period pursuant to this Section 12.

b. The Adjustment of the Initial Weekly Installment shall be performed by GCF within five (5) Workdays following its receipt of the Seller's request for Adjustment by modifying the amount of the Initial Weekly Installment that shall be debited from the Approved Bank Account until the Purchased Amount is paid in full. Notwithstanding anything to the contrary set forth in Sections 12 and 13 hereof, no Adjustment shall take place until and unless Reconciliation for at least one (1) Reconciliation Month takes place resulting in the reduction of the total amount debited from Seller's Approved Bank Account during the Reconciliation Month by at least fifteen percent (15%) in comparison to the amount that would have been debited during that month without Reconciliation.

c. One or more Adjustments performed by GCF may substantially extend the term of this Agreement.

**13. Request for Adjustment Procedure.**

a. It shall be Seller's sole responsibility and the right to initiate the Adjustment by sending a request for Adjustment to GCF.

b. A request for Adjustment (an "Adjustment Request") shall be in writing, and shall include copies of: (i) Seller's last

three (3) consecutive bank statements of the Approved Bank Account and credit card processing statements immediately preceding the date of GCF's receipt of the Adjustment Request, and (ii) Seller's bank statements and credit card processing statements previously provided by Seller to GCF based upon which statements the amount of the Initial Weekly Installment set forth in Section 1 above (or the then current Adjusted Weekly Installment, as the case may be) was determined, and shall be received by GCF by email at adjustment@customerinfoportal.com, with the subject line "REQUEST FOR ADJUSTMENT," within thirty (30) days after the date that is the later of (i) the last day of the latest bank statement enclosed with the Adjustment Request and (ii) the last date of the latest credit card processing statement enclosed with the Adjustment Request (time being of the essence as to the last day of the period during which an Adjustment Request shall be received by GCF).

**c.** GCF's receipt of a Seller's Adjustment Request after the expiration of the above referenced thirty (30) day period nullifies and makes obsolete such Adjustment Request.

**d.** Seller shall have the right to request Adjustment of the Initial Weekly Installment, or the Adjusted Weekly Installment (as the case may be), as many times during the term of this Agreement as it deems proper, and GCF shall comply in good faith with such request, provided that:

**i.** Each such request for Adjustment is made in accordance with the terms of this Section 13; and

**ii.** A request for Adjustment shall not be made after the Expiration Date.

**e.** Nothing set forth in Sections 12 or 13 of this Agreement shall be deemed to provide Seller with the right to (i) interfere with GCF's right and ability to debit the Approved Bank Account while the request for Adjustment is pending or until the Purchased Amount is collected by GCF in full or (ii) request Adjustment retroactively for the portion of the term of this Agreement preceding the date of an Adjustment Request.

**14. <u>Seller's Right to Accelerate Remittance of the Outstanding Portion of the Purchased Amount of Future Receipts</u> ("<u>Outstanding PAFR</u>").**

**a.** Notwithstanding anything to the contrary set forth in this Agreement, Seller shall have the right, at any time after receipt from GCF of the Purchase Price, and upon obtaining GCF's prior written consent, to accelerate delivery to GCF of the then undelivered portion of the Purchased Amount of Future Receipts (such amount, the "<u>Outstanding PAFR</u>"). The delivery of the Outstanding PAFR shall be governed by the following subparagraphs.

**b.** The Outstanding PAFR can only be delivered in full and not partially.

**c.** Seller shall request the right to accelerate the delivery of the Outstanding PAFR by notifying GCF to that effect; provided that such notice shall be in writing (an email delivery shall be deemed acceptable) and shall contain the information on the source(s) of the funds to be used for delivery of the Outstanding PAFR and on the approximate date of such delivery.

**d.** GCF shall respond to Seller's request within three (3) Workdays from the date of its receipt by GCF.

**e.** In its response to Seller's request, GCF shall indicate the exact amount of the Outstanding PAFR as of the date of its delivery by Seller.

**f.** As of the date agreed upon as between GCF and Seller, Seller shall deliver to GCF the full amount of the Outstanding PAFR (such date, the "<u>Accelerated Delivery Date</u>").

**g.** Under no circumstances shall Seller suspend or modify, or cause to be suspended or modified, the delivery to GCF of the Initial Weekly Installments prior to the delivery of the Outstanding PAFR to GCF.

**h.** Upon delivery of the Outstanding PAFR to GCF in compliance with the provisions of this Section 14, Seller's obligations to GCF pursuant to this Agreement shall be deemed completed and fulfilled.

**15. <u>Rights and Obligations of GCF Upon Receipt of the Outstanding PAFR</u>.** Upon receipt of the full amount of the Outstanding PAFR:

**a.** GCF shall notify the Approved Bank Account and request from it to stop transferring Initial Weekly Installments to GCF's bank account.

**b.** If GCF shall have received one or more Initial Weekly Installment (or Adjusted Weekly Installment, as the case may be) after the Accelerated Delivery Date (due to the Approved Bank's delay in processing GCF's request described in subparagraph (a) above or for any other reason), GCF shall immediately do one of the two following things (but not both):

**i.** Return to Seller the total sum of the Initial Weekly Installments (or the Adjusted Weekly Installments, as the case may be) received by GCF after the date of delivery of the Outstanding PAFR to GCF; or

**ii.** Apply the total sum of the Initial Weekly Installments (or the Adjusted Weekly Installments, as the case may be) received by GCF after the Accelerated Delivery Date toward Seller's outstanding financial obligations to GCF existing as of the Accelerated Delivery Date for reasons unrelated to this Agreement (if any).

**A.** By way of example, if as of the Accelerated Delivery Date, Seller and GCF would be parties to a another future receivables sale and purchase agreement in connection with a portion of Seller's Future Receipts that is not subject to this Agreement (such agreement, an "<u>Unrelated Future Agreement</u>"), then and in such event GCF may, in its sole and absolute discretion, apply the sum of the Initial Weekly Installments (or the Adjusted Weekly Installments, as the case may be) received by GCF after the Accelerated Delivery Date pursuant to this Agreement toward fulfilling Seller's obligations to GCF pursuant to the Unrelated Future Agreement.

**c.** Seller acknowledges and agrees that GCF shall have the right to apply the total sum of the Initial Weekly Installments (or Adjusted Weekly Installments, as the case may be) received by GCF after the Accelerated Delivery Date toward Seller's outstanding financial obligations to GCF existing as of the Accelerated Delivery Date for reasons unrelated to this Agreement (if any) in exchange for, and as an adequate and sufficient consideration for, GCF granting Seller the right to accelerate the payment of the Purchased Amount of Future Receipts.

**16. Risk Sharing Acknowledgments and Arrangements.**

**a.** Seller and GCF each hereby acknowledges and agrees that:

**i.** The Purchased Future Receipts represent a portion of Seller's Future Receipts.

**ii.** This Agreement consummates the sale of the Purchased Future Receipts at a discount, not the borrowing of funds by Seller from GCF. GCF does not charge Seller and will not collect from Seller any interest on the monies used by GCF for the purchase of the Purchased Future Receipts. The period of time that it will take GCF to collect the Purchased Amount is not fixed, is unknown to both parties as of the Effective Date of this Agreement and will depend on how well or not well Seller's business will be performing following the Effective Date. As an extreme example, in the event Seller's business ceases to exist after GCF's purchase of the Purchased Future Receipts as a result of a drying up of revenues for reasons outside Seller's control, GCF may never collect all or a substantial portion of the Purchased Future Receipts and will never recover the moneys it spent on such purchase.

**iii.** The amount of the Initial Weekly Installment set forth in Section 1 of this Agreement is calculated based upon the information concerning an average amount of Weekly Receipts collected by Seller's business immediately prior to the Effective Date of this Agreement, as well as representations regarding the Seller's estimated Future Receipts, which information was provided by the Seller to GCF.

**iv.** The amounts of Seller's future Weekly Receipts may increase or decrease over time.

**v.** If, based upon the Reconciliation and/or the Adjustment procedures described above, it will be determined that the actual weekly amounts of the Specified Percentage of the Future Receipts get reduced in comparison to the amount of the Initial Weekly Installment as of the Effective Date set forth in Section 1 of this Agreement, and in comparison to the amount that both Seller and GCF may have anticipated or projected because Seller's business has slowed down, or if the full Purchased Amount is not remitted because Seller's business went bankrupt or otherwise ceased operations in the ordinary course of business (but not due to Seller's willful or negligent mishandling of its business or due to Seller's failure to comply with its obligations under this Agreement), Seller would not be in breach of or in default under this Agreement.

**b. GCF's Risk Acknowledgments.** GCF agrees to purchase the Purchased Future Receipts knowing the risks that Seller's business may slow down or fail, and GCF assumes this risk based exclusively upon the information provided to it by Seller and related to the business operations of Seller's business prior to the date hereof, and upon Seller's representations, warranties and covenants contained in this Agreement that are designed to give GCF a reasonable and fair opportunity to receive the benefit of its bargain. Furthermore, GCF hereby acknowledges and agrees that Seller shall be excused from performing its obligations under this Agreement in the event Seller's business ceases its operations exclusively due to the following reasons (collectively, the "Valid Excuses"):

**i.** adverse business conditions that occurred for reasons outside Seller's control and not due to Seller's willful or negligent mishandling of its business;

**ii.** loss of the premises where the business operates (but not due to Seller's breach of its obligations to its landlord), provided however that Seller does not continue and/or resume business operations at another location;

**iii.** bankruptcy of Seller; and/or

**iv.** natural disasters or similar occurrences beyond Seller's control.

**c. Application of Amounts Received by GCF.** GCF reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to GCF from Seller prior to applying such amounts to reduce the outstanding amount of the Purchased Amount. Any ACH payments and/or payments which clear after the Effective Date of this Agreement shall be applied to the balance hereunder.

**d. Not a Loan.** Seller and GCF agree that the Purchase Price is paid to Seller in consideration for the acquisition of the Purchased Future Receipts and that payment of the Purchase Price by GCF is not intended to be, nor shall it be construed as, a loan from GCF to Seller that requires absolute and unconditional repayment on a maturity date. To the contrary, GCF's ability to receive the Purchased Amount pursuant to this Agreement, and the date when the Purchased Amount is delivered to GCF in full (if ever) are subject to and conditioned upon performance of Seller's business. If, nevertheless, a court having jurisdiction over this Agreement and the parties hereto shall have determined that GCF has charged or received interest hereunder in excess of the highest rate allowed by law, then the rate of such interest received by GCF shall automatically be reduced to the maximum rate permitted by applicable law and GCF shall promptly refund to Seller any interest received by GCF in excess of the maximum lawful rate.

**17. Applicable Fees.** Seller acknowledges that the Applicable Fees were agreed upon between Seller and GCF prior to Seller entering into this Agreement, were subject to arm-length negotiation between GCF and Seller, and a detailed list of the

Applicable Fees is set forth in Rider 1 of this Agreement, which is attached hereto and made a part hereof.

**18.** **Prior Balance of Purchased Amounts.** Seller represents and warrants that Rider 2, which is attached hereto and made a part hereof, contains true and correct information as to the name(s) of Seller's creditors and the amounts that Seller owes each of those creditors as of the Effective Date (and these amounts being a portion of the Prior Balance of Purchased Amounts), and that as of the date hereof there are no creditors of Seller which may otherwise encumber the Purchased Future Receipts other than those listed in Rider 2. Seller indemnifies and holds harmless GCF for any and all damages and losses (including without limitation legal fees and expenses) incurred by GCF as the result of such representation being untrue, incorrect or incomplete.

**19.** **Origination Fee**.  To the extent that Seller has agreed to a broker fee with a third-party broker with respect to this Agreement (which is not a party hereto), Seller hereby requests and agrees for GCF to withhold from the Purchase Price, and pay to the third-party broker associated with this Agreement, the Origination Fee contained in Rider 3, which is attached hereto and made a part hereof.

**20.** **No Reduction of Purchase Price**. Seller hereby: (i) agrees to pay the Applicable Fee, the Prior Balance and the Origination Fee (the sum of those, hereinafter, the "Closing Costs") in full; (ii) hereby authorizes GCF to apply a portion of the Purchase Price due to Seller pursuant to this Agreement toward satisfaction of Seller's obligation to pay the Closing Costs by deducting the amount of the Agreement Fees from the Purchase Price prior to delivering it to Seller; and (iii) agrees that deduction of the Closing Costs from the Purchase Price shall not be deemed to be a reduction of the Purchase Price.


**REPRESENTATIONS, WARRANTIES AND COVENANTS**


**21.** Seller represents, warrants and covenants that as of this date and during the term of this Agreement:

    **a.** **Financial Condition and Financial Information**. Seller's bank and financial statements, copies of which have been furnished to GCF, and future statements which may be furnished hereafter pursuant to this Agreement or upon GCF's request, fairly represent the financial condition of Seller as of the dates such statements were issued, and prior to execution of the Agreement there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Seller. Seller has a continuing, affirmative obligation to advise GCF of any material adverse change in its financial condition, operation or ownership, and/or online banking log-in credentials. GCF may request Seller's bank statements at any time during the term of this Agreement and Seller shall provide them to GCF within five (5) Workdays. Seller's failure to do so, and/or cutting off GCF's online access to the Approved Bank Account, is a material breach of this Agreement.

    **b.** **Governmental Approvals**. Seller is in compliance and, during the term of this Agreement, shall be in compliance with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

    **c.** **Good Standing**. Seller is a corporation/limited liability company/limited partnership/other type of entity that is in good standing and duly incorporated or otherwise organized and validly existing under the laws of its jurisdiction of incorporation or organization, and has full power and authority necessary to carry its business as it is now being conducted.

    **d.** **Authorization**. Seller has all requisite power to execute, deliver and perform this Agreement and consummate the transactions contemplated hereunder; entering into this Agreement will not result in breach or violation of, or default under, any agreement or instrument by which Seller is bound or any statute, rule, regulation, order or other law to which Seller is subject, nor require the obtaining of any consent, approval, permit or license from any governmental authority having jurisdiction over Seller. All organizational and other proceedings required to be taken by Seller to authorize the execution, delivery and performance of this Agreement have been taken. The person signing this Agreement on behalf of Seller has full power and authority to bind Seller to perform its obligations under this Agreement.

    **e.** **Accounting Records and Tax Returns**. Seller will treat receipt of the Purchase Price and payment of the Purchased Amount in a manner evidencing sale of its future receipts in its accounting records and tax returns and further agrees that GCF is entitled to audit Seller's accounting records upon reasonable notice in order to verify compliance. Seller hereby waives any rights of privacy, confidentiality or taxpayer privilege in any litigation or arbitration arising out of this Agreement in which Seller asserts that this transaction is anything other than a sale of future receipts.

    **f.** **Taxes; Workers Compensation Insurance.** Seller has paid and will promptly pay, when due, all taxes, including without limitation, income, employment, sales and use taxes, imposed upon Seller's business by law, and will maintain workers compensation insurance required by applicable governmental authorities.

    **g.** **Business Insurance**. Seller maintains and will maintain general liability and business-interruption insurance naming GCF as loss payee and additional insured in the amounts and against risks as are satisfactory to GCF and shall provide GCF proof of such insurance upon request.

    **h.** **Electronic Check Processing Agreement**. Seller shall not change its Approved Processor, add terminals, change its Approved Bank Account(s) or take any other action that could have any adverse effect upon Seller's obligations or impede GCF's rights under this Agreement, without GCF's prior written consent.

    **i.** **No Diversion of Future Receipts**. Seller shall not allow any event to occur that would cause a diversion of any portion of Seller's Future Receipts from the Approved Bank Account or Approved Processor without GCF's written permission.

    **j.** **Change of Name or Location**. Seller, any successor-in-interest of Seller, and Guarantor shall not conduct Seller's

businesses under any name other than as disclosed to the Approved Processor and GCF, shall not change and/or transfer ownership in/of the Seller and will not change any of its places of business without first obtaining GCF's written consent.

**k. Prohibited Business Transactions.** Seller shall not: (i) transfer or sell all or substantially all of its assets (including without limitation the Collateral (as such term is defined in Section 22) or any portion thereof) without first obtaining GCF's consent; or (ii) make or send notice of its intended bulk sale or transfer.

**l. No Closing of Business.** Seller will not sell, dispose, transfer or otherwise convey all or substantially all of its business or assets without first: (i) obtaining the express written consent of GCF, and (ii) providing GCF with a written agreement of a purchaser or transferee of Seller's business or assets to assume all of Seller's obligations under this Agreement pursuant to documentation satisfactory to GCF. Seller represents that it has no current plans to close its business either temporarily (for renovations, repairs or any other purpose), or permanently. Seller agrees that until GCF shall have received the Purchased Amount in full, Seller will not voluntarily close its business on a permanent or temporarily basis for renovations, repairs, or any other purposes. Notwithstanding the foregoing, Seller shall have the right to close its business temporarily if such closing is necessitated by a requirement to conduct renovations or repairs imposed upon Seller's business by legal authorities having jurisdiction over Seller's business (such as from a health department or fire department), or if such closing is necessitated by circumstances outside Seller's reasonable control. Prior to any such temporary closure of its business, Seller shall provide GCF ten (10) business days advance notice.

**m. No Pending Bankruptcy.** As of the date of Seller's execution of this Agreement, Seller is not insolvent, has not filed, and does not contemplate filing, any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary bankruptcy petition brought or pending against Seller. Seller represents that it has not consulted with a bankruptcy attorney on the issue of filing bankruptcy or some other insolvency proceeding within six months immediately preceding the date of this Agreement.

**n. Estoppel Certificate.** Seller will at any time, and from time to time, upon at least one (1) day's prior notice from GCF to Seller, execute, acknowledge and deliver to GCF and/or to any other person or entity specified by GCF, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modification(s) and stating the date(s) on which the Purchased Amount or any portion thereof has been repaid.

**o. Unencumbered Future Receipts.** Seller has and will continue to have good, complete and marketable title to all Future Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests other than by virtue or entering into this Agreement. Seller specifically warrants and represents that it is not currently bound by the terms of any future receivables and/or factoring agreement which may encumber in any way the Future Receipts.

**p. No Stacking.** Seller shall not further encumber the Future Receipts, without first obtaining written consent of GCF.

**q. Business Purpose.** Seller is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes.

**r. No Default Under Contracts with Third Parties.** Seller's execution of and/or performance of its obligations under this Agreement will not cause or create an event of default by Seller under any contract, which Seller is or may become a party to.

**s. Right of Access.** In order to ensure Seller's compliance with the terms of this Agreement, Seller hereby grants GCF the right to enter, without notice, the premises of Seller's business for the purpose of inspecting and checking Seller's transaction processing terminals to ensure the terminals are properly programmed to submit and/or batch Seller's weekly receipts to the Approved Processor and to ensure that Seller has not violated any other provision of this Agreement. Furthermore, Seller hereby grants GCF and its employees and consultants access to Seller's employees and records and all other items of property located at the Seller's place of business during the term of this Agreement. Seller hereby agrees to provide GCF, upon request, all and any information concerning Seller's business operations, banking relationships, names and contact information of Seller's suppliers, vendors and landlord(s), to allow GCF to interview any of those parties.

**t. Phone Recordings and Contact.** Seller agrees that any call between Seller and GCF and its owners, managers, employees and agents may be recorded and/or monitored. Furthermore, Seller acknowledges and agrees that: (i) it has an established business relationship with GCF, its managers, employees and agents (collectively, the "GCF Parties") and that Seller may be contacted by any of the GCF Parties from time-to-time regarding Seller's performance of its obligations under this Agreement or regarding other business transactions; (ii) it will not claim that such communications and contacts are unsolicited or inconvenient; and (iii) any such contact may be made by any of the GCF Parties in person or at any phone number (including mobile phone number), email addresses, or facsimile number belonging to Seller's office, or its owners, managers, officers, or employees.

**u. Knowledge and Experience of Decision Makers.** The persons authorized to make management and financial decisions on behalf Seller with respect to this Agreement have such knowledge, experience and skill in financial and business matters in general and with respect to transactions of a nature similar to the one contemplated by this Agreement so as to be capable of evaluating the merits and risks of, and making an informed business decision with regard to, Seller entering into this Agreement.

**v. Seller's Due Diligence.** The person authorized to sign this Agreement on behalf of Seller: (i) has received all information that such person deemed necessary to make an informed decision with respect to a transaction contemplated by

this Agreement; and (ii) has had unrestricted opportunity to make such investigation as such person desired pertaining to the transaction contemplated by this Agreement and verify any such information furnished to him or her by GCF.

**w. Consultation with Counsel.** The person(s) signing this Agreement of behalf of Seller: (a) has read and fully understands the content of this Agreement; (b) has consulted to the extent he/she wished with Seller's own counsel in connection with the entering into this Agreement; (c) has made sufficient investigation and inquiry to determine whether this Agreement is fair and reasonable to Seller, and whether this Agreement adequately reflects his or her understanding of its terms.

**x. GCF's Consent.** Seller agrees that in every instance Seller's rights under this Agreement are contingent upon first obtaining GCF's consent, such consent may be withheld, granted or conditioned at GCF's sole and absolute discretion.

**y. No Reliance on Oral Representations.** This Agreement contains the entire agreement between Seller and GCF with respect to the subject matter of this Agreement, and supersedes each course of conduct previously pursued or acquiesced in, and each oral agreement and representation previously made, by GCF or any of the GCF Parties with respect thereto (if any), whether or not relied or acted upon. No course of performance or other conduct subsequently pursued or acquiesced in, and no oral agreement or representation subsequently made, by the GCF Parties, whether or not relied or acted upon, and no usage of trade, whether or not relied or acted upon, shall amend this Agreement or impair or otherwise affect Seller's obligations pursuant to this Agreement or any rights and remedies of the parties to this Agreement.

**z. No Additional Fees Charged.** Seller hereby acknowledges and agrees that: (i) other than the Closing Costs, if any, set forth in Sections 17-19 herein, GCF is NOT CHARGING ANY ADDITIONAL FEES OR CLOSING COSTS to Seller; and (ii) if Seller is charged with any fee and/or cost not listed in Sections 17-19 hereof, such fee is not charged by GCF. Moreover, as all working capital received under this Agreement is required to ensure Seller's continued success, Seller warrants and covenants not to pay any fee and/or commission with regard to this transaction other than as provided for herein.


**PLEDGE OF SECURITY**


**22. Pledge.** As security for the prompt and complete payment and performance of any and all liabilities, obligations, covenants or agreements of Seller under this Agreement (and any future amendments of this Agreement, if any) (hereinafter referred to collectively as the "Obligations"), Seller hereby pledges, assigns and hypothecates to GCF (collectively, "Pledge") and grants to GCF a continuing, perfected and first priority lien upon and security interest in, to and under all of Seller's right, title and interest in and to the following (collectively, the "Collateral"), whether now existing or hereafter from time to time acquired:

**a.** all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Seller; and

**b.** all Seller's proceeds, as such term is defined by Article 9 of the UCC.

**23. Termination of Pledge.** Upon the payment and performance by Seller in full of the Obligations, the security interest in the Collateral pursuant to this Pledge shall automatically terminate without any further act of either party being required, and all rights to the Collateral shall revert to Seller. Upon any such termination, GCF will execute, acknowledge (where applicable) and deliver such satisfactions, releases and termination statements, as Seller shall reasonably request.

**24. Representations with Respect to Collateral.** Seller hereby represents and warrants to GCF that the execution, delivery and performance by Seller of this Pledge, and the remedies in respect of the Collateral under this Pledge (i) have been duly authorized; (ii) do not require the approval of any governmental authority or other third party or require any action of, or filing with, any governmental authority or other third party to authorize same (other than the filing of the UCC-1s); and (iii) do not and shall not (A) violate or result in the breach of any provision of law or regulation, any order or decree of any court or other governmental authority, and/or (B) violate, result in the breach of or constitute a default under or conflict with any indenture, mortgage, deed of trust, agreement or any other instrument to which Seller is a party or by which any of Seller's assets (including, without limitation, the Collateral) are bound.

**25. Further Assurances.** Upon the request of GCF, Seller, at Seller's sole cost and expense, shall execute and deliver all such further UCC-1s, continuation statements, assurances and assignments of the Collateral and consents with respect to the pledge of the Collateral and the execution of this Pledge, and shall execute and deliver such further instruments, agreements and other documents and do such further acts and things, as GCF may request in order to more fully effectuate the purposes of this Pledge and the assignment of the Collateral and obtain the full benefits of this Pledge and the rights and powers herein created.

**26. Attorney-in-Fact.** Seller hereby authorizes GCF at any time to take any action and to execute any instrument, including without limitation to file one or more financing statements and/or continuation statements, to evidence and perfect the security interest created hereby and irrevocably appoints GCF as its true and lawful attorney-in-fact, which power of attorney shall be coupled with an interest, with full authority in the place and stead of Seller and in the name of Seller or otherwise, from time to time, in GCF's sole and absolute discretion, including without limitation (a) for the purpose of executing such statements in the name of and on behalf of Seller, and thereafter filing any such financing and/or continuation statements, and (b) to receive, endorse and collect all instruments made payable to Seller.

**EVENTS OF DEFAULT AND REMEDIES**

**27. Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" by Seller:

**a.** Seller shall violate any term, condition or covenant in this Agreement governing Seller's obligations of timely delivery and in full of Initial Weekly Installments (or Adjusted Weekly Installments, as the case may be) to GCF, and timely and in full payment to GCF of any other sums due for any reason whatsoever other than as the result of Seller's business ceasing its operations exclusively due to any of the Valid Excuses.

**b.** Any representation or warranty by Seller made in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made.

**c.** Seller shall default under any of the terms, covenants and conditions of any other agreement with GCF(if any) which is related to the instant Agreement.

**d.** Seller uses multiple depository accounts without obtaining prior written consent of GCF in each instance.

**e.** Seller fails to deposit any portion of its Future Receipts into the Approved Bank Account;

**f.** Seller changes the Approved Bank Account or Approved Processor without obtaining prior written consent of GCF in each instance.

**g.** Seller interferes with GCF collection of Initial Weekly Installments (or Adjusted Weekly Installments, as the case may be).

**h.** Two (2) or more ACH transactions attempted by GCF are rejected by Seller's bank.

**i.** The Guaranty shall for any reason cease to be in full force and effect.

**28. Default under the Agreement.** In case any Event of Default occurs and is not waived by GCF, in writing, GCF may declare Seller in default under this Agreement without notice.   Without limiting the foregoing, upon Seller's default it shall have no right to request Reconciliation or Adjustment provided in Sections 10-13 of this Agreement.

**29. Seller's Obligations Upon Default.** Upon occurrence of an Event of Default due to Seller's breach of its obligations under this Agreement, Seller shall immediately deliver to GCF the entire unpaid portion of the Purchased Amount. In addition, Seller shall also pay to GCF, as additional damages, any reasonable expenses incurred by GCF in connection with recovering the monies due to GCF from Seller pursuant to this Agreement, including without limitation the costs of retaining collection firms and reasonable attorneys' fees and disbursements (collectively, "Reasonable Damages"). The parties agree that GCF shall not be required to itemize or prove its Reasonable Damages and that the fair value of the Reasonable Damages shall be calculated as twenty-five percent (25%) of the undelivered portion of the Purchased Amount of Future Receipts upon the occurrence of an event of default, or twenty-five hundred dollars ($2,500.00), whichever is greater. The entire sum due to GCF pursuant to this Section 29 shall bear simple interest from the Default Payment Date until is paid in full, at the rate of 9.00% per annum (and such interest shall accrue weekly).

**30. Remedies Upon Default.** Upon Seller's default, GCF may immediately proceed to protect and enforce its rights under this Agreement and/or Guaranty by:

**a.** Enforcing its rights as a secured creditor under the Uniform Commercial Code including, without limitation, notifying any account debtor(s) of Seller as the term is defined below, of GCF's security interest;

**b.** Enforcing the provisions of the Personal Guarantee of Performance against the Guarantor(s) without first seeking recourse from Seller;

**c.** Filing the affidavit of confession of judgment (the "Affidavit"), if any, executed by the Guarantor(s), individually and on Seller's behalf, jointly and severally, in connection with this Agreement in the amount of the unpaid portion of the Purchased Amount, plus the Reasonable Damages, entering judgment with the Clerk of the Court, without notice, and executing thereon **(NOTE THAT THIS CONFESSION OF JUDGMENT PROVISION CONSTITUTES A WAIVER OF IMPORTANT RIGHTS THAT SELLER AND/OR GUARANTOR MAY HAVE AS PARTIES IN DEFAULT UNDER THE TERMS OF THIS AGREEMENT AND/OR GUARANTY, AND ALLOWS GCF TO OBTAIN A JUDGMENT AGAINST EITHER SELLER AND/OR GUARANTOR WITHOUT NOTICE)**;

**d.** Notifying Seller's credit card processor of the sale of Future Purchase Receipts hereunder and to direct such credit card processor to make payment to GCF of all or any portion of the amounts received by such credit card processor on behalf of Seller.

**e.** Commencing a suit in law and/or equity, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Seller's obligations hereunder (including the Personal Guarantee) or any other legal or equitable right or remedy including without limitation GCF's rights of a secured party under the UCC.

**31. Remedies are not Exclusive.** All rights, powers and remedies of GCF in connection with this Agreement set forth herein may be exercised at any time after the occurrence of any Event of Default, are cumulative and not exclusive and shall be in addition to any other rights, powers or remedies provided to GCF by law or equity.

**32. Power of Attorney.** Seller irrevocably appoints GCF and its representatives as its agents and attorneys-in-fact with full authority to take any action or execute any instrument or document to do the following: (A) to settle all obligations due to GCF from any credit card processor and/or account debtor(s) of Seller; (B) upon occurrence of an Event of Default to perform any and all obligations of Seller under this Agreement, including without limitation (i) to protect the value of the Collateral by obtaining the required insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to

receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Seller's name on any invoice, bill of lading, or assignment directing customers or account debtors, as that term is defined by Article 9 of the Uniform Commercial Code ("Account Debtors"), to make payment directly to GCF (including providing information necessary to identify Seller); and (v) to file any claims or take any action or institute any proceeding which GCF may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to collection of the Purchased Amount.

## ADDITIONAL TERMS

**33. Seller Deposit Agreement**. Seller shall execute an agreement with GCF that shall authorize GCF to arrange for electronic fund transfer services and/or "ACH" payments of Initial Weekly Installments (or Adjusted Weekly Installments, as the case may be) from the Approved Bank Account. Seller shall provide GCF and/or its authorized agent with all information, authorizations and passwords necessary to verify Seller's receivables, receipts and deposits into the Approved Bank Account. Seller shall authorize (by executing written authorizations, if required) GCF and/or it's agent to deduct weekly the amounts of the Initial Weekly Installment (or the Adjusted Weekly Installment, as the case may be) to GCF from settlement amounts which would otherwise be due to Seller from electronic check transactions and to pay such amounts to GCF by permitting GCF to withdraw the Initial Weekly Installments (or the Adjusted Weekly Installments, as the case may be) from such an account. The authorization shall be irrevocable until such time when Seller shall have performed its obligations under this Agreement in full.

**34. Financial Condition**. Seller and its Guarantor(s) authorize GCF and its agents to investigate their financial status and history, and will provide to GCF any bank or financial statements, tax returns, etc., as GCF deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of financial information. GCF Seller hereby authorizes GCF to receive from time to time updates on such information and financial status.

**35. Transactional History**. Seller shall execute written authorization(s) to their bank(s) to provide GCF with Seller's banking and/or credit-card processing history.

**36. Indemnification**. Seller and its Guarantor(s) jointly and severally, indemnify and hold harmless to the fullest extent permitted by law Approved Processor, any ACH processor, customer and/or Account Debtors of the Seller, its/their officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by any ACH processor, customer and/or Account Debtors of the Seller resulting from (a) claims asserted by GCF for monies owed to GCF from Seller and (b) actions taken by any ACH processor, customer and/or Account Debtor of the Seller in reliance upon information or instructions provided by GCF.

**37. No Liability**. In no event shall GCF be liable for any claims asserted by Seller or its Guarantor under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is hereby knowingly and voluntarily waived by Seller and Guarantor(s).

## MISCELLANEOUS

**38. Modifications; Agreements**. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by both parties.

**39. Assignment**. GCF may assign, transfer or sell its rights or delegate its duties hereunder, either in whole or in part without prior notice to the Seller. Seller shall not assign its rights or obligations under this Agreement without first obtaining GCF's written consent.

**40. Notices**. Unless different means of delivering notices are set forth elsewhere in this Agreement, all notices, requests, consent, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement and shall become effective as of the date of receipt or declined receipt.

**41. Waiver Remedies**. No failure on the part of GCF to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**42. Binding Effect**. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

**43. Governing Law, Venue and Jurisdiction.** This Agreement shall be governed by and construed exclusively in accordance with the laws of the State of New York, without regards to any applicable principles of conflicts of law. Any lawsuit, action or proceeding arising out of or in connection with this Agreement shall be instituted exclusively in any court sitting in New York State, (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, and submit to the jurisdiction of the Acceptable Forums and waive any and all objections to inconvenience of the jurisdiction or venue. Should a proceeding be initiated in any other forum, each of the parties to this Agreement irrevocably waives any right to oppose any motion or application made by any other party to this Agreement to transfer such proceeding to an Acceptable Forum. Seller and its Guarantor(s)

acknowledge and agree that the Purchase Price is being paid and received by Seller in New York, that the Specified Percentage of the Future Receipts are being delivered to GCF in New York, and that the transaction contemplated in this Agreement was negotiated, and is being carried out, in New York. Seller and its Guarantor(s) acknowledge and agree that New York has a reasonable relationship to this transaction.

**44. Survival of Representation, etc**. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have expired.

**45. Severability**. In case any of the provisions in this Agreement are found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired. Any provision of this Agreement that may be found by a court having jurisdiction to be prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof.

**46. Entire Agreement**. This Agreement embodies the entire agreement between Seller and GCF and supersedes all prior agreements and understandings relating to the subject matter hereof. The Exhibit(s) and Riders to this Agreement are part of this Agreement.

**47. JURY TRIAL WAIVER. THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF. EACH PARTY HERETO ACKNOWLEDGES THAT IT MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION AND DISCUSSIONS OF THE RAMIFICATIONS OF THIS WAIVER WITH ITS ATTORNEYS.**

**48. CLASS ACTION WAIVER. EACH PARTY HERETO WAIVES ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY, AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR IS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT TO THE CONTRARY); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.**

**49. ARBITRATION. THE PARTIES ACKNOWLEDGE AND AGREE THAT, PROVIDED THAT NO SUIT, ACTION OR PROCEEDING (INCLUDING WITHOUT LIMITATION FILING OF AN AFFIDAVIT OF CONFESSION OF JUDGMENT) HAS BEEN ALREADY COMMENCED IN CONNECTION WITH ANY MATTER ARISING OUT OF OR RELATED TO THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT, EACH GCF, SELLER, AND ANY GUARANTOR OF SELLER SHALL HAVE THE RIGHT TO REQUEST THAT ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THE CONSTRUCTION AND INTERPRETATION OF THIS AGREEMENT, ARE SUBMITTED TO ARBITRATION. THE PARTY SEEKING ARBITRATION SHALL FIRST SEND A WRITTEN NOTICE OF INTENT TO ARBITRATE TO ALL OTHER PARTIES, BY CERTIFIED MAIL UPON SENDING OF SUCH NOTICE, A PARTY REQUESTING ARBITRATION MAY COMMENCE AN ARBITRATION PROCEEDING WITH THE AMERICAN ARBITRATION ASSOCIATION ("AAA") OR NATIONAL ARBITRATION FORUM ("NAF"). EACH SELLER, GUARANTOR AND GCF SHALL PAY THEIR OWN ATTORNEYS' FEES INCURRED DURING THE ARBITRATION PROCEEDING. THE PARTY INITIATING THE ARBITRATION SHALL PAY ANY ARBITRATION FILING FEE, ADMINISTRATION FEE AND ARBITRATOR'S FEE.**

**50. Service of Process. IN ADDITION TO THE METHODS OF SERVICE ALLOWED BY THE NEW YORK STATE CIVIL PRACTICE LAW & RULES ("CPLR"), SELLER HEREBY CONSENTS, IN THE EVENT OF DEFAULT HEREUNDER, TO SERVICE OF PROCESS UPON IT BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED. SERVICE HEREUNDER SHALL BE DEEMED COMPLETED UPON SELLER'S ACTUAL RECEIPT OF THE SERVICE OF PROCESS OR UPON BUYER'S RECEIPT OF THE RETURN THEREOF BY THE UNITED STATES POSTAL SERVICE AS REFUSED OR UNDELIVERABLE. SELLER MUST PROMPTLY NOTIFY BUYER, IN WRITING, OF EACH AND EVERY CHANGE OF ADDRESS TO WHICH SERVICE OF PROCESS SHALL BE MADE. SERVICE OF PROCESS BY BUYER TO THE LAST KNOWN SELLER'S ADDRESS SHALL BE SUFFICIENT. SELLER WILL HAVE THIRTY (30) CALENDAR DAYS FROM THE DATE OF DELIVERY (OR ATTEMPTED DELIVERY) OF THE SERVICE OF PROCESS HEREUNDER IN WHICH TO RESPOND. FURTHERMORE, SELLER EXPRESSLY CONSENTS THAT ANY AND ALL NOTICE(S), DEMAND(S), REQUEST(S) OR OTHER COMMUNICATION(S) UNDER AND PURSUANT TO THIS AGREEMENT SHALL BE DELIVERED IN ACCORDANCE WITH THE PROVISIONS OF THIS AGREEMENT.**

**51. Counterparts and Facsimile Signatures**. This Agreement can be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together, shall constitute one and the same agreement. Signatures delivered via facsimile and/or via Portable Digital Format (PDF) shall be deemed acceptable for all purposes, including without limitation the evidentially purposes.  Furthermore, this Agreement may be signed electronically and a copy this Agreement with e-signatures of the parties shall have the same force and effect as the original.

52. **Further Acknowledgments**.  Seller hereby acknowledges and agrees that any and all electronic communication (e-mails) from funding@customerinfoportal.com received by Seller after this Agreement is signed but prior to Seller's receipt of any amount due to it pursuant to this Agreement, shall be deemed to be part of this Agreement and shall be deemed to be incorporated herein by reference.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed as of the date first above written.

**FOR THE SELLER**                                    **FOR THE SELLER**

*LAURENCE N Girard*

**By:**                                               **By:**

**Name:** LAURENCE N GIRARD                           **Name:** N/A
**Title:** Owner/Agent/Manager                        **Title:** N/A
**EIN:** 46-5619384                                   **EIN:** N/A

**AGREE TO BE BOUND BY THE PROVIONS OF THIS AGREEMENT APPLICABLE TO AND CONCERNING GUARANTOR**

<u>**OWNER/GUARANTOR #1**</u>                          <u>**OWNER/GUARANTOR #2**</u>

*LAURENCE N Girard*

**By:**                                               **By:**

**Name:** LAURENCE N GIRARD                           **Name:** N/A
                                                      **SSN:** N/A

**GREEN CAPITAL FUNDING, LLC**

**By:**
**Name:**
**Title:**

# EXHIBIT A

## PERSONAL GUARANTY OF PERFORMANCE

This Personal Guaranty of Performance (this "Guaranty") is executed as of 4/7/2021, by the undersigned individual(s) whose name(s) and signature(s) appear in the signature box of this Guaranty (individually and collectively, jointly and severally, "Guarantor") for the benefit of **GREEN CAPITAL FUNDING, LLC** ("Buyer").

**WHEREAS:**

**A.** Pursuant to that Future Receivables Sale and Purchase Agreement (the "Agreement"), dated as of 4/7/2021, between Buyer and the Seller(s) listed below (collectively and individually, "Seller"), Buyer has purchased a portion of Future Receipts of Seller.

    **THE SELLER:**

    **Legal Business Name:** FRUIT STREET HEALTH PBC

    **D/B/A:** FRUIT STREET HEALTH PBC d/b/a WELLIKO

**B.** Each Guarantor is an owner, officer, or manager of Seller and will directly benefit from Buyer and Seller entering into the Agreement.

**C.** Buyer is not willing to enter into the Agreement unless Guarantor irrevocably, absolutely and unconditionally guarantees to Buyer prompt and complete performance of all of the obligations of Seller under the Agreement (each such obligation, individually, an "Obligation" and all such obligations, collectively, the "Obligations").

**NOW, THEREFORE,** as an inducement for Buyer to enter into the Agreement, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Guarantor does hereby agree as follows:

**1. Defined Terms.** All capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

**2. Guaranty of Obligations.** Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Buyer prompt, full, faithful and complete performance and observance of all of Seller's Obligations; and Guarantor unconditionally covenants to Buyer that if default or breach shall at any time be made by Seller in the Obligations, Guarantor shall well and truly pay or perform (or cause to be paid or performed) the Obligations and pay all damages and other amounts stipulated in the Agreement with respect to the non-performance of the Obligations, or any of them.

**3. Guarantor's Additional Covenants.** The liability of Guarantor hereunder shall not be impaired, abated, deferred, diminished, modified, released, terminated or discharged, in whole or in part, or otherwise affected, by any event, condition, occurrence, circumstance, proceeding, action or failure to act, with or without notice to, or the knowledge or consent of, Guarantor, including, without limitation:

    **a.** any amendment, modification or extension of the Agreement or any Obligation;

    **b.** any extension of time for performance, whether in whole or in part, of any Obligation given prior to or after default thereunder;

    **c.** any exchange, surrender or release, in whole or in part, of any security that may be held by Buyer at any time under the Agreement;

    **d.** any other guaranty now or hereafter executed by Guarantor or anyone else;

    **e.** any waiver of or assertion or enforcement or failure or refusal to assert or enforce, in whole or in part, any Obligation, claim, cause of action, right or remedy which Buyer may, at any time, have under the Agreement or with respect to any guaranty or any security which may be held by Buyer at any time for or under the Agreement or with respect to the Seller;

    **f.** any act or omission or delay to do any act by Buyer which may in any manner or to any extent vary the risk of Guarantor or which would otherwise operate as a discharge of Guarantor as a matter of law;

    **g.** the release of any other guarantor from liability for the performance or observance of any Obligation, whether by operation of law or otherwise;

    **h.** the failure to give Guarantor any notice whatsoever;

    **i.** any right, power or privilege that Buyer may now or hereafter have against any person, entity or collateral.

**4. Guarantor's Other Agreements.** Guarantor will not dispose, convey, sell or otherwise transfer, or cause Seller to dispose, convey, sell or otherwise transfer, any material business assets of Seller outside of the ordinary course of Seller's business without the prior written consent of Buyer, which consent may be withheld for any reason, until receipt of the entire Purchased Amount. Guarantor shall pay to Buyer upon demand all expenses (including, without limitation, reasonable attorneys' fees and disbursements) of, or incidental to, or relating to the enforcement or protection of Buyer's rights hereunder or Buyer's rights under the Agreement. This Guaranty is binding upon Guarantor and Guarantor's heirs, legal representatives, successors and assigns and shall inure to the benefit of and may be enforced by the successors and assigns of Buyer. If there is more than one Guarantor, the obligations of the Guarantors hereunder shall be joint and several. The obligation of Guarantor shall be unconditional and absolute, regardless of the unenforceability of any provision of any agreement between Seller and Buyer, or the existence of any defense, setoff or counterclaim, which Seller may assert. Buyer is hereby authorized, without notice or demand and without affecting the liability of Guarantor hereunder, to at any time renew or extend Seller's obligations under the Agreement or otherwise modify, amend or change the terms of the Agreement. Guarantor is hereby notified and consents

    Guarantor #1 Initials: _Austin R Gour_    Guarantor #2 Initials:_____

that a negative credit report reflecting on his/her credit record may be submitted to a credit-reporting agency if the Guarantor does not honor the terms of this Guaranty. Guarantor additionally consents to the ordering of a credit report for Guarantor (a) as a condition precedent to Buyer entering into this Agreement, (b) from time to time during the entire Term of the Agreement, and (c) in the event of default pursuant to the Agreement.

**5. Waiver; Remedies.** No failure on the part of Buyer to exercise, and no delay in exercising, any right under this Guaranty shall operate as a waiver, nor shall any single or partial exercise of any right under this Guaranty preclude any other or further exercise of any other right. The remedies provided in this Guaranty are cumulative and not exclusive of any remedies provided by law or equity. In the event that Seller fails to perform any obligation under the Agreement, Buyer may enforce its rights under this Guaranty without first seeking to obtain performance for such default from Seller or any other guarantor.

**6. Acknowledgment of Purchase.** Guarantor acknowledges and agrees that the Purchase Price paid by Buyer to Seller in exchange for the Purchased Amount of Future Receipt is a payment for an adequate consideration and is not intended to be treated as a loan or financial accommodation from Buyer to Seller. Guarantor specifically acknowledges that Buyer is not a lender, bank or credit card processor, and that Buyer has not offered any loans to Seller, and Guarantor waives any claims or defenses of usury in any action arising out of this Guaranty. Guarantor acknowledges that the Purchase Price paid to Seller is good and valuable consideration for the sale of the Purchased Amount.

**7. Governing Law and Jurisdiction.** This Guaranty shall be governed by, and constructed in accordance with, the internal laws of the State of New York without regard to principles of conflicts of law. Except as provided in Section 10 of this Guaranty, Guarantor submits to the nonexclusive jurisdiction and venue of any state or federal court sitting in New York State or otherwise having jurisdiction over this Guaranty and Guarantor, for resolution of any claim or action arising, directly or indirectly, out of or related to this Guaranty. The parties stipulate that the venues referenced in this Agreement are convenient. The parties further agree that the mailing by certified or registered mail, return receipt requested, of any process required by any such court will constitute valid and lawful service of process against them, without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions. Guarantor acknowledges and agrees that the Purchase Price is being paid and received by Seller in New York, that the Specified Percentage of the Future Receipts are being delivered to Buyer in New York, and that the transaction contemplated in this Guaranty was negotiated, and is being carried out, in New York. Guarantor acknowledges and agrees that it is guaranteeing a New York agreement and transaction. Guarantor acknowledges and agrees that New York has a reasonable relationship to this transaction.

**8. JURY WAIVER. THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS GUARANTY IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.**

**9. CLASS ACTION WAIVER. THE PARTIES WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES AGREE THAT: (I) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (II) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.**

**10. ARBITRATION. THE PARTIES ACKNOWLEDGE AND AGREE THAT, PROVIDED THAT NO SUIT, ACTION OR PROCEEDING (INCLUDING WITHOUT LIMITATION FILING OF AN AFFIDAVIT OF CONFESSION OF JUDGMENT) HAS BEEN ALREADY COMMENCED IN CONNECTION WITH ANY MATTER ARISING OUT OF OR RELATED TO THIS GUARANTY AND/OR THE TRANSACTION CONTEMPLATED BY THE AGREEMENT, EACH BUYER, SELLER AND GUARANTOR SHALL HAVE THE RIGHT TO REQUEST THAT ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THE CONSTRUCTION AND/OR INTERPRETATION OF THIS GUARANTY ARE SUBMITTED TO ARBITRATION. THE PARTY SEEKING ARBITRATION SHALL FIRST SEND A WRITTEN NOTICE OF INTENT TO ARBITRATE TO ALL OTHER PARTIES, BY CERTIFIED MAIL. UPON SENDING OF SUCH NOTICE, A PARTY REQUESTING ARBITRATION MAY COMMENCE AN ARBITRATION PROCEEDING WITH THE AMERICAN ARBITRATION ASSOCIATION ("AAA") OR NATIONAL ARBITRATION FORUM ("NAF"). EACH SELLER, GUARANTOR AND BUYER SHALL PAY THEIR OWN ATTORNEYS' FEES INCURRED DURING THE ARBITRATION PROCEEDING. THE PARTY INITIATING THE ARBITRATION SHALL PAY ANY ARBITRATION FILING FEE, ADMINISTRATION FEE AND ARBITRATOR'S FEE.**

**11. Service of Process. IN ADDITION TO THE METHODS OF SERVICE ALLOWED BY THE NEW YORK STATE CIVIL PRACTICE LAW & RULES ("CPLR"), GUARANTOR HEREBY CONSENTS, IN THE EVENT OF DEFAULT HEREUNDER, TO**

SERVICE OF PROCESS UPON HIM/HER/THEM BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED. SERVICE HEREUNDER SHALL BE DEEMED COMPLETED UPON GUARANTOR'S ACTUAL RECEIPT OF THE SERVICE OF PROCESS OR UPON BUYER'S RECEIPT OF THE RETURN THEREOF BY THE UNITED STATES POSTAL SERVICE AS REFUSED OR UNDELIVERABLE. GUARANTOR SHALL PROMPTLY NOTIFY BUYER, IN WRITING, OF EACH AND EVERY CHANGE OF ADDRESS TO WHICH SERVICE OF PROCESS SHALL BE MADE. SERVICE OF PROCESS BY BUYER TO THE LAST KNOWN GUARANTOR'S ADDRESS SHALL BE SUFFICIENT. GUARANTOR WILL HAVE THIRTY (30) CALENDAR DAYS FROM THE DATE OF DELIVERY (OR ATTEMPTED DELIVERY) OF THE SERVICE OF PROCESS HEREUNDER IN WHICH TO RESPOND. FURTHERMORE, GUARANTOR EXPRESSLY CONSENTS THAT ANY AND ALL NOTICE(S), DEMAND(S), REQUEST(S) OR OTHER COMMUNICATION(S) UNDER AND PURSUANT TO THIS AGREEMENT SHALL BE DELIVERED IN ACCORDANCE WITH THE PROVISIONS OF THIS AGREEMENT.

**12. Severability.** If for any reason any court of competent jurisdiction finds any provisions of this Guaranty to be void or voidable, the parties agree that the court may reform such provision(s) to render the provision(s) enforceable ensuring that the restrictions and prohibitions contained in this Guaranty shall be effective to the fullest extent allowed under applicable law.

**13. Opportunity for Attorney Review.** The Guarantor represents that he/she has carefully read this Guaranty and has had had a reasonable opportunity to, - and to the extent he or she wishes did, - consult with his or her attorney. Guarantor understands the contents of this Guaranty, and signs this Guaranty as his or her free act and deed.

**14. Counterparts and Facsimile Signatures.** This Guaranty may be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same agreement. Facsimile or scanned documents shall have the same legal force and effect as an original and shall be treated as an original document for evidentiary purposes. Furthermore, this Guaranty may be signed electronically and a copy this Guaranty with e-signature of the Guarantor shall have the same force and effect as the original.

**AGREED AND ACCEPTED:**

**OWNER/GUARANTOR #1:**                    **OWNER/GUARANTOR #2:**

*LAURENCE N GIRARD*

By: _____          By: _____

**Name: LAURENCE N GIRARD**              **Name: N/A**
▮▮▮▮▮▮▮                                  **SSN: N/A**

**OWNER/GUARANTOR #3:**

By: _____

**Name: N/A**
**SSN: N/A**

**GREEN CAPITAL FUNDING, LLC**

By: _____
**Name:**
**Title:**

## RIDER 1

### TO THE 4/7/2021 FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT ("Agreement")

### Between GREEN CAPITAL FUNDING, LLC ("GCF")

### and FRUIT STREET HEALTH PBC d/b/a FRUIT STREET HEALTH PBC d/b/a WELLIKO  ("Seller")

### APPLICABLE FEES

**1. Possible Conflicts**.  If there is any conflict or inconsistency between any of the provisions of this Rider and any of the provisions of the 4/7/2021 Future Receivables Sale and Purchase Agreement (the "Agreement") to which this Rider is attached, all such conflicts and inconsistencies shall be resolved in favor of the provisions of this Rider.

**2. Definitions**.  All capitalized terms used in this Rider shall have the meaning set forth in the Agreement unless otherwise indicated herein.

**3. Applicable Fees**.   The parties agree that the Applicable Fees which Seller shall pay to GCF, pursuant to Section 17 of the Agreement shall be as follows:

    a. **Due Diligence Fee:** $ 0.00 (the cost of the due diligence of Seller' business performed by GCF. As a general rule, the Due Diligence Fee varies and depends on the complexity of underwriting required on a business including without limitation, sophistication of Seller's principals, difficulty in ascertaining Seller's receivables and account debtors, sources of Seller's revenue flow, etc.).

    b. **ACH Program Fee**: WAIVED (to cover expense of ACH processing program).

    c. **UCC Fee**: WAIVED (part of filing UCC financing statements and their terminations).

    d. **Wire Fee**: $ 35.00 (to cover cost of remitting the Purchase Price).

**4. Authorization**.  Seller hereby authorizes GCF to apply a portion of the Purchase Price due to Seller pursuant to the Agreement toward satisfaction of Seller's obligation to pay the Applicable Fees pursuant to Section 17 of the Agreement by deducting the amount of the Applicable Fees from the Purchase Price prior to delivering it to Seller.

**5. No Reduction of Purchase Price**.  Seller hereby agrees that deduction of the Applicable Fees from the Purchase Price shall not be deemed to reduce the Purchase Price.

**Seller and GCF agree that this Rider shall be attached to the Agreement and shall be made a part thereof.**

**FOR THE SELLER**

**FOR THE SELLER**

*LAURENCE N GIRARD*

**By:**

**By:**

**Name:** LAURENCE N GIRARD

**Name:** N/A

Case 1:22-cv-00359-LAK   Document 1-3   Filed 01/14/22   Page 133 of 154

## RIDER 2

### TO THE 4/7/2021 FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT ("Agreement")

### Between GREEN CAPITAL FUNDING, LLC ("GCF")

### and FRUIT STREET HEALTH PBC d/b/a FRUIT STREET HEALTH PBC d/b/a WELLIKO  ("Seller")

### PRIOR BALANCE

**1. Possible Conflicts**.  If there is any conflict or inconsistency between any of the provisions of this Rider and any of the provisions of the Future Receivables Sale and Purchase Agreement (the "Agreement") to which this Rider is attached, all such conflicts and inconsistencies shall be resolved in favor of the provisions of this Rider.

**2. Definitions**.  All capitalized terms used in this Rider shall have the meaning set forth in the Agreement unless otherwise indicated herein.

**3. Prior Balance**.   Seller represents and warrants that the following are the amounts that Seller owes to GCF and/or its affiliates (collectively, the "Affiliates") as of the Effective Date of the Agreement under agreements similar in nature to this Agreement (the sum of all such amounts, the "Prior Balance of Purchased Amounts"):

### Creditor 1:

Name: GREEN CAPITAL FUNDING LLC

Amount Owed to Creditor 1: $93,486.00

### TOTAL PRIOR BALANCE: $93,486.00

**4. Buyback Right.**  By choosing to enter into this Rider 2, Seller hereby exercises its right to buyback from the Affiliates the Prior Balance of Purchased Amounts.  In furtherance of the foregoing, Seller hereby authorizes and directs GCF to apply a portion of the Purchase Price due to Seller pursuant to the Agreement toward satisfaction of Seller's obligation to pay the Prior Balance of Purchased Amounts pursuant to Section 18 of the Agreement by deducting the amount of the Prior Balance of Purchased Amounts from the Purchase Price prior to delivering it to Seller, and to forward the specific amounts owed by Seller to GCF and/or the creditors listed in this Rider.

**5. No Right for Reconciliation or Adjustment.**  Seller acknowledges and agrees that in the event GCF will indeed forward the Prior Balance of Purchased Amounts to the Affiliates, Seller shall have no right to request any Reconciliation or Adjustments set forth in Sections 10 through 13 of the Agreement.

**6. No Reduction of Purchase Price**.  Seller hereby agrees that deduction of the Prior Balance of Purchased Amounts from the Purchase Price shall not be deemed to reduce the Purchase Price.

**7. Indemnification.**  Seller hereby indemnifies and holds harmless GCF for any and all damages and losses (including without limitation legal fees and expenses) incurred by GCF as the result of the information set forth in this Rider being untrue or incorrect or incomplete.

**Seller and GCF agree that this Rider shall be attached to the Agreement and shall be made a part thereof.**

**FOR THE SELLER**                                                  **FOR THE SELLER**

*LAURENCE N GIRARD*

By: _____                By: _____

**Name:** LAURENCE N GIRARD                          **Name:** N/A

## RIDER 3

### TO THE 4/7/2021 FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT ("Agreement")

### Between GREEN CAPITAL FUNDING, LLC ("GCF")

### and FRUIT STREET HEALTH PBC d/b/a FRUIT STREET HEALTH PBC d/b/a WELLIKO  ("Seller")

### ORIGINATION FEE

**1. Possible Conflicts**. If there is any conflict or inconsistency between any of the provisions of this Rider and any of the provisions of the Future Receivables Sale and Purchase Agreement (the "Agreement") to which this Rider is attached, all such conflicts and inconsistencies shall be resolved in favor of the provisions of this Rider.

**2. Definitions**. All capitalized terms used in this Rider shall have the meaning set forth in the Agreement unless otherwise indicated herein.

**3. Applicable Fees**. The parties agree that the Origination Fee that Seller shall pay to GCF pursuant to Section 19 of the Agreement shall be:

**$12,000.00**

**4. Authorization**. Seller hereby authorizes GCF to apply a portion of the Purchase Price due to Seller pursuant to the Agreement toward satisfaction of Seller's obligation to pay the Origination Fee pursuant to Section 19 of the Agreement by deducting the amount of the Origination Fee from the Purchase Price prior to delivering it to Seller.

**5. No Reduction of Purchase Price**. Seller hereby agrees that deduction of the Origination Fee from the Purchase Price shall not be deemed to reduce the Purchase Price.

**Seller and GCF agree that this Rider shall be attached to the Agreement and shall be made a part thereof.**

**FOR THE SELLER**

**FOR THE SELLER**

*LAURENCE N GIRARD*

By: _____

By: _____

**Name:** LAURENCE N GIRARD

**Name:** N/A

# APPENDIX A

# ACH Authorization Form
All information on this form is required unless otherwise noted.

### Business Authorized to Debit/Credit Account (the "Buyer")

Authorized Business Name: GREEN CAPITAL FUNDING, LLC

Authorized Business Phone Number: 1-800-955-2411

Authorized Business Address: 116 Nassau Street, Suite 804, New York, NY 10038

### Business Information (the "Seller"):

Business Name: FRUIT STREET HEALTH PBC

Business DBA: FRUIT STREET HEALTH PBC d/b/a WELLIKO

Business Phone: ▉▉▉▉▉▉▉▉

Account Holder Address: 85 BROAD STREET 18TH FLOOR, NEW YORK, NY 10004

### Account Holder's Bank Information:

Name of Bank: RADIUS BANK

Bank Routing Number: ▉▉▉▉▉▉

Bank Account Number: ▉▉▉▉▉▉▉

**\*Please verify and complete any missing information.**

### Transaction Information:

Amount of Transaction: $16,996.00

Effective Date: 4/7/2021

Rate of collection: Weekly

### Authorization:

Pursuant to that certain Future Receivables Sale and Purchase Agreement dated 4/7/2021 between Buyer and Seller (the "Agreement"), Seller authorizes Buyer to electronically draft via the Automated Clearing House system up to the amount(s) indicated above from the account(s) identified above (the "Approved Bank Account"), and Seller agrees to be bound by the ACH Rules as set forth by NACHA" (The Electronic Payments Association).  The Undersigned hereby certifies that they are duly authorized to execute this form on behalf of the above listed account holder and acknowledges that Seller is subject to a $35 reject fee if items are returned for insufficient funds.

NOTE that this authorization is to remain in full force and effect until Buyer receives written notification from Seller of its termination in such time and in such manner to afford Buyer a reasonable opportunity to act on it; provided, however, that revocation of this authorization prior to remittance of the balance under the Agreement may constitute a breach of the Agreement.

FOR THE SELLER



By: *LAURENCE N GIRARD* _____

Date: Apr 7, 2021 _____

Name of Account Holder: LAURENCE N GIRARD

Title of Account Holder: OWNER

# ✍ SignRequest

# Signing Log

Document ID: 97PQ41KQ

**Documents**

| | |
|---|---|
| Document name: | fruitstreethealthpbc-1813101-479-20210407_112354.pdf |
| | SHA256 security hash: |
| | 930ef8ad38904fc61a62f91a3615b28d3b9b1bc266d8839a04fe5350a1624b9d |
| Sent on: | April 7, 2021, 5:54 p.m. (UTC) |
| From: | SignRequest <no-reply@signrequest.com> on behalf of (no-reply@signyouragreement.com) |
| To: | LAURENCE N GIRARD▬ |
| Subject: | Signature Request from Green Capital Funding, LLC |
| Message: | |

> Please sign this document.

| | |
|---|---|
| IP address: | 72.32.137.13 |
| User agent: | Swagger-Codegen/1.1.0/php |

**no-reply@signyouragreement.com**

| | |
|---|---|
| Email address verification: | Verified by SignRequest |

**LAURENCE N GIRARD (▬**



Email address verification:
Text added (otherinfo), page 21:
Text added (password), page 21:
Text added (username), page 21:
Text added (bankportalwebsite), page 21:
Text added (nameofbank), page 21:
Text added, page 20:
Signature added, page 20:

*LAURENCE N GIRARD*

Signature added, page 19:

*LAURENCE N GIRARD*

Signature added, page 18:

*LAURENCE N GIRARD*

# SignRequest

Signature added, page 17:

*LAURENCE N GERARD*

Signature added, page 16:

*LAURENCE N GERARD*

Signature added, page 15:

*LAURENCE N GERARD*

Signature added, page 14:

*LAURENCE N GERARD*

Signature added, page 13:

*LAURENCE N GERARD*

Signature added, page 13:

*LAURENCE N GERARD*

Signature added, page 12:

*LAURENCE N GERARD*

Signature added, page 11:

*LAURENCE N GERARD*

## ✒ SignRequest

Signature added, page 10:

*LAURENCE N GERARD*

Signature added, page 9:

*LAURENCE N GERARD*

Signature added, page 8:

*LAURENCE N GERARD*

Signature added, page 7:

*LAURENCE N GERARD*

Signature added, page 6:

*LAURENCE N GERARD*

Signature added, page 5:

*LAURENCE N GERARD*

Signature added, page 4:

*LAURENCE N GERARD*

Signature added, page 3:

*LAURENCE N GERARD*

# SignRequest

# Signing Log

Signature added, page 2:

*LAURENCE N GIRARD*

Signature added, page 1:

*LAURENCE N GIRARD*

Signature added, page 1:

*LAURENCE N GIRARD*

| | |
|---|---|
| IP address: | 64.125.180.210 |
| User agent: | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_14_6) AppleWebKit/ 537.36 (KHTML, like Gecko) Chrome/89.0.4389.114 Safari/ 537.36 |
| Text message verification: | Verified by SignRequest |
| | April 7, 2021, 6 p.m. (UTC) |
| | Phone number: ██████ |
| Document signed: | April 7, 2021, 6:02 p.m. (UTC) |

# EXHIBIT 4

Case 1:22-cv-00359-LAK   Document 1-8   Filed 01/14/22   Page 141 of 154



Laurence Girard <laurence.girard@fruitstreetclinic.com>

## RE: Hey Laurence - RENEWAL OFFER
19 messages

**Alex Hadz** <alex@svpfunding.com>                              Tue, Feb 11, 2020 at 1:58 PM
To: Laurence Girard <laurence.girard@fruitstreet.com>

I think you accidentally sent the statements to my associate Laurence. All is good, he was kind enough to forward them to me. I spoke to my Underwriter and we can do the following:

Your last advance with us Laurence was for $25,000 for a total of 60 payments. I am able to improve our renewal offer to the following:

| | |
|---|---|
| Approval | $100,000 |
| Payback | $145,900 |
| Payments | 95 |
| Daily ACH | $1,536 |
| | |
| Closing Cost | $3,900 |
| Professional Service Fee | $0 |
| Broker Fee | $0 |
| Balance as of Today | $4,183.00 |
| | |
| Net | $91,917.00 |

This is 4 times the approval we did last time. I also extended the term to 95 payments. If I have to adjust this in such a way Laurence where we maybe do a slight increase and net you $100,000 even, I can give it a try. Let me know please your thoughts. We do have to take other positions into account here Laurence, with that said however, we are trending in the right direction and I am confident we can do double the amount of this next time around.

Let me know please. This can fund today should you wish to proceed as our documents now have the docusign option.

Call me if you have any questions.

Best,

Alex.

**Alex Hadz**
Funding Specialist | SVP Funding
Direct: 646-774-3030
Mobile: 973-262-5235
Fax: 347-246-4338
alex@svpfunding.com



SVP Funding is an approved vendor of Fundry products

**From:** Laurence Girard <laurence.girard@fruitstreet.com>
**Sent:** Friday, February 7, 2020 7:17 PM
**To:** Alex Hadz <alex@svpfunding.com>
**Subject:** Re: Hey Laurence


Yes I sent you the statements can we do 500k


On Fri, Feb 7, 2020 at 7:14 PM Alex Hadz <alex@svpfunding.com> wrote:

> Just wanted to check in with you and give you an update on your balance with us. You are currently at 85% paid in with a balance of $5,379. Should you be interested in exploring renewal options and looking into additional funding options, I would be more than happy to help and see what we can do for you this time around. Let me know please if you have any questions and I look forward to your response.
>
>
> Best,
>
> **Alex Hadz**
>
> Funding Specialist | SVP Funding
>
> Direct: 646-774-3030
>
> Mobile: 973-262-5235
>
> Fax: 347-246-4338
>
> alex@svpfunding.com
>
> 
>
> SVP Funding is an approved vendor of Fundry products
>
> Confidentiality Note: This e-mail message may contain information which may be privileged, confidential and/or protected from disclosure. The information is intended only for the use of the individual or entity intended as the recipient. If you think that you have received this message in error, please e-mail the sender. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited.


--

Laurence

CEO & Founder


Cell: 617-981-0920 |

Case 1:22-cv-00359-LAK   Document 1-8   Filed 01/14/22   Page 143 of 154

**Laurence Girard** <laurence.girard@fruitstreet.com>                    Tue, Feb 11, 2020 at 2:08 PM
To: Alex Hadz <alex@svpfunding.com>

This is way too expensive.

Give us $100K and we will pay back $125K. We did not miss a single payment. This is free money for you.
[Quoted text hidden]
Laurence
CEO & Founder

 fruit street

Cell: 617-981-0920 |

---

**Alex Hadz** <alex@svpfunding.com>                                      Tue, Feb 11, 2020 at 2:11 PM
To: Laurence Girard <laurence.girard@fruitstreet.com>

Revised, please see below:

| | |
|---|---|
| Approval | $100,000 |
| Payback | $139,000 |
| Payments | 95 |
| Daily ACH | $1,463 |
| | |
| Closing Cost | $3,900 |
| Professional Service Fee | $0 |
| Broker Fee | $0 |
| **Balance as of Today** | **$4,183.00** |
| | |
| **Net** | **$91,917.00** |

**Alex Hadz**
Funding Specialist | SVP Funding
Direct: 646-774-3030
Mobile: 973-262-5235
Fax: 347-246-4338
alex@svpfunding.com



SVP Funding is an approved vendor of Fundry products

**From:** Laurence Girard <laurence.girard@fruitstreet.com>
**Sent:** Tuesday, February 11, 2020 2:08 PM
**To:** Alex Hadz <alex@svpfunding.com>
**Subject:** Re: Hey Laurence - RENEWAL OFFER

[Quoted text hidden]

---

**Laurence Girard** <laurence.girard@fruitstreet.com>                    Tue, Feb 11, 2020 at 2:15 PM
To: Alex Hadz <alex@svpfunding.com>

Still too expensive

As I mentioned we are willing to pay back $125k on $100kn

This is free money for you. We have not missed a single payment and have deposited almost $1 million last month
[Quoted text hidden]

Laurence
CEO & Founder



Cell: 617-981-0920 |

---

**Alex Hadz** <alex@svpfunding.com>                                    Tue, Feb 11, 2020 at 2:33 PM
To: Laurence Girard <laurence.girard@fruitstreet.com>

I do appreciate the feedback Laurence, with that said, I would like to point out a few things:

- The factor below is 6 points lower than what you took last time around
- We have quadrupled your approval in comparison to last time
- We have stretched the term by an additional 2 months almost
  - If I have to go to 100 days, I will, but that is the max
- The same goes for net amount
  - If I have to increase to adjust to 100K net, I will
- Last months rev, while yes there was 794K in deposits, there were also 722K in withdrawals
- The rolling active balance is what allows us to get this approval
- Please do not forget the other positions in your account as well
  - Forward
  - Flash Funding
  - Kapitus
  - Fox Business
  - VCG

So when you say "free money" that isn't exactly the case Laurence, as we have a huge risk factor here and have to worry about a handful other MCA companies, god forbid this were to ever go bad. The deeper the position, the larger the risk factor. As far as the expense, I have already addressed that and lowered the factor rate for you. I will make one last attempt at this. Ofcourse I want you to take the best deal possible, with that said however, I have my limitations and this is the best and final:

| | |
|---|---|
| Approval | $109,000 |
| Payback | $149,330 |
| Payments | 100 |
| Daily ACH | $1,493 |
| | |
| Closing Cost | $4,360 |
| Professional Service Fee | $0 |
| Broker Fee | $0 |
| Balance as of Today | $4,183.00 |
| | |
| Net | $100,457.00 |

If not, I appreciate the feedback.


Best,

Alex.


**Alex Hadz**
Funding Specialist | SVP Funding
Direct: 646-774-3030

Mobile: 973-262-5235
Fax: 347-246-4338
alex@svpfunding.com



SVP Funding is an approved vendor of Fundry products

**From:** Laurence Girard <laurence.girard@fruitstreet.com>
**Sent:** Tuesday, February 11, 2020 2:15 PM
[Quoted text hidden]

[Quoted text hidden]

---

Laurence Girard <laurence.girard@fruitstreet.com>                     Tue, Feb 11, 2020 at 5:08 PM
To: Alex Hadz <alex@svpfunding.com>

Can you do weekly instead of daily payments?
[Quoted text hidden]
Laurence
CEO & Founder



Cell: 617-981-0920 |

---

Alex Hadz <alex@svpfunding.com>                                      Tue, Feb 11, 2020 at 5:15 PM
To: Laurence Girard <laurence.girard@fruitstreet.com>

Yes, it would look as follows:

| | |
|---|---|
| Approval | $109,000 |
| Payback | $149,330 |
| Weeks | 14.6 |
| Weekly ACH | $7,465 |
| | |
| Closing Cost | $4,360 |
| Professional Service Fee | $0 |
| Broker Fee | $0 |
| **Balance as of Today** | **$4,183.00** |
| | |
| **Net** | **$100,457.00** |

You pick what day of the week works best.

**Alex Hadz**
Funding Specialist | SVP Funding
Direct: 646-774-3030
Mobile: 973-262-5235
Fax: 347-246-4338
alex@svpfunding.com



SVP Funding is an approved vendor of Fundry products

**From:** Laurence Girard <laurence.girard@fruitstreet.com>
**Sent:** Tuesday, February 11, 2020 5:08 PM
**To:** Alex Hadz <alex@svpfunding.com>
**Subject:** Re: Hey Laurence - RENEWAL OFFER

Can you do weekly instead of daily payments?

On Tue, Feb 11, 2020 at 2:34 PM Alex Hadz <alex@svpfunding.com> wrote:

I do appreciate the feedback Laurence, with that said, I would like to point out a few things:

· The factor below is 6 points lower than what you took last time around
· We have quadrupled your approval in comparison to last time
· We have stretched the term by an additional 2 months almost
  o If I have to go to 100 days, I will, but that is the max
· The same goes for net amount
  o If I have to increase to adjust to 100K net, I will
· Last months rev, while yes there was 794K in deposits, there were also 722K in withdrawals
· The rolling active balance is what allows us to get this approval
· Please do not forget the other positions in your account as well
  o Forward
  o Flash Funding
  o Kapitus
  o Fox Business
  o VCG

[Quoted text hidden]
[Quoted text hidden]

[Quoted text hidden]

---

Alex Hadz <alex@svpfunding.com>                              Wed, Feb 12, 2020 at 10:20 AM
To: Laurence Girard <laurence.girard@fruitstreet.com>

Updated numbers for today Laurence:

| | |
|---|---|
| Approval | $109,000 |
| Payback | $149,330 |
| Weeks | 20 |
| Weekly ACH | $7,465 |
| | |
| Closing Cost | $4,360 |
| Professional Service Fee | $0 |
| Broker Fee | $0 |
| Balance as of Today | $3,585.00 |
| | |
| Net | $101,055.00 |

Your net increased since we cleared another debit, thus lowering your balance.

We now have a 20 week payback term length. Let me know please should you wish to proceed. Our docs are now digital and this can get done within 2 hours.

Alex.

**Alex Hadz**
Funding Specialist | SVP Funding
Direct: 646-774-3030
Mobile: 973-262-5235
Fax: 347-246-4338
alex@svpfunding.com



SVP Funding is an approved vendor of Fundry products

**From:** Laurence Girard <laurence.girard@fruitstreet.com>
**Sent:** Tuesday, February 11, 2020 5:08 PM
**To:** Alex Hadz <alex@svpfunding.com>
**Subject:** Re: Hey Laurence - RENEWAL OFFER

Can you do weekly instead of daily payments?

On Tue, Feb 11, 2020 at 2:34 PM Alex Hadz <alex@svpfunding.com> wrote:

I do appreciate the feedback Laurence, with that said, I would like to point out a few things:

· The factor below is 6 points lower than what you took last time around

· We have quadrupled your approval in comparison to last time

· We have stretched the term by an additional 2 months almost

    o If I have to go to 100 days, I will, but that is the max

· The same goes for net amount

    o If I have to increase to adjust to 100K net, I will

· Last months rev, while yes there was 794K in deposits, there were also 722K in withdrawals

· The rolling active balance is what allows us to get this approval

· Please do not forget the other positions in your account as well

    o Forward

    o Flash Funding

    o Kapitus

    o Fox Business

    o VCG

[Quoted text hidden]
[Quoted text hidden]

Case 1:22-cv-00359-LAK   Document 1-3   Filed 01/14/22   Page 148 of 154

---

**Laurence Girard** <laurence.girard@fruitstreet.com>          Wed, Feb 12, 2020 at 1:48 PM
To: Alex Hadz <alex@svpfunding.com>

Any chance of making the repayment period longer without significantly increasing cost?
[Quoted text hidden]
Laurence
CEO & Founder



Cell: 617-981-0920 |

---

**Alex Hadz** <alex@svpfunding.com>                            Wed, Feb 12, 2020 at 1:51 PM
To: Laurence Girard <laurence.girard@fruitstreet.com>

The cost is fixed Laurence, which we have lowered almost by 10 points in comparison to last deal we did. I can ask to see if we can stretch this by a week or two and maybe get us down to the high 6K+ per week. I cant do better than that.


For example, at 21.3 weeks, we would be looking at a debit of $6,999.



**Alex Hadz**
Funding Specialist | SVP Funding
Direct: 646-774-3030
Mobile: 973-262-5235
Fax: 347-246-4338
alex@svpfunding.com



SVP Funding is an approved vendor of Fundry products

**From:** Laurence Girard <laurence.girard@fruitstreet.com>
**Sent:** Wednesday, February 12, 2020 1:49 PM
[Quoted text hidden]

[Quoted text hidden]

---

**Laurence Girard** <laurence.girard@fruitstreet.com>          Wed, Feb 12, 2020 at 1:53 PM
To: Alex Hadz <alex@svpfunding.com>

Any chance we can get weekly down to $5k? Send me something with the lowest weekly amount possible ?
[Quoted text hidden]
Laurence
CEO & Founder



Cell: 617-981-0920 |

---

**Alex Hadz** <alex@svpfunding.com>                            Wed, Feb 12, 2020 at 1:59 PM
To: Laurence Girard <laurence.girard@fruitstreet.com>

I can ask to come down to $5,999 per week Laurence. But the only thing that would make this easier for me is if I can tell my boss "Laurence said he will proceed if you can come down to this weekly." This would be just shy of 25 weeks Laurence. I know he is not going to go out longer than that and will just tell me to lower the approval if you want a lower debit.

Let me know please.

Alex.

**Alex Hadz**
Funding Specialist | SVP Funding
Direct: 646-774-3030
Mobile: 973-262-5235
Fax: 347-246-4338
alex@svpfunding.com



SVP Funding is an approved vendor of Fundry products

**From:** Laurence Girard <laurence.girard@fruitstreet.com>
**Sent:** Wednesday, February 12, 2020 1:54 PM
[Quoted text hidden]

[Quoted text hidden]

---

**Laurence Girard** <laurence.girard@fruitstreet.com>                    Wed, Feb 12, 2020 at 2:03 PM
To: Alex Hadz <alex@svpfunding.com>

I am 99 percent sure we would proceed, but of course nothing is final until we sign the contract
[Quoted text hidden]
Laurence
CEO & Founder



Cell: 617-981-0920 |

---

**Alex Hadz** <alex@svpfunding.com>                    Wed, Feb 12, 2020 at 2:04 PM
To: Laurence Girard <laurence.girard@fruitstreet.com>

Understood Laurence. I am just trying to minimize any further back and forth because sometimes that can get in the way. Stand by one and I
will do my pitch and confirm what I have on my end.

Alex.

**Alex Hadz**
Funding Specialist | SVP Funding
Direct: 646-774-3030
Mobile: 973-262-5235
Fax: 347-246-4338
alex@svpfunding.com



SVP Funding is an approved vendor of Fundry products

**From:** Laurence Girard <laurence.girard@fruitstreet.com>
**Sent:** Wednesday, February 12, 2020 2:03 PM
[Quoted text hidden]

[Quoted text hidden]

Case 1:22-cv-00359-LAK   Document 1-8   Filed 01/14/22   Page 150 of 154

**Alex Hadz** <alex@svpfunding.com>                    Wed, Feb 12, 2020 at 2:19 PM
To: Laurence Girard <laurence.girard@fruitstreet.com>

Laurence, below is what we just discussed:

| | |
|---|---:|
| Approval | $109,000 |
| Payback | $149,330 |
| Weeks | 24.89 |
| Weekly ACH | $5,999 |
| | |
| Closing Cost | $4,360 |
| Professional Service Fee | $0 |
| Broker Fee | $0 |
| **Balance as of Today** | **$3,585.00** |
| | |
| **Net** | **$101,055.00** |

Just to reiterate:

- We are almost 10 points lower on the cost factor (in comparison to last time)
- We have DOUBLED your term length (6 months)
- We have quadrupled the approval
- We now have a weekly debit payback option

If this does not sell it, I will be unofficially stripped of my sales rep position and placed on janitorial duties for the remainder of the month.

Let me know please. Given the position this is and given that this would only be our second time we are doing business, I think it is more than fair. As always Laurence, I promise to continue to do my best and outperform any previous deal we might have had.

Ready when you are.

Alex.

**Alex Hadz**
Funding Specialist | SVP Funding
Direct: 646-774-3030
Mobile: 973-262-5235
Fax: 347-246-4338
alex@svpfunding.com



SVP Funding is an approved vendor of Fundry products

**From:** Laurence Girard <laurence.girard@fruitstreet.com>
**Sent:** Wednesday, February 12, 2020 2:03 PM
[Quoted text hidden]

[Quoted text hidden]

**Laurence Girard** <laurence.girard@fruitstreet.com>
To: Alex Hadz <alex@svpfunding.com>

Wed, Feb 12, 2020 at 2:22 PM

Alex,

We are getting very close and I certainly don't want you to be demoted to Janitor. I don't understand why there is a $4,360 closing cost for a repeat customer. Can we please shave $2K off this?

Thanks,
Laurence

[Quoted text hidden]

Laurence
CEO & Founder



Cell: 617-981-0920 |

---

**Alex Hadz** <alex@svpfunding.com>
To: Laurence Girard <laurence.girard@fruitstreet.com>

Wed, Feb 12, 2020 at 2:33 PM

Laurence, nothing I can do on this. In the interest of full disclosure, I would be more than happy to disclose to you how that works. 3% is company mandatory for utilizing the funding platform we work on. In other words, our own company collects a fee for allowing us (in this case your Underwriter) to have access to unlimited funds. In other words, the cost of doing business with the bank, since each underwriter is an independent contractor.

1% is how I make my living Laurence. In short, 4% is the minimum. If you look at the Contract, we are allow to charge up to 10%, which ofcourse is not the case here. The same thing happened last time Laurence, you paid a 4% total closing cost. I cant go lower than our min. To allocate funds and send funds, it unfortunately costs money.

Alex.

**Alex Hadz**
Funding Specialist | SVP Funding
Direct: 646-774-3030
Mobile: 973-262-5235
Fax: 347-246-4338
alex@svpfunding.com



SVP Funding is an approved vendor of Fundry products

**From:** Laurence Girard <laurence.girard@fruitstreet.com>
**Sent:** Wednesday, February 12, 2020 2:22 PM

[Quoted text hidden]

[Quoted text hidden]

---

**Laurence Girard** <laurence.girard@fruitstreet.com>
To: Alex Hadz <alex@svpfunding.com>

Wed, Feb 12, 2020 at 2:35 PM

That's fine

Quick questions
1 - remind me what is our daily currently under current contract?
2 - if we pay off our other balances first do you think the cost would be lower at all or only amount you offer can increase?
3 - what's the max you can offer if we pay off our other balances first?

[Quoted text hidden]
--
Laurence

Case 1:22-cv-00359-LAK   Document 1-8   Filed 01/14/22   Page 152 of 154

12/8/21, 1:33 AM
CEO & Founder



Cell: 617-981-0920 |

---

**Alex Hadz** <alex@svpfunding.com>                                    Wed, Feb 12, 2020 at 2:51 PM
To: Laurence Girard <laurence.girard@fruitstreet.com>

Sure thing;

1 - <span style="color:red">Remind me what is our daily currently under current contract?</span>

- *Current debits are at $598 from our last $25,000 approval we did.*

2 - <span style="color:red">If we pay off our other balances first do you think the cost would be lower at all or only amount you offer can increase?</span>

- *Cost (payback) would not change since we are as low as we go, only potentially the approval amount.*

3 - <span style="color:red">What's the max you can offer if we pay off our other balances first?</span>

- *In my humble opinion, minimal increase Laurence. I think you would be better off holding on the monies and balances you have and proceeding with this, as this allows you to have more cash flow. As ludacris as this may sound, you paying other positions increases my bosses comfort level. Eliminating other positions would get us a slightly higher approval, but I do not think it would outweigh the monies you sent out to get you to that point. So I think you would minimize your debt, which is always a great thing, but I think you would have less cash flow at the end, even if our approval is increased.*
  - *Also, all of these advances are fixed paybacks, so in essence you are not really saving money per se by paying off prematurely.*
- *If the objective is to have more funds available to you in the grand scheme of things, I do not think that paying off other positions will get us there.*
- *I can promise however that we will continue to trend in the right direction in the future. Do not forget we only have one deal under our belt Laurence. This usually always favors the client whenever we are doing renewal business when it comes to cost factor and approvals. I think we have demonstrated that today when you compare the two advance side by side.*

Also Laurence, I know we are doing this renewal a lot later than usual. By that, I mean that usually renewals we do at 50% paid in. In other words, given how this offer is structured, we can get you additional funds in only 3 months from today, should there be a need ofcourse. Just be mindful of that option should you wish to explore.

Alex.

**Alex Hadz**
Funding Specialist | SVP Funding
Direct: 646-774-3030
Mobile: 973-262-5235
Fax: 347-246-4338
alex@svpfunding.com



SVP Funding is an approved vendor of Fundry products

**From:** Laurence Girard <laurence.girard@fruitstreet.com>
**Sent:** Wednesday, February 12, 2020 2:35 PM

[Quoted text hidden]

[Quoted text hidden]

# EXHIBIT 5

**Alex Hadz** <alex@svpfunding.com>
to Laurence ▾

Tue, Feb 11, 2020, 2:34 PM   ☆   ↩   ⋮

I do appreciate the feedback Laurence, with that said, I would like to point out a few things:

- The factor below is 6 points lower than what you took last time around
- We have quadrupled your approval in comparison to last time
- We have stretched the term by an additional 2 months almost
  - If I have to go to 100 days, I will, but that is the max
- The same goes for net amount
  - If I have to increase to adjust to 100K net, I will
- Last months rev, while yes there was 794K in deposits, there were also 722K in withdrawals
- The rolling active balance is what allows us to get this approval
- Please do not forget the other positions in your account as well
  - Forward
  - Flash Funding
  - Kapitus
  - Fox Business
  - VCG

So when you say "free money" that isn't exactly the case Laurence, as we have a huge risk factor here and have to worry about a handful other MCA companies, god forbid this were to ever go bad. The deeper the position, the larger the risk factor. As far as the expense, I have already addressed that and lowered the factor rate for you. I will make one last attempt at this. Ofcourse I want you to take the best deal possible, with that said however, I have my limitations and this is the best and final:



If not, I appreciate the feedback.

Best,
Alex.

**Alex Hadz**
Funding Specialist | SVP Funding
Direct: 646-774-3030
Mobile: 973-262-5235
Fax: 347-246-4338
alex@svpfunding.com

